**No. 23-598**
_____

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
———

**UNITED STATES OF AMERICA,**

Plaintiff-Appellee,

v.

**ORLANDO ROJO,**

Defendant-Appellant.

———

Appeal from the
United States District Court
for the Southern District of California
Honorable Gonzalo P. Curiel, Presiding,
No. 21-CR-682-GPC

———

**APPELLANT'S OPENING BRIEF**
_____

KATIE HURRELBRINK
DANIEL J. YADRON, JR.
FEDERAL DEFENDERS OF SAN DIEGO, INC.
225 Broadway, Suite 900
San Diego, CA 92101
(619) 234-8467
Katie_Hurrelbrink@fd.org

Attorneys for Mr. Rojo

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................iv

INTRODUCTION....................................................................... 1

STATEMENT OF JURISDICTION ................................................ 3

BAIL STATUS ............................................................................ 3

RELEVANT LEGAL PROVISIONS ................................................ 4

ISSUE PRESENTED .................................................................... 4

STATEMENT OF THE CASE......................................................... 4

SUMMARY OF THE ARGUMENT ................................................. 6

STANDARD OF REVIEW............................................................ 10

ARGUMENT............................................................................. 10

   I.  *Bruen* held that "only" Second Amendment text and
history can validate a firearms regulation.............................. 10

  II.  The Second Amendment's plain text guarantees Mr.
Rojo's right to keep and bear arms......................................... 13

     A.  Under *Heller*, the Second Amendment right
belongs to all members of the national
community, including Mr. Rojo. ................................. 14

     B.  *Heller*'s and *Bruen*'s "law-abiding" language does
not resolve questions about law-breakers, but
leaves them open for future evaluation...................... 17

 III.  The government did not and cannot show that § 922(g)(1)
falls within a "historical tradition of firearm regulation.".......22

     A.  *Bruen* provides the analytical framework for how
courts should evaluate the government's
evidence. ................................................................. 23

        1.  The government must produce enacted
regulations, which prove a well-established
tradition present at the Founding..................... 23

i

2.    Statutes addressing persistent societal problems are subject to more rigorous scrutiny than statutes addressing historically "unprecedented" challenges............ 25

B.    The government cannot show that forever disarming anyone with any felony conviction is consistent with the Nation's historical tradition. ....... 28

1.    Forever depriving all people with felony convictions of their right to bear arms does not comport with English history. ..................... 29

    a.    Militia Act of 1662 ..................................... 30

    b.    English Bill of Rights.............................. 31

    c.    Laws disarming Catholics ....................... 33

    d.    Game laws................................................. 34

2.    Forever depriving all people with felony convictions of their right to bear arms does not comport with colonial and founding-era history. ............................................................... 35

    a.    Founding-era statutes and regulations.....36

        i.    Laws affecting enslaved people, Native Americans, and Catholics.....37

        ii.    Laws disarming Loyalists, seditionists, and rebels .................... 39

        iii.    Laws requiring felons to bear arms in the militia......................................... 42

    b.    Proposals from state constitutional conventions................................................ 44

    c.    Felon execution ......................................... 48

3.    Forever depriving all people with felony convictions of their right to bear arms does not comport with later 19th-century history......50

4.    Evidence from the 20th century is
irrelevant..............................................................52

C.    The government cannot distill, from a hodge-
podge of dissimilar regulations, the power to
disarm anyone deemed a "danger" or a threat to
an "orderly society." ..................................................53

IV.  Because there is no history and tradition of disarming all
felons, the statute must fall, or it at least cannot be
applied to Mr. Rojo.......................................................60

V.  *Bruen*'s mode of analysis is clearly irreconcilable with
*Vongxay*......................................................................62

CONCLUSION .............................................................69

iii

# TABLE OF AUTHORITIES

**Cases**             **Page(s)**

*Atkinson v. Garland,*
  70 F.4th 1018 (7th Cir. 2023) .............................................. 68

*Brown v. Davenport,*
  142 S.Ct. 1510 (2022) ............................................................ 19

*Campiti v. Garland,*
  No. 3:22-CV-177 (AWT), 2023 WL 143173
  (D. Conn. Jan. 10, 2023) ...................................................... 17

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ....................................................... *passim*

*Firearms Pol'y Coal., Inc. v. McCraw,*
  623 F. Supp. 3d 740 (N.D. Tex. 2022) ................................. 42

*Folajtar v. Att'y Gen. of the United States,*
  980 F.3d 897 (3d Cir. 2020) (Bibas, J., dissenting) .............. 58

*Frein v. Pennsylvania State Police,*
  47 F.4th 247 (3d Cir. 2022) ............................................ 30, 31

*Jennings v. State,*
  5 Tex. Ct. App. 298 (1878) .................................................... 51

*Kanter v. Barr,*
  919 F.3d 437 (7th Cir. 2019) (Barrett, J., dissenting) ........ *passim*

*Mai v. United States,*
  952 F.3d 1106 (9th Cir. 2020) .............................................. 65

*McDonald v. City of Chicago,*
  561 U.S. 742 (2010) ......................................................... 1, 32

iv

*Miller v. Gammie*,
  335 F.3d 889 (9th Cir. 2003) (en banc)..................................63

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185 (5th Cir. 2012), *abrogated by Bruen*,
  142 S. Ct. 2111 ..................................36

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  142 S. Ct. 2111 (2022)..................................*passim*

*Range v. Att'y Gen.*,
  69 F.4th 96 (3d Cir. 2023) (en banc)..................................*passim*

*Range v. Att'y Gen.*,
  53 F.4th 262 (3d Cir. 2022), *reh'g en banc granted, opinion vacated*,
  69 F.4th 96 (3d Cir. 2023)..................................54

*Stimmel v. Sessions*,
  879 F.3d 198 (6th Cir. 2018)..................................20

*United States v. Alaniz*,
  69 F.4th 1124 (9th Cir. 2023) ..................................*passim*

*United States v. Barber*,
  No. 4:20-CR-384-SDJ, 2023 WL 1073667
  (E.D. Tex. Jan. 27, 2023) ..................................17

*United States v. Bullock*,
  ___ F. Supp. 3d ___, 2023 WL 4232309
  (S.D. Miss. June 28, 2023)..................................3, 17

*United States v. Carpio-Leon*,
  701 F.3d 974 (4th Cir. 2012)..................................38

*United States v. Carrero*,
  No. 2:22-CR-00030, 2022 WL 9348792
  (D. Utah Oct. 14, 2022) ..................................18

v

*United States v. Chovan,*
735 F.3d 1127 (9th Cir. 2013*)* (Bea, J., concurring)............................22

*United States v. Coombes,*
No. 22-CR-00189-GKF, 2022 WL 4367056
(N.D. Okla. Sept. 21, 2022)................................................................18

*United States v. Goins,*
No. 22-CR-00091GFVTMAS1, 2022 WL 17836677
(E.D. Ky. Dec. 21, 2022)....................................................................17

*United States v. Gray,*
No. 22-CR-00247-CNS, 2022 WL 16855696
(D. Colo. Nov. 10, 2022) ....................................................................18

*United States v. Harrison,*
No. CR-22-00328-PRW, 2023 WL 1771138
(W.D. Okla. Feb. 3, 2023) .................................................. 33, 37, 38, 59

*United States v. Hester,*
No. 1:22-cr-20333-RNS, ECF No. 39
(S.D. Fla. Jan. 27, 2023) ....................................................................17

*United States v. Jackson,*
69 F.4th 495 (8th Cir. 2023) ........................................................ *passim*

*United States v. Jimenez-Shilon,*
34 F.4th 1042 (11th Cir. 2022) ....................................................... 16, 38

*United States v. Lowry,*
No. 1:22-CR-10031-CBK, 2023 WL 3587309
(D.S.D. May 5, 2023)..........................................................................17

*United States v. Martin,*
No. 2:21-CR-00068, 2023 WL 1767161
(D. Vt. Feb. 3, 2023)...........................................................................17

vi

*United States v. Meza-Rodriguez*,
   798 F.3d 664 (7th Cir. 2015) ............................................................ 16

*United States v. Phillips*,
   827 F.3d 1171 (9th Cir. 2016) .......................................................... 64

*United States v. Pierre*,
   No. 1:22-cr-20321-JEM, ECF No. 53
   (S.D. Fla. Nov. 28, 2022) ................................................................. 18

*United States v. Price*,
   No. 2:22-CR-00097, 2022 WL 6968457
   (S.D.W. Va. Oct. 12, 2022) ............................................................... 18

*United States v. Rahimi*,
   61 F.4th 443 (5th Cir. 2023), *cert. granted*, No. 22-915,
   2023 WL 4278450 (U.S. June 30, 2023) ...................................... *passim*

*United States v. Skoien*,
   614 F.3d 638 (7th Cir. 2010) ...................................................... 21, 45

*United States v. Torres*,
   911 F.3d 1253 (9th Cir. 2019) .......................................................... 65

*United States v. Verdugo–Urquidez*,
   494 U.S. 259 (1990) ......................................................................... 15

*United States v. Vongxay*,
   594 F.3d 1111 (9th Cir. 2010) .................................................... *passim*

*United States v. Ware*,
   No. 22-CV-30096-SPM, 2023 WL 3568606
   (S.D. Ill. May 19, 2023) .................................................................... 17

*United States v. Williams*,
   No. 1:21-cr-362-LMM, 2022 WL 18285005
   (N.D. Ga. Nov. 14, 2022) .................................................................. 18

vii

*United States v. Younger,*
  398 F.3d 1179 (9th Cir. 2005)................................................................64

*Young v. Hawaii,*
  992 F.3d 765 (9th Cir. 2021), *cert. granted, judgment vacated,*
  142 S. Ct. 2895 (2022)..........................................................................65

## Statutes                                                              Page(s)

18 U.S.C. § 922(g)(1)........................................................................ *passim*

18 U.S.C. § 922(g)(8)................................................................................60

18 U.S.C. § 1464 ......................................................................................59

18 U.S.C. § 3231 ........................................................................................3

28 U.S.C. § 1291 ........................................................................................3

28 U.S.C. § 1294 ........................................................................................3

28 U.S.C. § 41 ............................................................................................3

28 U.S.C. § 84(d) ......................................................................................3

18 Pa. Cons. Stat. § 3929.1....................................................................59

62 Pa. Stat. Ann. § 481............................................................................61

An Act for the better secur[]ing the Government by disarming Papists
  and reputed Papists. 1 W. & M. ch. 15 (1689) ....................................33

Act of May 8, 1792, § 1, 1 Stat. 271.........................................................43

Constitution and Laws of the State of New-Hampshire, Act of Dec. 28,
  1792, at 251-52, 256 (1805) ..................................................................43

Federal Firearms Act (FFA), ch. 850, § 2(e), 52 Stat. 1250 .................... 52

Herty, Digest of the Laws of Maryland, "Militia," Commonwealth of
Massachusetts, 1780-1805, ch. 14, at 381-82, 389-90 (1898) .............. 43

Laws of the State of Delaware, ch. XXXVI, §§ 1, 2, 4, at
1134-36 (1797) ...................................... 43

Marbury, Digest of the Laws of the State of Georgia, Act of December
24, 1792, §§ 9-10, at 350 (1802) ......................... 43

Mich. Comp. Laws § 445.574(a)(2)(d) ...................................... 59

Militia Act of 1662, 13 &14 Car. 2, c.3, § 13 (1662) ......................... 30, 31

Mitchell, Statutes at Large of Pennsylvania, Act of March 20, 1780,
§§ III, XXI, at 146, 154 (1700-1809) ...................................... 43

Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-
351, § 901(a)(1), (2), 82 Stat. 225, 225 .................................... 41

Public Statute Laws of the State of Connecticut, Title CXII, ch. I, §§ 1,
10, at 499-500, 505-06 (1808) ................................ 43

Thomas Greenleaf, Laws of the State of New-York, Act of April 4, 1786,
at 227-28, 232-33 (1792) ..................................... 43

## Other Authorities                                          Page(s)

Stephen P. Halbrook, *The Founder's Second Amendment* (2008) .... 32, 35

1 Jonathan Elliott, *The Debates in the Several State Conventions of the
Federal Constitution* 328 (2d ed. 1836) ......................... 44, 46

1 Samuel Johnson, A Dictionary of the English Language
(5th ed. 1773) ....................................... 47

ix

1 William Blackstone, *Commentaries* (St. George Tucker ed., 1803)..........................................................................33, 34

12 James Madison, *The Papers of James Madison* (F. Hobson et al. eds., 1979)....................................................................32, 36

2 Bernard Schwartz, *The Bill of Rights: A Documentary History* (1971) ................................................................44, 45

2 William Blackstone, *Commentaries*..............................................34, 35

Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551 (2009)..........28

C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Policy 695 (2009) .......................................*passim*

Carlton F.W. Larson, *Four Exceptions in Search of A Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371 (2009) ...............................................................28, 45

Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143 (1986) .......................................64, 67

English BIll of Rights, 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441 ....................................................................33

Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191 (2006) ...........................................47

Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L.Rev. 461 (1995)................................................65, 67

John D. Bessler, *Cruel & Unusual: The American Death Penalty and the Founders' Eighth Amendment* (2012)..................................49

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249 (2020) .......................................................................... *passim*

Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* (1994).............................................................. 32, 33, 38

Nancy J. King, *The Origins of Felony Jury Sentencing in the United States*, 78 Chi.-Kent L. Rev. 937 (2003) ............................................... 50

Robert E. Shalhope, *The Armed Citizen in the Early Republic*, 49 Law & Contemp. Probs. 125 (1986) ................................................................ 47

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139 (2007) ............................. *passim*

Sec'y of the Commonwealth, *Acts and Resolves of Massachusetts 1786–87*, at 178 (1893) .................................................................. 41

Stephen P. Halbrook, *Freedmen, The Fourteenth Amendment and the Right to Bear Arms, 1866–1876* (1998) ................................................ 51

*Whether the Second Amendment Secures an Individual Right*, 28 Op. O.L.C. 126 (2004) ......................................................................... 34, 51

Will Tress, *Unintended Collateral Consequences: Defining Felony in the Early American Republic*, 57 Clev. St. L. Rev. 461 (2009) ................. 49

William Bradford, *An Enquiry How Far the Punishment of Death is Necessary in Pennsylvania* (1793) ..................................................... 50

William Rawle, *A View of the Constitution of the United States of America* (1825) ...................................................................................... 32

## Rules                                            Page(s)

Fed. R. App. P. 4...................................................................3

## Constitutional Provisions               Page(s)

U.S. Const. amend. II.................................................*passim*

## INTRODUCTION

"[T]he right to keep and bear arms" enshrined in the Second Amendment is "among those fundamental rights necessary to our system of ordered liberty." *McDonald v. City of Chicago*, 561 U.S. 742, 778 (2010). But for the last decade, legislatures' efforts to abridge that right went largely unchecked. *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2131 (2022). Faced with Second Amendment challenges to gun laws, courts sometimes employed interest-balancing tests. *Id*. In practice, this balancing usually ended in "defer[ence] to the determinations of legislatures." *Id*. Other times, courts upheld laws with no constitutional scrutiny at all, deeming them "presumptively"—and irrefutably—"lawful." *United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010) (quoting *District of Columbia v. Heller*, 554 U.S. 570 (2008)). That included 18 U.S.C. § 922(g)(1)'s lifetime ban on gun possession for anyone convicted of any felony. *Id*.

This regime ended with the Supreme Court's watershed opinion in *Bruen*. No more may courts uphold laws with a "judge-empowering interest-balancing inquiry." *Bruen*, 142 S. Ct. at 2129 (simplified). Means-ends scrutiny has no place in Second Amendment analysis. Nor may courts "defer[] to legislative interest-balancing." *Id*. at 2131. Like any other right, the Second Amendment restricts legislatures' authority; legislatures do not define the right's scope.

1

Instead, *Bruen* held unequivocally that there is "only" one way to validate a gun regulation: by showing that it accords with the Second Amendment's text and history. *Id.* at 2126, 2130, 2135. Per the text, "the people" presumptively have the right to bear arms. *Id.* at 2126. To rebut the presumption, the government must prove that the challenged law accords with our "historical tradition of firearm regulation." *Id.*

Orlando Rojo is among "the people" with a right to bear arms. Yet under § 922(g)(1), he was prohibited for life from ever possessing a gun—and prosecuted when one was discovered in his car. As the district court recognized, however, his was not "the traditional kind of felon-in-possession offense." ER-11. Mr. Rojo's prosecution was predicated on a single conviction from 2010. That conviction was for possessing marijuana with intent to distribute. Mr. Rojo received a six-month sentence. He then completed two years of supervised release without incident. His arrest under § 922(g)(1) arose about 10 years later.

Our Nation's regulatory traditions do not permit the government to imprison someone for possessing a firearm, based solely on a 10-year-old nonviolent marijuana offense. As the en banc Third Circuit recently concluded, the historical record does not support a general government power to disarm anyone and everyone whom § 922(g)(1) affects. *See*

2

*Range v. Att'y Gen.*, 69 F.4th 96, 106 (3d Cir. 2023) (en banc); *accord United States v. Bullock*, ___ F. Supp. 3d ___, 2023 WL 4232309 (S.D. Miss. June 28, 2023) (granting motion to dismiss). This sweeping and unprecedented law is therefore unconstitutional. At a minimum, however, the government cannot show that history supports applying the "*particular* . . . punishment" embodied in § 922(g)(1) to "[Mr. Rojo] and his individual circumstances." *Id.* at 105 (emphasis original). Either way, Mr. Rojo's conviction is unconstitutional. This Court must reverse.

## STATEMENT OF JURISDICTION

The district court had original jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction from a final order entered in the Southern District of California. *See* 28 U.S.C. §§ 41, 84(d) 1291, 1294(1). Mr. Rojo filed a timely notice of appeal on April 5, 2023. ER-78; Fed. R. App. P. 4(b)(1).[1]

## BAIL STATUS

Mr. Rojo is in prison. His projected release date is August 21, 2023. *See* Bureau of Prisons, *Inmate Locator*, https://www.bop.gov/ inmateloc/.

---

[1] In this brief, "ER" stands for "Excerpts of Record" and "Doc." stands for "district court docket number."

3

### RELEVANT LEGAL PROVISIONS

The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

### ISSUE PRESENTED

In 2010, Mr. Rojo sustained a conviction for possessing marijuana with intent to distribute. Under 18 U.S.C. § 922(g)(1), that conviction barred him—on pain of imprisonment—from possessing a firearm for the rest of his life. Has the government met its burden to show that this regulation accords with the Second Amendment's text and history?

### STATEMENT OF THE CASE

On November 21, 2020, Customs and Border Patrol agents stopped Orlando Rojo as he was leaving the United States for Mexico. PSR-4. They searched his car and found a handgun, along with $50,000 in cash, in the car's rocker panel. PSR-4.

Record checks showed that Mr. Rojo had one prior conviction. PSR-10. Ten years earlier, in 2010, he had agreed to act as a drug courier transporting marijuana to Los Angeles. PSR-10. He was caught at a Southern California checkpoint. PSR-10. He pled guilty to possessing marijuana with the intent to distribute it. PSR-10. He then

4

served a six-month sentence and completed two years of supervised release without any violations. PSR-10. Based on this 10-year-old marijuana conviction, the government charged Mr. Rojo with being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1). ER-76.

While Mr. Rojo's case was pending, the Supreme Court issued the *Bruen* decision. Mr. Rojo soon filed a motion to dismiss his indictment on the ground that the Second Amendment, as interpreted in *Bruen*, barred his prosecution under § 922(g)(1). ER-51–75.

The government opposed the motion. ER-33. The government noted that this Court had upheld § 922(g)(1) against a Second Amendment challenge in *United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010). Per the government, this pre-*Bruen* precedent foreclosed Mr. Rojo's Second Amendment claim. ER-40–43. In the alternative, the government contended that the Second Amendment allows legislatures to impose lifetime disarmament on anyone with any felony conviction. ER-44–52. In support, the government pointed to the common law practice of executing felons; revolutionary-era laws disarming persons who would not swear loyalty to the state; several rejected proposals from state constitutional conventions; and some scholars' theories that only "virtuous" persons have Second Amendment rights. ER-44–51. The

government did not identify any pre-20th century laws predicating disarmament on felony conviction.

The district court denied Mr. Rojo's motion, concluding that *Vongxay* survived *Bruen*. ER-30–31. The court did not reach the government's historical arguments. ER-30–31. Mr. Rojo signed a conditional plea agreement allowing him to appeal the district court's decision. Doc. 60.

At Mr. Rojo's subsequent sentencing, the court remarked that this case was not "the traditional kind of felon-in-possession offense, where we have people who may have been associated with gangs or involved with violence." ER-11. "[T]he concern there, obviously, is that a firearm is going to be directed at someone in the community," the court said. ER-11. But in Mr. Rojo's case, the prior was "somewhat dated." ER-11. "[I]t involved marijuana." ER-11. And "it produced a six-month sentence." ER-11. Given the mitigated nature of the offense, the Court imposed a below-guidelines sentence of 30 months. ER-11.

This appeal follows.

## SUMMARY OF THE ARGUMENT

Under *Bruen*'s new "text-and-history standard," § 922(g)(1) is unconstitutional, at least as applied to Mr. Rojo. 142 S. Ct. at 2138.

*Bruen* instructs that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," and the government may rebut the presumption of unconstitutionality only by showing that "the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126.

The Second Amendment's plain text protects Mr. Rojo's right to bear arms, as he is among "the people" to whom the Amendment applies. *Heller* holds that "the people" includes everyone who is "part of [the] national community"; that the right to bear arms "belongs to *all* Americans"; and that "the people" means the same thing in the Second Amendment as it does in the First and Fourth Amendments. 554 U.S. at 578–80. *Heller* did not silently overrule its own interpretation of "the people" by referring to "law-abiding, responsible citizens." *Id.* at 634–35. That language in *Heller* and *Bruen* serves to focus narrowly on the questions presented in those cases, while "leaving to future evaluation" the full scope of the Second Amendment. *Id.* at 635. Any other conclusion would place a hopelessly vague, unworkable, and atextual limit on the right to bear arms.

7

Second, the government did not and cannot rebut the presumption that Mr. Rojo's prosecution is unconstitutional. Felon-disarmament laws did not appear until the 20th century, well after the period *Bruen* deems relevant. Not only are there no distinctly similar regulations in the founding era—militia statutes affirmatively required all able-bodied men to maintain arms, without excepting felons.

The government's typical historical comparators do not fill in the gaps. Some cited laws applied to persons who did not have a right to bear arms in the first place. These laws say nothing about the right's scope. Other historical evidence takes the form of rejected proposals at state constitutional conventions or scholarly theories derived from classical republican philosophy. These are not "regulations," i.e., enacted laws, so they do not establish the "historical tradition of firearm regulation" that *Bruen* demands. *Id.* at 2125, 2130, 2135. Still others addressed the potential for violent rebellion against the state—and even then, often provided a way for the offender to regain their arms. These laws are not "distinctly similar" to § 922(g)(1) or comparable in "how" or "why" they restrict arms bearing. *Id.* at 2131–32. For these reasons and many more, the government has not identified a particularized tradition of comparable regulations.

8

The government cannot remedy this deficiency by offering a hodge-podge of regulations dissimilar to § 922(g)(1); characterizing them at a sky-high level of generality (e.g., that they disarm the "dangerous" or "unvirtuous"); and claiming vast, unchecked power to pass any law arguably fitting that general description. New York tried that tactic in *Bruen*, claiming a generalized authority to regulate public carry. But the Supreme Court declined to infer that broad regulatory power from New York's narrow historical comparators. The same logic applies here.

Finally, *Bruen* overrules this Court's previous cases upholding § 922(g)(1). *Heller* referred to felon-in-possession laws as "presumptively lawful." 554 U.S. at 626. *Vongxay* upheld § 922(g)(1) based on that language, without performing any textual analysis or citing a single historical regulation. But *Bruen* held that the "only" way to validate a gun law is through text and history. 142 S. Ct. at 2126, 2130, 2135. *Bruen* also applied the text-and-history test to items on the "presumptively lawful" list, showing that these laws are not exempt. Thus, *Vongxay* misinterpreted *Heller*, and consequently, it did not employ the text-and-history test *Bruen* demands. It is therefore clearly irreconcilable with *Bruen*'s mode of analysis.

9

For all these reasons, this Court should reverse and remand with instructions to dismiss.

## STANDARD OF REVIEW

This Court applies de novo review both to the "constitutionality of a statute" and to a "district court's denial of a motion to dismiss." *Vongxay*, 594 F.3d at 1114.

## ARGUMENT

## I. *Bruen* held that "only" Second Amendment text and history can validate a firearms regulation.

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *Heller*, the Supreme Court held that this Amendment confers an individual right to gun ownership. 554 U.S. at 595. It then assessed the handgun ban challenged in that case, employing a "methodology centered on constitutional text and history." *Bruen*, 142 S.Ct. at 2128–29. Because the Amendment's plain text covered the right of all members of our "national community" to "keep and bear" arms, and its history revealed no tradition comparable to D.C.'s ban, the regulation was unconstitutional. *Heller*, 554 U.S. at 579–636.

10

Though *Heller*'s analysis was grounded solely in text and history, the courts of appeals added to that test. This Court, like other courts of appeals, employed a two-step framework. *United States v. Alaniz*, 69 F.4th 1124, 1127 (9th Cir. 2023). The Court first asked whether the regulation accorded with text and history. *Bruen*, 142 S. Ct. at 2126. But even if not, the Court gave the government a second chance to validate the regulation by satisfying strict or intermediate scrutiny. *Id.* Few regulations failed this "two-step" inquiry, as the second step usually ended with "judicial deference to legislative interest balancing." *Id.* at 2131.

That changed with the Supreme Court's watershed opinion in *Bruen*. At issue in *Bruen* was New York's "proper cause" requirement. *Id.* at 2122–23. That law conditioned concealed carry licenses on demonstrating "a special need for self-protection distinguishable from that of the general community." *Id.* New Yorkers with ordinary self-defense needs did not qualify. *Id.* at 2156. The Supreme Court struck down the law, and in the process, it disavowed the two-step approach. "*Heller* does not support applying means-end scrutiny" to Second Amendment claims, the Court explained. *Id.* at 2127. "Instead, the government must affirmatively prove that its firearms regulation is

11

part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.*

The Court then described in detail the "text-and-history standard" applicable to all future Second Amendment challenges. *Id.* at 2138. The analysis begins by asking whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2126. If it does, then "the Constitution presumptively protects that conduct." *Id.* To rebut the presumption, "the government may not simply posit that [a] regulation promotes an important interest." *Id.* at 2126. "Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*

As *Bruen* made clear, this text-and-history method is now the exclusive means of Second Amendment analysis: "*Only* if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* (emphasis added).

Employing this methodology here, Mr. Rojo's conviction under § 922(g)(1) violates the Second Amendment.

12

## II. The Second Amendment's plain text guarantees Mr. Rojo's right to keep and bear arms.

The *Bruen* analysis starts by asking whether "the Second Amendment's plain text covers an individual's conduct." *Id*. at 2126. The operative clause's plain text, in turn, has three elements. It protects the right of (1) "the people" to (2) "keep and bear" (3) "Arms." U.S. Const. amend. II; *see also Alaniz*, 69 F.4th at 1128.

Possessing a handgun in public, as Mr. Rojo did, qualifies as "bear[ing]" "arms." *Heller* defines "bear" to mean to "wear, bear, or carry upon the person or in the clothing or in a pocket, for the purpose of being armed and ready for offensive or defensive action in a case of conflict with another person." 554 U.S. at 584 (simplified). "This definition of 'bear' naturally encompasses public carry." *Bruen*, 142 S. Ct. at 2134. The word "arms" covers all "weapons 'in common use' today for self-defense." *Id*. (quoting *Heller*, 554 U.S. at 627). That includes handguns. *Id*.

Mr. Rojo is also among "the people" referenced in the Second Amendment. But the government has frequently pressed the opposite viewpoint, contending that the Second Amendment covers only "law-abiding, responsible citizens." *Heller*, 554 U.S. at 579; *see also Range*, 69

13

F.4th at 101 (describing government argument). That view cannot be reconciled with the detailed and binding textual analysis in *Heller*.

**A. Under *Heller*, the Second Amendment right belongs to all members of the national community, including Mr. Rojo.**

In *Heller*, the Supreme Court considered for the first time what kind of right the Second Amendment protects. Does it codify an "individual right to possess and carry weapons," or a collective right belonging only to "a well-regulated Militia"? *Heller*, 554 U.S. at 592, 610. The Amendment's command that "the right of the people" not be infringed was critical to the Court's decision.

*Heller* began with a "textual analysis" of the operative clause. *Id.* at 578, 579. The Court first noted that the phrase "the right of the people" also appears in the First and Fourth Amendments. *Id.* at 578, 579. Similarly, the Ninth Amendment provides that non-enumerated "rights" are "retained by the people." *Id.* "All three of these instances unambiguously refer to individual rights, not 'collective' rights[.]" *Id.* at 579–80. Three other usages arguably involved collective rights. *Id.* But critically, all six provisions "unambiguously refer to all members of the political community, not an unspecified subset." *Id.* at 580.

14

Furthermore, the Court had previously concluded in the Fourth Amendment context that "the people" is "a term of art employed in select parts of the Constitution." *Id*. (quoting *United States v. Verdugo–Urquidez*, 494 U.S. 259, 265 (1990)) (simplified). "'[Its uses] sugges[t] that 'the people' protected by the Fourth Amendment, and by the First and Second Amendments, . . . refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.'" *Id*. (quoting *Verdugo–Urquidez*, 494 U.S. at 265).

By contrast, "the 'militia' in colonial America consisted of a subset of 'the people'—those who were male, able bodied, and within a certain age range." *Id*. This tension confirmed that the prefatory clause did not limit the operative clause, but merely announced the right's purpose. *Id*. at 578–81, 598–600. The phrase "the people," then, created "a strong presumption that the Second Amendment right is exercised individually and belongs to *all* Americans," not just militiamen. *Id*. (emphasis added).

*Heller*'s discussion of "the people" was thus integral to its reasoning and holding. And *Heller* unambiguously held that "the people" in the Second Amendment, like "the people" in the First and the

15

Fourth Amendments, includes all members of the national community, "not an unspecified subset." 554 U.S. 580. Courts have so recognized. *See*, *e.g.*, *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1044–45 (11th Cir. 2022) (discussing *Heller*'s 'national community'-focused definition of 'the people'" and remarking that it "finds support in founding-era dictionaries"); *United States v. Meza-Rodriguez*, 798 F.3d 664, 670-71 (7th Cir. 2015) (holding that "the term 'the people' in the Second Amendment has the same meaning as it carries in other parts of the Bill of Rights" and therefore extends to all "persons who are part of a national community"); *Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting) ("[T]he Court interpreted the word 'people' as referring to 'all Americans.'").[2]

People with felony convictions are not "categorically excluded from our national community." *Kanter*, 919 F.3d at 453 (Barrett, J., dissenting). Thus, applying *Heller*'s national-community-focused definition here, Mr. Rojo "remains among 'the people' despite his

---

[2] This Court also adopted a national community-based definition in *Jones v. Bonta*, but the opinion was vacated and remanded in light of *Bruen*. 34 F.4th 704, 723 (9th Cir.), *opinion vacated on reh'g*, 47 F.4th 1124 (9th. Cir. 2022) ("[Y]oung adults have Second Amendment protections as 'persons who are a part of a national community[.]'").

16

[marijuana] conviction." *Range*, 69 F.4th at 103. Thus, he presumptively enjoys the right to keep and bear arms.

### B. *Heller*'s and *Bruen*'s "law-abiding" language does not resolve questions about law-breakers, but leaves them open for future evaluation.

Nevertheless, the government argued below that persons with felony convictions lack Second Amendment rights. ER-34. The government grounded that contention not in constitutional text or history, but in *Heller*'s and *Bruen*'s references to "law-abiding, responsible citizens." *Bruen*, 142 S. Ct. at 2131 (quoting *Heller*, 544 U.S. at 635).

This argument has been rightly rejected in many courts, including the en banc Third Circuit. *Range*, 69 F.4th at 103.[3] As these courts

---

[3] *See also, e.g.*, *Bullock*, 2023 WL 4232309, at *20; *United States v. Ware*, No. 22-CV-30096-SPM, 2023 WL 3568606, at *5 (S.D. Ill. May 19, 2023); *United States v. Lowry*, No. 1:22-CR-10031-CBK, 2023 WL 3587309, at *3 (D.S.D. May 5, 2023); *United States v. Martin*, No. 2:21-CR-00068, 2023 WL 1767161, at *2 (D. Vt. Feb. 3, 2023); *United States v. Barber*, No. 4:20-CR-384-SDJ, 2023 WL 1073667, at *6 (E.D. Tex. Jan. 27, 2023); *United States v. Hester*, No. 1:22-cr-20333-RNS, ECF No. 39 (S.D. Fla. Jan. 27, 2023); *Campiti v. Garland*, No. 3:22-CV-177 (AWT), 2023 WL 143173, *3 (D. Conn. Jan. 10, 2023); *United States v. Goins*, No. 522CR00091GFVTMAS1, 2022 WL 17836677, at *5 (E.D. Ky. Dec. 21, 2022); *United States v. Price*, No. 2:22-CR-00097, 2022 WL 6968457, at *7 (S.D.W. Va. Oct. 12, 2022); *United States v. Pierre*, No. 1:22-cr-20321-JEM, ECF No. 53 (S.D. Fla. Nov. 28, 2022); *United States v. Williams*,

17

recognize, the government's "law-abiding" theory misinterprets Supreme Court precedent. Taken in context, *Heller*'s and *Bruen*'s "law-abiding" qualifiers served only to focus narrowly on the particular challenges at issue in those cases, while "leav[ing] open to future evaluation" the Second Amendment's full scope. *Heller*, 554 U.S. at 635.

The phrase "law-abiding, responsible citizens" first arose in *Heller*. The *Heller* petitioner was a police officer who carried guns at work. *Id*. at 575. But under Washington, D.C.'s strict gun laws, even he was barred from keeping operational guns at home. *Id*. The Court held that that regulation violated the newly recognized individual right to gun ownership. *Id*. at 636.

Instead of fleshing out all the details of Second Amendment analysis, however, the Court proceeded cautiously. It warned that it was conducting the "first in-depth examination of the Second Amendment," and its opinion would not "clarify the entire field." *Id*. at 635. Thus, over the dissent's objection, the Court refused to locate the

---

No. 1:21-cr-362-LMM, 2022 WL 18285005, *2 (N.D. Ga. Nov. 14, 2022); *United States v. Gray*, No. 22-CR-00247-CNS, 2022 WL 16855696, at *2 (D. Colo. Nov. 10, 2022); *United States v. Coombes*, No. 22-CR-00189-GKF, 2022 WL 4367056, at *4 (N.D. Okla. Sept. 21, 2022); *United States v. Carrero*, No. 2:22-CR-00030, 2022 WL 9348792, at *2 (D. Utah Oct. 14, 2022).

Second Amendment in a tier of means-ends scrutiny or perform freewheeling interest balancing. *Id*. at 634–35. But even without settling those details, the Court expressed confidence that, at a minimum, disarming Mr. Heller in his own house must violate the Second Amendment: "*[W]hatever else it leaves to future evaluation*, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id*. (emphasis added).

Nothing in that qualified statement suggests that *Heller* meant to amend, sub silentio, its holding that "the people" are all members of the national community, and "not an unspecified subset." *Id*. at 580; *cf. Brown v. Davenport*, 142 S.Ct. 1510, 1528 (2022) ("We neither expect nor hope that our successors will comb [our opinions] for stray comments and stretch them beyond their context—all to justify an outcome inconsistent with this Court's reasoning and judgments."). Rather, the Court was mounting a case-specific defense of *Heller*'s analytical approach for invalidating the draconian D.C. regulations, which applied even to active-duty police officers. Accordingly, the Court did not purport to *limit* the Second Amendment to law-abiding citizens—it instead recognized that the Second Amendment protects

19

"law-abiding and peaceable citizens *at the very least.*" *Stimmel v. Sessions*, 879 F.3d 198, 204-05 (6th Cir. 2018) (emphasis added).

Indeed, if that sentence were intended to limit the Second Amendment's scope, then the Amendment would protect only the "use [of] arms in defense of hearth and home." *Heller*, 554 U.S. at 635. Yet *Bruen* wasted no time rejecting any such limit, reasoning that "[n]othing in the Second Amendment's text draws a home/public distinction." *Bruen*, 142 S. Ct. at 2134. The same can be said of the proposed "law-abiding, responsible citizens" limit: Nothing in the Second Amendment's text justifies drawing that line.

*Bruen* did not purport to place a "law-abiding" limit on the Second Amendment, either. In fact, the Court had no reason to address the scope of "the people," because it was undisputed that the petitioners— "two ordinary, law-abiding, adult citizens"—were "part of 'the people' whom the Second Amendment protects." *Bruen*, 142 S. Ct. at 2134. The only question in that case was whether "[t]he Second Amendment allow[ed] the government to prohibit" those "ordinary law-abiding citizens from carrying handguns outside the home for self-defense." Petition for Writ of Certiorari at 2, *Bruen*, 142 S. Ct. 2111 (No. 20-843). Throughout the opinion, the Court included limiting language to make

20

clear that it was answering *only* that question, and *only* with respect to persons like the petitioners. *E.g.*, *Bruen*, 142 S. Ct. at 2122, 2134, 2138, 2150. And it tailored its holding accordingly: New York's law was unconstitutional inasmuch as "it prevent[ed] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Id*. at 2156.

In short, both *Heller* and *Bruen* used "law-abiding" qualifiers to focus narrowly on the questions presented. And those questions did not implicate law-breakers—"the criminal histories of the plaintiffs in *Heller* . . . and *Bruen* were not at issue in those cases." *Range*, 69 F.4th at 101. The "law-abiding" language therefore does not "resolv[e] questions" about law-breakers' rights; it "t[ells] us that the matters have been left open." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010).

Finally, there is a practical reason not to adopt the government's "law-abiding, responsible citizens" standard: It is hopelessly vague and unworkable. *See Range*, 69 F.4th at 102. If all felonies prevent a person from being "law-abiding," "[w]hy not all misdemeanors? Why not minor infractions?" *United States v. Chovan*, 735 F.3d 1127, 1148 (9th Cir. 2013*)* (Bea, J., concurring). How about civil violations or arrests? For

21

that matter, is a person still non-law-abiding 50 years on, no matter how impeccable their conduct? And what about the term "responsible"? "In our Republic of over 330 million people, Americans have widely divergent ideas about what is required for one to be considered a 'responsible' citizen." *Range*, 69 F.4th at 102.

It is not plausible that the Supreme Court intended to adopt this amorphous limitation without saying so directly, without giving any justification, and without explaining what it means. This Court must reject the government's argument and hold that the plain text of the Second Amendment presumptively guarantees Mr. Rojo's right to keep and bear arms. *Bruen*, 142 S. Ct. at 2126.

## III. The government did not and cannot show that § 922(g)(1) falls within a "historical tradition of firearm regulation."

To rebut Mr. Rojo's presumptive right to bear arms, the government bears the burden to show that disarming him "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2135. The government did not and cannot meet that burden here.

22

### A. *Bruen* provides the analytical framework for how courts should evaluate the government's evidence.

At the outset, *Bruen* offers several key instructions for evaluating the government's historical evidence. To prevail, the government must prove a well-established tradition, present at the Founding, embodied in enacted regulations, and sharing the appropriate degree of similarity to the challenged law.

### 1. The government must produce enacted regulations, which prove a well-established tradition present at the Founding.

First, *Bruen* described *what kind* of evidence the government must produce: The government must point to enacted regulations, with the most persuasive evidence arising at or near the Founding.

As an initial matter, the historical tradition in question must be reflected in "regulations," that is, rules and prohibitions having the force of law. *Bruen*, 142 S. Ct. at 2133. Over and over, *Bruen* stressed that the government must locate the challenged law in an American tradition of firearm "regulation." *See, e.g., id.* at 2126 ("historical tradition of firearm regulation"); *id.* at 2130 ("historical tradition of firearm regulation"); *id.* at 2131-32 ("comparable tradition of regulation"); *id.* at 2135 ("historical tradition of firearm regulation"). In

23

line with this command, *Bruen*'s historical examination focused
exclusively on actual, enacted "regulations," i.e., positive law, laid out in
statute books or judicial decisions, that affirmatively prohibited
particular conduct. *Id*. at 2135–56. Only with such regulations can the
government meet its burden.

Not all historical regulations receive equal weight, however.
"Constitutional rights are enshrined with the scope they were
understood to have *when the people adopted them*." *Id.* at 2136
(emphasis original). Thus, courts must discern whether the challenged
law accords with "historical tradition" in 1791, when the Second
Amendment was ratified. *Id.* at 2136.

Evidence of a founding-era historical tradition can come from
"before" and "even after the founding" period, but courts should treat
such evidence with care. *Id.* at 2131–32. For example, courts should
avoid "rely[ing] on an ancient practice that had become obsolete in
England at the time of the adoption of the Constitution and never was
acted upon or accepted in the colonies." *Id.* at 2136 (simplified).
Conversely, courts must "guard against giving post-enactment history
more weight than it can rightly bear." *Id*. In particular, "post-Civil War"
evidence "do[es] not provide as much insight into its original meaning

24

as earlier sources," though it can be used to "confirm[]" earlier practice. *Id.* at 2137 (simplified).

The "comparable tradition of regulation" emerging from these sources must be "well-established and representative." *Id.* at 2131–33. A handful of "outlier[]" statutes or cases from a few "outlier jurisdictions" do not make out a historical tradition. *Id.* at 2153, 2156. The Court expressed "doubt," for instance, that statutes from only three of the original thirteen colonies would establish a relevant tradition of restricting firearms. *Id.* at 2142. And in evaluating 19th-century "surety laws," the Court discounted two "unusually broad" laws as unrepresentative. *Id.* at 2148 n.24. Only a robust history of regulation can overcome the Second Amendment's "unqualified command." *Id.* at 2126 (simplified).

### 2. Statutes addressing persistent societal problems are subject to more rigorous scrutiny than statutes addressing historically "unprecedented" challenges.

Second, *Bruen* addressed *how similar* the historical laws must be to the regulation under review. To prevail, the government "must produce representative analogues," though not a "historical *twin*." *Alaniz*, 69 F.4th at 1128 (quoting *Bruen*, 142 S. Ct. at 2133). But the

25

standard differs depending on what kind of problem a statute is intended to remedy—specifically, whether that problem is old or new.

In "some cases," where a challenged statute "addresses a general societal problem that has persisted since the 18th century," the historical "inquiry will be fairly straightforward." *Bruen*, 142 S. Ct. at 2131. Regulations challenging such "longstanding problems must be 'distinctly similar' to a historical analogue." *Range*, 69 F.4th at 103 (quoting *Bruen*, 142 S. Ct. at 2131); *see also Alaniz*, 69 F.4th at 1129 (discussing "distinctly similar" standard). If "the Founders themselves could have adopted" a particular regulation to "confront" a problem that existed in 1791, but did not do so, then that regulation is unconstitutional today. *Bruen*, 142 S. Ct. at 2131.

In contrast, "'cases implicating unprecedented societal concerns' . . . 'may require a more nuanced approach.'" *Alaniz*, 69 F.4th at 1130 (quoting *Bruen*, 142 S. Ct. at 2132). Specifically, "'modern regulations that were unimaginable at the founding' need only be 'relevantly similar' to historical laws." *Range*, 69 F.4th at 103 (quoting *Bruen*, 142 S. Ct. at 2132). Whether the analogue is "relevantly similar" is "judged by 'at least two metrics: how and why the regulations burden

26

a law-abiding citizen's right to armed self-defense.'" *Alaniz*, 69 F.4th at 1128 (quoting *Bruen*, 142 S. Ct. at 2132–33).

Notably, a problem is not unprecedented just because of changes in its severity or context. For example, the regulation in *Bruen* addressed the problem of "handgun violence," primarily in "urban areas." 142 S. Ct. at 2131 (simplified). The "degrees and types of risks" arising from that problem have evolved since the Founding as a result of, e.g., growing populations, urbanization, and technology. *Id.* at 2180 (Breyer, J., dissenting). Yet the Supreme Court subjected New York's regulation to the straightforward inquiry for persistent problems. *Id.* at 2131–32 (majority opinion). In contrast, "illegal drug trafficking is a largely modern crime," which has resulted in "unprecedented contemporary concerns regarding drug abuse." *Alaniz*, 69 F.4th at 1129. This Court therefore subjected a drug trafficking firearms enhancement to the more nuanced inquiry. *Id.* at 1130.

Here, the "general societal problem" at which § 922(g)(1) is directed—i.e., felons' access to guns—"has persisted since the 18th century." *Bruen*, 142 S. Ct. at 2131. As a result, disarming Mr. Rojo is unconstitutional unless the government shows a robust tradition of "distinctly similar" regulations as of 1791, when the Second

27

Amendment was ratified. *Id.*; *see also Range*, 69 F.4th at 103. But that distinction will not make the difference in this case. Neither standard justifies lifetime disarmament for all felons.

**B.**  **The government cannot show that forever disarming anyone with any felony conviction is consistent with the Nation's historical tradition.**

The government cannot meet its burden for a simple reason: neither the federal government nor a single state barred all people convicted of felonies from possessing guns until the twentieth century. *See Range*, 69 F.4th at 104; Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 260 (2020); Carlton F.W. Larson, *Four Exceptions in Search of A Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1375 (2009); C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Policy 695, 717 (2009); Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 155 (2007); Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009). To state it briefly: "History does not support the proposition that felons lose their

28

Second Amendment rights solely because of their status as felons."
*Kanter*, 919 F.3d at 464 (Barrett, J., dissenting).

Nor has the government identified a comparable tradition of
regulation. As laid out below, "(1) . . . early modern England; (2) the
American Colonies and the early Republic; (3) antebellum America;
[and] (4) Reconstruction," *Bruen*, 142 S. Ct. at 2135–36, all lack
evidence of a "distinctly similar" or even analogous tradition justifying
disarmament here.

### 1. Forever depriving all people with felony convictions of their right to bear arms does not comport with English history.

Pre-colonial English history lacks any tradition of lifetime
disarmament of all felons or of persons like Mr. Rojo. Marshall, *supra*,
at 717; *Kanter*, 919 F.3d at 457 (Barrett, J., dissenting); Greenlee,
*supra*, at 260. Such a "distinctly similar historical regulation," *Bruen*,
142 S. Ct. at 2131, does not exist.

Nevertheless, the government has frequently pointed to certain
English practices to justify disarming anyone with a felony conviction.
But these regulations not only lack the requisite degree of similarity.
They also were not incorporated into American traditions. And under
*Bruen*, courts may not rely on a practice that "never was acted upon or

29

accepted in the colonies." *Bruen*, 142 S. Ct. at 2136 (simplified). Thus, these regulations do not help the government meet its burden.

### a. Militia Act of 1662

First, the government has frequently relied on the Militia Act of 1662, which allowed the Crown's officers to seek a warrant to "seize all arms in the custody or possession of any person or persons whom . . . [officers] shall judge dangerous to the Peace of the Kingdom." 13 &14 Car. 2, c.3, § 13 (1662); *see, e.g.*, *United States v. Jackson*, 69 F.4th 495, 502 (8th Cir. 2023). But far from *supporting* the government's asserted power, the Militia Act of 1662 refutes it.

Between 1660 and 1688, "the Stewart Kings Charles II and James II ramped up efforts to disarm their political opponents," *Bruen*, 142 S. Ct. at 2140, including through the Militia Act, *Frein v. Pennsylvania State Police*, 47 F.4th 247, 255 (3d Cir. 2022). These laws "caused Englishmen to be jealous of their arms." *Bruen*, 142 S. Ct. at 2140. As a result, the 1689 English Bill of Rights "qualified the Militia Act by guaranteeing '[t]hat the subjects which are Protestants may have arms for their defen[s]e suitable to their Conditions and as allowed by Law.'" *United States v. Rahimi*, 61 F.4th 443, 456 (5th Cir. 2023), *cert. granted*, No. 22-915, 2023 WL 4278450 (U.S. June 30, 2023)

30

(quoting 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441). Thus, far from existing harmoniously with the Second Amendment, the Militia Act embodied the very government overreach necessitating a right to bear arms. *Frein*, 47 F.4th at 255.

In any case, the Militia Act is not distinctly similar to § 922(g)(1), and "how and why the [Militia Act] burden[ed]" rights is not analogous. *Bruen*, 142 S. Ct. at 2133. The Act required a warrant and a finding that an individual was "dangerous to the Peace of the Kingdom." 13 & 14 Car. 2, c.3, § 13 (1662). There was no such individualized dangerousness finding here.

### b.    English Bill of Rights

The government has sometimes claimed that the English Bill of Rights itself supports status-based restrictions. That's because it codified only a qualified right to bear arms, and it reserved Parliament's power to prescribe "by Law" the terms of gun ownership. *E.g.*, *Jackson*, 69 F.4th at 502. This argument proves too much. The English Bill of Rights gave Parliament unlimited power to regulate guns—a power American legislatures manifestly do not have. *See, e.g.*, *Bruen*, 142 S. Ct. at 2156.

31

The mismatch makes sense, because while the English right "was initially limited—it was restricted to Protestants and held only against the Crown, but not Parliament— . . . [it] matured by the time of the founding[.]" *Bruen*, 142 S. Ct. at 2142 (simplified). "[W]hile American drafters adopted some English rights verbatim, the language of the two pronouncements on arms differs markedly and importantly." Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 136 (1994). "The American language is much broader." *Id.* at 137.

James Madison noted these differences. When introducing the Bill of Rights, he observed that England's right could be circumscribed by a "mere act of parliament." Stephen P. Halbrook, *The Founder's Second Amendment* 252 (2008) (quoting 12 James Madison, *The Papers of James Madison* 193 (F. Hobson et al. eds., 1979)). The Second Amendment gives American legislatures no such authority. *McDonald*, 561 U.S. at 791. Madison also observed that England limited "arms to protest[an]ts," while the Second Amendment did not. Halbrook, *supra*, at 252. And his contemporaries, also cited in *Heller*, highlighted favorably that the Second Amendment shed England's limitation on arms "suitable to their conditions." William Rawle, *A View of the Constitution of the United States of America* 126 (1825); *accord*

32

1 William Blackstone, *Commentaries* 143 n.40 (St. George Tucker ed., 1803) [hereinafter *Tucker's Blackstone*].

In short, the Founders intentionally expanded *who* had the right to bear arms, while limiting the legislature's power to strip those rights. Because the English right's limitations were not carried over into the Second Amendment, they do not bear on the Amendment's scope.

### c. Laws disarming Catholics

In the same year as their Bill of Rights, the English Parliament passed "An Act for the better secur[]ing the Government by disarming Papists and reputed Papists." 1 W. & M. ch. 15 (1689). This law does not help the government either, because—as just explained—the English Bill of Rights' plain text guaranteed an arms right only to Protestants. 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441. Thus, regulations on Catholics tell us nothing about the scope of the English right to bear arms. *See United States v. Harrison,* No. CR-22-00328-PRW, 2023 WL 1771138, at *23 (W.D. Okla. Feb. 3, 2023).

In any case, this law is not "distinctly similar" to § 922(g)(1), and the two regulations differ in their operation and justification. The English law permitted Catholics to keep arms for self-defense. *Bruen*, 142 S. Ct. at 2142 n.12; *see also* Joyce Malcolm, *supra*, at 123. And the

33

English disarmed Catholics not to prevent interpersonal violence, but for fear that they would overthrow the protestant monarchy. *See* Churchill, *supra*, at 157. In contrast, Mr. Rojo may not possess guns for self-defense, and his 10-year-old marijuana offense raises no risk of violent rebellion. The "how and why" do not match.

### d. Game laws

Finally, the government sometimes cites founding-era England's laws permitting authorities to seize the weapons of those who impermissibly hunted game (that is, those who were not rich landowners). *E.g.*, *Jackson*, 69 F.4th at 503; Marshall, *supra*, at 719; *Whether the Second Amendment Secures an Individual Right*, 28 Op. O.L.C. 126, 167 (2004) ("O.L.C. Mem.").

But the founding generation understood the Second Amendment to proscribe the sort of "game laws" that had "disgraced" England. Rawle, *supra*, at 126. This reaction was warranted given how game laws were used. One understood reason for the game laws "oftener meant, than avowed" was "disarming the bul[k] of the people." 2 William Blackstone, *Commentaries* *412. A law used as a pretext for widespread disarmament does not accord with the American right to bear arms. *See* 5 *Tucker's Blackstone*, *supra*, app. B at 19 (bemoaning

34

England's stricter approach to arms and contrasting it with the freer American tradition).

In any case, these laws bear little resemblance to § 922(g)(1), including in "how" and "why" they infringe on gun rights. The "how" is different because the game laws required offenders only to forfeit the specific gun used in illegal hunting. Marshall, *supra*, at 719. Mr. Rojo's crime, possession of marijuana with intent to distribute, "did not involve a firearm, so there was no criminal instrument to forfeit." *Range*, 69 F.4th at 105. "And even if there were, government confiscation of the instruments of crime . . . differs from a status-based lifetime ban on firearm possession." *Id*. The "why" was also different, as Blackstone suggested that the core reason was to prevent "popular insurrections." Blackstone, *supra*, at *412.

Thus, none of these English laws support disarmament here.

## 2. Forever depriving all people with felony convictions of their right to bear arms does not comport with colonial and founding-era history.

The colonies and early United States had an even more permissive approach to firearms than England. That was by design. The founding generation saw England's right to arms as a "fallacy" and expressly wanted the real thing. Halbrook, *supra*, at 252 (quoting 12 James

35

Madison, *The Papers of James Madison* 193 (F. Hobson et al. eds., 1979)). It should therefore come as no surprise that "there is little evidence of an early American practice of," *Bruen*, 142 S. Ct. at 2142, forever barring all people convicted of a felony from ever again possessing a firearm. That can be seen in the colonies' and states' statutes, early American practice, and rejected proposals from state constitutional conventions.

### a. Founding-era statutes and regulations.

First, no founding-era statutes or interpretations of the common law barred all felons from possessing firearms. *See Range*, 69 F.4th at 104–05; *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting). Even before *Bruen*, some recognized that § 922(g)(1) "bears little resemblance to laws in effect at the time the Second Amendment was ratified." *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 196 (5th Cir. 2012), *abrogated by Bruen*, 142 S. Ct. 2111. In other words, there is no "distinctly similar historical regulation" from the founding-era that justifies disarming Mr. Rojo. That should settle this case. *Bruen*, 142 S. Ct. at 2131.

36

### i. Laws affecting enslaved people, Native Americans, and Catholics

Even if one entertains the distant analogies that the government often cites, the result is the same.

For example, the government has frequently "argued that 'legislatures traditionally used status-based restrictions' to disarm certain groups of people." *Range*, 69 F.4th at 104; *see also Rahimi*, 61 F.4th at 456. These groups include enslaved people, Native Americans, and Catholics. *Range*, 69 F.4th at 104–05. That reasoning's problems are legion.

First off, there is no American tradition of denying Catholics the right to armed self-defense. "[O]nly two American colonies—Virginia in 1756 and Pennsylvania in 1759—ever acted to disarm Catholics." *Harrison*, 2023 WL 1771138, at *23. And Virginia, at least, both allowed Catholics to retain guns they needed for self-defense and eliminated any restrictions for Catholics who swore loyalty oaths. Churchill, *supra*, at 157.

More importantly, none of these laws reflect the scope of the Second Amendment, because none of these groups had rights to bear arms. "Neither the Indian nor the slave was a citizen, therefore neither was entitled to the rights of English subjects" or, following

37

independence, the rights of American citizens. Malcolm, *supra*, at 141; *accord Jimenez-Shilon*, 34 F.4th at 1047. Likewise, Catholics did not have a right to bear arms when the Virginia and Pennsylvania laws were passed. Until the Revolution, "the operative rights-protecting document was the English Bill of Rights." *Harrison*, 2023 WL 1771138, at *23. As explained above, *see supra*, Section III.B.1.c, the English Bill of Rights protected only Protestants' right to gun ownership, not Catholics'.

Each of these groups was therefore excluded from the American and English rights to bear arms—"i.e., written out of 'the people' altogether." *Rahimi*, 61 F.4th at 457; *accord United States v. Carpio-Leon*, 701 F.3d 974, 978 n.* (4th Cir. 2012). "Laws applying to a group that was not protected by the right to armed self-defense cannot provide any insight into that right's scope." *Harrison*, 2023 WL 1771138, at *23.

Relatedly, these race- and religion-based restrictions would be unconstitutional today under the First or Fourteenth Amendments. *Range*, 69 F.4th at 104. And *Bruen*'s analysis suggests that such patently unconstitutional regulations have no bearing on determining the Second Amendment's contours. For example, the Court noted Southern states' restrictions on Black Americans' ability to carry

38

weapons not as evidence of what regulations *were* constitutional, but as evidence of what regulations were unconstitutional. *See Bruen*, 142 S. Ct. at 2151.

Eliminate now-unconstitutional laws affecting groups with no right to bear arms, and few if any status-based restrictions remain. As one oft-cited historian concluded following a survey of founding-era session laws, "at no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a *police power* to restrict the ownership of guns *by members of the body politic*." Churchill, *supra*, at 142 (emphases added). This "suggest[s] . . . that colonial and early national legislators did not see the regulation of gun ownership *of citizens* as a legitimate exercise of police power." *Id*. at 164–65 (emphasis added). Instead, in the rare instances where colonial governments disarmed free, white, Protestant men, they did so under their "emergency military powers" to confront perceived threats to the state. *Id*. at 155. These laws are discussed next.

### ii.     Laws disarming Loyalists, seditionists, and rebels

In defending § 922(g)(1) cases, the government has frequently relied on Revolution-era laws disarming persons who would not swear

39

loyalty to state or federal governments. *E.g.*, *Jackson*, 69 F.4th at 503. Like the status-based laws just discussed, these laws would be unconstitutional today, and it is not clear that Loyalists were among "the people" whom the Second Amendment protected. *Range*, 69 F.4th at 105; *Rahimi*, 61 F.4th at 457; *see supra*, Section III.B.2.a.i. Furthermore, regulations limited to times of "turmoil" and "rebellion" shed little light on the Second Amendment. *Bruen*, 142 S.Ct. at 2139. Thus, these laws are weak comparators.

But in any case, they do not justify disarming Mr. Rojo. People disarmed under loyalty statutes could regain their rights at any time simply by swearing a loyalty oath. *See* Churchill, *supra*, at 157. Mr. Rojo has no similar ability to restore rights at will. And unlike Mr. Rojo, persons who refused to take oaths were free to acquire new, additional firearms. *See* Marshall, *supra*, at 724.

Loyalty statutes also were not "comparably justified." *Bruen*, 142 S. Ct. at 2133. They were aimed at preserving "allegiance" during a period of war and regime change on both sides of the Atlantic Ocean. *Id.* at 157. Nowhere does the history suggest that the laws were designed to achieve § 922(g)(1)'s purpose: preventing "violent crime." Omnibus

40

Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, §
901(a)(1), (2), 82 Stat. 225, 225.

In addition to these loyalty-oath statutes, actions that posed a
direct threat to the state would, in rare instances, result in temporary
disarmament. For example, leaders of the seminal Massachusetts Bay
colony once disarmed supporters of a banished seditionist. Greenlee,
*supra*, at 263. But "[s]ome supporters who confessed their sins were
welcomed back into the community and able to retain their arms." *Id.*
And in 1787, after the participants in Shay's Rebellion attacked
courthouses, a federal arsenal, and the Massachusetts militia—"crimes
bordering on treason"—they were required to "deliver up their arms."
*Range*, 69 F.4th at 106 n.10; *see also* Greenlee, *supra*, 267–68. But
Massachusetts law required the Commonwealth to hold *and then return*
the rebels' arms after a three-year period. *Id.*; Sec'y of the
Commonwealth, *Acts and Resolves of Massachusetts 1786–87*, at 178
(1893).

In contrast, Mr. Rojo's marijuana offense posed no existential
threat to the state. Yet 10 years later, he had not had his rights
restored. "[D]istinctly similar historical regulations" those are not.
*Bruen*, 142 S. Ct. at 2131.

41

### iii. Laws requiring felons to bear arms in the militia

Not only has the government pointed to no founding-era regulations disarming felons. Founding-era militia statutes appeared to *require* felons to keep arms for militia service. That matters, because "the Second Amendment's prefatory clause announces the purpose for which the right was codified: to prevent elimination of the militia." *Heller*, 554 U.S. at 599. Given this "stated purpose, logic demands that if an individual was (or is) a member of the 'militia,' the Second Amendment's protections extend at least to . . . the pool of individuals from whom the militia would be drawn." *Firearms Pol'y Coal., Inc. v. McCraw*, 623 F. Supp. 3d 740, 750 (N.D. Tex. 2022).

As of 1791, that pool appeared to include felons who had completed their sentences. *Heller* defined the militia as "all males physically capable of acting in concert for the common defense," 554 U.S. at 595, and statutory law from the founding era demonstrates that "all males" encompassed felons. The first Militia Act, enacted one year after the Second Amendment's ratification, provided that "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of fortyfive years . . . shall severally and respectively be

42

enrolled in the militia." Act of May 8, 1792, § 1, 1 Stat. 271. It further stipulated that "every citizen so enrolled . . . shall, within six months thereafter, provide himself with a good musket or firelock, a sufficient bayonet and belt." *Id.*

Although the Act "exempted" certain classes of people from these requirements, including very specific groups such as "all custom-house officers" and "all ferrymen employed at any ferry on the post road," felons were not among them. *Id.* § 2, 1 Stat. 272. At least eight state militia statutes, passed shortly before or after 1791, contained similar requirements, and similarly did not exempt felons.[4] Those acts provide affirmative evidence that people with felony convictions were expected to keep and bear arms.

---

[4] *See* Laws of the State of Delaware, ch. XXXVI, §§ 1, 2, 4, at 1134-36 (1797); Public Statute Laws of the State of Connecticut, Title CXII, ch. I, §§ 1, 10, at 499-500, 505-06 (1808); Herty, Digest of the Laws of Maryland, "Militia," Commonwealth of Massachusetts, 1780-1805, ch. 14, at 381-82, 389-90 (1898); Constitution and Laws of the State of New-Hampshire, Act of Dec. 28, 1792, at 251-52, 256 (1805); Thomas Greenleaf, Laws of the State of New-York, Act of April 4, 1786, at 227-28, 232-33 (1792); Mitchell, Statutes at Large of Pennsylvania, Act of March 20, 1780, §§ III, XXI, at 146, 154 (1700-1809); Marbury, Digest of the Laws of the State of Georgia, Act of December 24, 1792, §§ 9-10, at 350 (1802).

### b. Proposals from state constitutional conventions

As just explained, the government cannot put forward actual historical regulations justifying disarmament in this case. That should end the analysis. But in addition to enacted regulations, the government frequently cites a series of unenacted ratification-convention proposals. *E.g.*, *Jackson*, 69 F.4th at 503. When the states' constitutional conventions debated ratification, several suggested that the new Constitution guarantee the right to bear arms. Greenlee, *supra*, at 265–66; 1 Jonathan Elliott, *The Debates in the Several State Conventions of the Federal Constitution* 328, 335 (2d ed. 1836). Three such proposals included an arguable limitation on that right.

First, New Hampshire's convention proposed that citizens not be disarmed "unless such as are or have been in actual rebellion." 1 Elliot, *supra*, at 326. Second, Samuel Adams argued at the Massachusetts convention that "the people of the United States, who are peaceable citizens," should not be disarmed. 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 675, 681 (1971). Finally, a minority of Pennsylvania delegates—all Antifederalists who opposed ratification[5]—

---

[5] As *Heller* noted, it is "highly problematic" to assume that the "the best or most representative reading of" the Second Amendment "would

44

suggested that persons should not be disarmed "unless for crimes committed, or real danger of public injury from individuals." Schwartz, *supra*, at 662, 665.

Any comparison to these laws is a nonstarter, because a mere proposal is not a "regulation" under *Bruen*. *See supra*, Section III.A.i. The proposals "cannot counter the Second Amendment's text, or serve as an analogue . . . because, inter alia, they were not enacted." *Rahimi*, 61 F.4th at 457. But in any case, the proposals do not support indiscriminately disarming all felons. *See, e.g.*, *Kanter*, 919 F.3d at 454 (Barrett, J. dissenting); *Skoien*, 614 F.3d at 648 (Sykes, J., dissenting); Marshall, *supra*, at 713; Greenlee, *supra*, at 267; Larson, *supra*, at 1375.

For starters, "only New Hampshire's proposal . . . even carried a majority of its convention." *Kanter*, 919 F.3d at 455 (Barrett, J., dissenting). And that proposal would affirmatively *preclude* the government from disarming citizens for any reason other than actual rebellion—including for transporting marijuana. *Id*. at 454.

---

conform to the understanding and concerns of the Antifederalists." 554 U.S. at 590 n.12.

Furthermore, none of the proposals made it into the final text. As *Heller* warns, "[i]t is always perilous to derive the meaning of an adopted provision from another provision deleted in the drafting process." 554 U.S. at 590. *Heller* specifically admonished that "the drafting history of the Second Amendment—the various proposals in the state conventions and the debates in Congress"—is a "dubious" source for Second Amendment interpretation. *Id.* at 603. That's because the Second Amendment was "widely understood to codify a pre-existing right, rather than to fashion a new one." *Id.* If these proposals really codified previous practice, the government should be able to point to founding-era laws imposing similar firearms restrictions—evidence that exists when it comes to other rights, like voting. *Kanter*, 919 F.3d at 463 (Barrett, J., dissenting) (identifying 10 early-19th-century state constitutions that excluded certain convicted persons from the franchise). Yet the government has not provided any such evidence here.

There is another issue with relying on these proposals: They differ significantly from one another and from other proposals. The conventions in Rhode Island, New York, and Virginia proposed an unqualified "right to keep and bear arms[.]" 1 Elliott, *supra*, at 328, 335;

46

Robert E. Shalhope, *The Armed Citizen in the Early Republic*, 49 Law & Contemp. Probs. 125, 134 (1986). Thus, while three proto-Second-Amendment proposals expressly limited who had the right to bear arms, three did not. Nor did the four state constitutions—including those of Pennsylvania and Massachusetts—that adopted a parallel right to arms before the Second Amendment. *See* Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191, 208 (2006). Relying on this drafting history would therefore suggest that "different people of the founding period had vastly different conceptions of the right to keep and bear arms. That simply does not comport with our longstanding view that the Bill of Rights codified venerable, widely understood liberties." *Heller*, 554 U.S. at 604–05.

Finally, the government cannot prove that these proposals' carve-outs would have applied to Mr. Rojo. Founding-era dictionaries suggest that persons were not "peaceable" if they were warlike, tumultuous, loud, disturbed, violent, bloody, quarrelsome, or turbulent. *Kanter*, 919 F.3d at 455 (Barrett, J., dissenting) (citing 1 Samuel Johnson, A Dictionary of the English Language (5th ed. 1773)). Transporting marijuana for distribution does not fit any of those descriptors. And

47

given founding-era practice, the Pennsylvanian antifederalists' proposal cannot seriously be read to suggest that anyone convicted of *any* offense lacks a right to bear arms. *See Kanter*, 919 F.3d at 456 (Barrett, J., dissenting) (noting that "no one even today reads this provision to support the disarmament of literally all criminals, even nonviolent misdemeanants"). The government has identified no evidence showing that this proposal's limits would encompass a 10-year-old, nonviolent marijuana crime. Thus, the proposals do not support imprisoning Mr. Rojo for bearing arms.

### c. Felon execution

Finally, the government often reasons that because the state historically had the power to execute felons, it must also have been able to prevent them from bearing arms. *E.g.*, *Jackson*, 69 F.4th at 503. This claim is doctrinally indefensible and historically inaccurate.

First off, to put it mildly, execution and § 922(g)(1) are not distinctly similar, and they differ in how and why they burden rights. "That founding-era governments punished some nonviolent crimes with death does not suggest that the particular (and distinct) punishment at issue—lifetime disarmament—is rooted in our Nation's history and tradition." *Range*, 69 F.4th at 105.

48

Logic also forecloses the dead-men-bear-no-arms argument. "[F]ounding-era governments' execution of some individuals convicted of certain offenses does not mean the State, then or now, could constitutionally strip a felon of his right to possess arms if he was not executed." *Id.* "The greater does not necessarily include the lesser." *Id.* Contrary reasoning, taken to its necessary conclusion, produces absurd results. "[W]e wouldn't say that the state can deprive felons of the right to free speech because felons lost that right via execution at the time of the founding." *Kanter*, 919 F.3d at 461–62 (Barrett, J., dissenting).

As for history, execution was not the dominant form of punishment during the founding era. *Id.* at 459. As James Wilson, an inaugural Supreme Court Justice and drafter of the Constitution, told a Virginia grand jury in 1791, "how few are the capital crimes, known to the laws of the United States, compared with those known to the laws of England!" John D. Bessler, *Cruel & Unusual: The American Death Penalty and the Founders' Eighth Amendment* 52 (2012) (simplified). For example, Pennsylvania in 1786 changed the punishment for numerous crimes from death to imprisonment at hard labor. Will Tress, *Unintended Collateral Consequences: Defining Felony in the Early American Republic*, 57 Clev. St. L. Rev. 461, 468 (2009). That list

49

expanded quickly. *See id.* Virginia and New York did the same by 1796. *See id.* at 470.

And even if an offense *could* be punished by death, that did not mean execution was the norm. "'[S]carce a single horse-stealer suffered death,' so many were pardoned." Nancy J. King, *The Origins of Felony Jury Sentencing in the United States*, 78 Chi.-Kent L. Rev. 937, 949 (2003) (quoting William Bradford, *An Enquiry How Far the Punishment of Death is Necessary in Pennsylvania* 62 (1793)).

In short, history shows that many felons lived and, eventually, rejoined society. "The obvious point that the dead enjoy no rights does not tell us what the founding-era generation would have understood about the rights of [these] felons[.]" *Kanter*, 919 F.3d at 462 (Barrett, J., dissenting). Thus, felon execution does not help the government meet its burden here.

### 3. Forever depriving all people with felony convictions of their right to bear arms does not comport with later 19th-century history.

American practice and laws during the Nineteenth Century only "confirm[s]" that disarming Mr. Rojo violates the Second Amendment. *Bruen*, 142 S. Ct. at 2137. This period, too, is devoid of precursors to § 922(g)(1)'s broad, class-based ban. In fact, there are at least two

50

documented instances where attempts to disarm a class of offenders was rejected as unconstitutional.

First, as with Shay's Rebellion, Congress declined to disarm southerners who fought against the Union in the Civil War. O.L.C. Mem., *supra* at 226. The reason: some northern senators feared that doing so "would violate the Second Amendment." *Id.*; see also Stephen P. Halbrook, *Freedmen, The Fourteenth Amendment and the Right to Bear Arms, 1866–1876*, at 68 (1998). In 1867, Senator Henry Wilson of Massachusetts proposed "that all militia forces" of Southern states be "disarmed and disbanded." *Id.* That ran into strong opposition. *Id.* For example, after quoting the Second Amendment, an Indiana senator warned: "If this infringes the right of the people to bear arms we have no authority to adopt it." *Id.* The proposal passed only after Wilson agreed to remove "disarm" from its text. *Id.* at 69.

Second, when a Texas law ordered that people convicted of unlawfully using a pistol be disarmed, it was struck down as unconstitutional. *Jennings v. State*, 5 Tex. Ct. App. 298, 298 (1878). The Texas Court of Appeals—then the state's highest court for criminal cases—held:

> The Legislature has the power by law to regulate the wearing of arms, with a view to prevent crime, but it has not the

51

> power to enact a law the violation of which will work a
> forfeiture of defendant's arms. While it has the power to
> regulate the wearing of arms, it has not the power by
> legislation to take a citizen's arms away from him. One of his
> most sacred rights is that of having arms for his own defence
> and that of the State.

*Id.* at 300–01 (emphases added). Although *Jennings* interpreted Texas's constitution, not the Second Amendment, its analysis is indicative of how firmly states believed that everyone had a fundamental, preexisting right to own firearms for self-defense—even those who had misused firearms in the past.

*Bruen* teaches that "if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality." 142 S. Ct. at 2131. This 19th century history therefore provides clear evidence that mass disarmament for people convicted of an offense is unconstitutional.

### 4. Evidence from the 20th century is irrelevant.

The first felon-in-possession laws finally emerged in the mid-1900s. Congress passed § 922(g)'s precursor in 1938. Federal Firearms Act (FFA), ch. 850, § 2(e), 52 Stat. 1250, 1251. But even that law did not

52

cover Mr. Rojo. It merely criminalized receiving a firearm by those convicted of a "crime of violence," which meant "murder, manslaughter, rape, mayhem, kidnapping, burglary, housebreaking," or various forms of aggravated assault. *Id.* §§ 1(6), (2)(e), 52 Stat. at 1250–51. Congress did not extend its proscription to all felons until 1968. Marshall, *supra*, at 698–99. This late 20th-century practice "does not provide insight into the meaning of the Second Amendment [because] it contradicts earlier evidence."*Bruen*, 142 S. Ct. at 2154 n.28. Thus, it is irrelevant.

### C. The government cannot distill, from a hodge-podge of dissimilar regulations, the power to disarm anyone deemed a "danger" or a threat to an "orderly society."

For the reasons just given, the government will not be able to offer comparable regulations that justify prohibiting Mr. Rojo from bearing arms. But in *Jackson*, the Eighth Circuit rejected a § 922(g)(1) challenge without requiring the government to identify a similar law. Instead, the *Jackson* court bundled together a wide variety of regulations, which bore little resemblance to § 922(g)(1) or one another. These included many of the laws discussed above, like the limitations on the English Bill of Rights, game laws, and laws disarming enslaved people. *Jackson*, 69 F.4th at 502–03. Based on these disparate regulations of discrete groups, the Eighth Circuit derived a broader

53

principle: Congress may disarm *any* group it deems "dangerous" or threatening to "an orderly society and compliance with its legal norms." *Id*. at 503 (quoting *Range v. Att'y Gen.*, 53 F.4th 262, 269 (3d Cir. 2022), *reh'g en banc granted, opinion vacated*, 69 F.4th 96 (3d Cir. 2023)).

Not only are most of these regulations improper comparators for the reasons just given. *See supra*, Section III.B. The Eighth Circuit's analogies also operate at far too high a level of generality. *See Range*, 69 F.4th at 105. Under *Bruen*, narrow historical regulations do not support broad claims of regulatory authority. To the contrary, *Bruen* shows that in carving out exceptions to "the Second Amendment's unqualified command," 142 S. Ct. at 2126, courts must define those exceptions narrowly and concretely to ensure that they are consistent with the Nation's traditions.

In *Bruen*, New York claimed a general power to regulate the public carrying of firearms. *Id*. at 2135. It supported that broad claim by pointing to four sets of regulations.

First, New York attempted to characterize the proper-cause requirement as a "'sensitive places' law," similar to historical prohibitions on carrying firearms in legislatures, polling places, and courthouses. *Id*. at 2133. New York interpreted this tradition to permit

54

public-carry prohibits in "places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." *Id*. The Court rejected that overgeneralization. By "expanding the category of 'sensitive places' simply to *all* places of public congregation that are not isolated from law enforcement," New York "define[d] the category of 'sensitive places' far too *broadly*." *Id*. at 2134 (emphases added).

Second, New York cited English and early American laws that prohibited "bring[ing] . . . force in affray of the peace." *Id*. at 2139–46 (simplified). But the Court determined that the cited historical laws prohibited only "bearing arms in a way that spreads 'fear' or 'terror' among the people." *Id*. at 2145. It therefore declined to infer that the government enjoys a "sweeping" power to pass "onerous public-carry regulations." *Id*. at 2139.

The Court applied the same reasoning to New York's third and fourth set of proffered regulations. Historical statutes proscribing *concealed* carry did not justify New York's "*general* prohibition" on *all* modes of public carry (both concealed and open). *Id*. at 2146–47 & n.19 (emphasis added). And historical "surety statutes," which applied "only to those reasonably accused" of intending to do injury or breach the

55

peace, did not validate a proper-cause requirement applicable to *all* New Yorkers. *Id.* at 2148–50.

 "A survey of Anglo-American history" therefore revealed only a small number of "well-defined" restrictions on public carry: those that limited "the intent for which one could carry arms" (to terrorize the people), "the manner by which one carried arms" (concealed vs. open), "the exceptional circumstances under which one could not carry arms" (if a surety statute applied), and the exceptional places in which one could not carry arms (places historically deemed "sensitive"). *Id.* at 2133, 2156. But New York could not extrapolate, from these specifics, a general power to regulate public carry.

Here, the Eighth Circuit committed the same errors that doomed New York's historical comparisons. True, the Eighth Circuit identified a handful of laws targeting discrete groups. But those laws do not support the claim that legislatures may disarm *anyone* they deem "dangerous" or threatening to "an orderly society and compliance with its legal norms." *Jackson*, 69 F.4th at 503. That "defines the category . . . far too broadly." *Bruen*, 142 S.Ct. at 2134. This is exactly the overgeneralization maneuver that *Bruen* already rejected: identify a few specific regulations (e.g., sensitive places laws and surety statutes),

56

move up the level-of-generality ladder to an abstract descriptor (e.g., regulations on "public carry"), then apply that descriptor to *all* conduct falling under its umbrella (e.g., publicly carrying without "proper cause"). The government may not distill such "broad" and "general" powers from "particular" prohibitions. *Id*. at 2145, 2147 & n.19.

This is the same conclusion that the en banc Third Circuit reached in *Range*. The en banc court acknowledged that the government had pointed to some status-based restrictions. *Range*, 69 F.4th at 104–05. But those laws did not help the government, because "the Government d[id] not successfully analogize those groups to Range and his individual circumstances." *Id*. The same conclusion obtains here. "That founding-era governments disarmed groups they distrusted like Loyalists, Native Americans, Quakers, Catholics, and Blacks does nothing to prove that [Mr. Rojo] is part of a similar group today." *Id*. at 105. "[A]ny such analogy would be 'far too broad.'" *Id*. (quoting *Bruen*, 142 S. Ct. at 2134)).

There is another reason why *Jackson*'s approach is incompatible with *Bruen*: That approach would reinstate "judicial deference to legislative interest balancing." *Bruen*, 142 S.Ct. at 2129. History would not constrain whom Congress could disarm. Rather, Congress would

57

have "discretion" to decide who is too dangerous or disorderly to exercise their Second Amendment rights. *Jackson*, 69 F.4th at 503–05.

That outcome is incompatible with *Bruen* and with the Second Amendment's status as a fundamental right. The whole point of "enshrin[ing] [a] constitutional right[]" is to "take[] certain policy choices off the table." *Range*, 69 F.4th at 103 (quoting *Heller*, 554 U.S. at 636). But the Eighth Circuit's "extreme deference gives legislatures unreviewable power to manipulate the Second Amendment by choosing a label." *Id.* (quoting *Folajtar v. Att'y Gen. of the United States*, 980 F.3d 897, 912 (3d Cir. 2020) (Bibas, J., dissenting)). "The government could quickly swallow the [Second Amendment] right if it had broad power to designate any group as dangerous" or out of step with legal norms "and thereby disqualify its members from having a gun." *Kanter*, 919 F.3d at 465 (Barrett, J., dissenting).

Even broader is the proposed power to disarm anyone who offends "legal norms." *Jackson*, 69 F.4th at 503. This proposal suffers from the same vagueness problems as the alleged "law-abiding" limitation. *See supra*, Section II.B. It also implies that the legislature can label any conduct a felony, and then strip any person who engages in that conduct of their right to bear arms. Already, "today, felonies include a wide

58

swath of crimes, some of which seem minor." *Range*, 69 F.4th at 102. This include, for instance, uttering "any obscene, indecent, or profane language by means of radio communication," 18 U.S.C. § 1464, returning out-of-state bottles or cans, Mich. Comp. Laws § 445.574(a)(2)(d), and reading another's email without permission, 18 Pa. Cons. Stat. § 3929.1. *See Range*, 69 F.4th at 103 n.5 (compiling examples). The government confirmed at oral argument in *Range* that the legislature's authority to define felonies had no "limiting principle"—"habitual jaywalkers," for instance, could be disarmed for life if the legislature deemed that conduct felonious. Oral Argument Recording at 46:40-47:20, *Range* 69 F.4th 96. In another case, the government agreed that mowing one's lawn could be deemed felony, then used as a basis for lifetime disarmament. *Harrison*, 2023 WL 1771138, at *11.

These extreme positions are the necessary result of *Jackson*-style overgeneralization. If this Court is to heed *Bruen*'s teachings, it must conduct the analysis at a lower, more administrable level of generality that is tightly tethered to the historical record. Applying that approach here, the government has not proved that disarming Mr. Rojo is consistent with the Nation's historical tradition of firearms regulation.

59

**IV.  Because there is no history and tradition of permanently disarming all felons, the statute must fall, or it at least cannot be applied to Mr. Rojo.**

For the reasons just given, people with felony convictions fall within the Second Amendment's plain text, and there is no historical tradition that justifies disarming all felons for life. But that is exactly what § 922(g)(1) does: It prohibits, on pain of imprisonment, anyone "who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year" from ever again possessing a gun. 18 U.S.C. § 922(g)(1). Accordingly, § 922(g)(1) is unconstitutional.

*Bruen* itself demands that result where—as here—the government cannot point to a historical tradition of regulation comparable to the challenged law. That's because *Bruen* considered a facial challenge to New York's proper-cause law, and it struck down the statute as a whole. 142 S. Ct. at 2122.

Recognizing as much, the Fifth Circuit in *Rahimi* patterned its relief after *Bruen*'s example. 61 F.4th at 453. Upon finding that the government failed to make a textual or historical case for 18 U.S.C. § 922(g)(8), the Fifth Circuit deemed the law facially invalid. *Id.* at 453, 463. As the Fifth Circuit observed, this outcome made sense because the

60

*Bruen* test lends itself to facial invalidation. The *Bruen* inquiry primarily targets the *regulation*'s historical pedigree, not the *litigant* raising the claim. *See id.* at 453. If the *regulation* "is inconsistent with the Second Amendment's text and historical understanding, then it falls under any circumstances," irrespective of who challenges it. *Id.*

Notably, this conclusion implies only that wholescale disarmament of this incredibly broad and heterogeneous class—all felons—cannot be squared with the Constitution's text and history. It still leaves open the possibility that Congress could craft a different, narrower statute that accords with tradition. But rather than having judges determine who can be disarmed and for how long, it would place that power (and responsibility) where it belongs: with our elected representatives.

For all these reasons, this Court should strike down the statute as a whole. But at a minimum, the government has not and cannot justify imprisoning Mr. Rojo for possessing a gun, based solely on his 10-year-old nonviolent marijuana conviction. No founding-era regulation premised disarmament on distinctly similar (or even analogous) conduct. Nor did any comparable regulation continue to apply 10 years

61

after the conduct in question, with no realistic possibility of restoring the right to bear arms.

The en banc Third Circuit reached a similarly "narrow" result in *Range*. 69 F.4th at 106. It considered § 922(g)(1)'s constitutionality "only as applied to [Mr. Range] given his violation of 62 Pa. Stat. Ann. § 481(a)," the food-stamps fraud offense justifying his disarmament. *Id.* The Court's analysis therefore turned on whether the government's historical comparators appeared sufficiently similar to "[Mr.] Range and his individual circumstances." *Id.* at 105. Because the government's evidence did not show "that our Republic has a longstanding history and tradition of depriving people like [Mr.] Range of their firearms, § 922(g)(1) [could not] constitutionally strip him of his Second Amendment rights." *Id.* at 106.

That narrow relief is enough to vacate Mr. Rojo's conviction here. Thus, even if this Court allows the government to justify disarmament on an individualized basis, Mr. Rojo would prevail. Mr. Rojo's conviction must therefore be vacated and his case must be dismissed.

62

## V.   *Bruen*'s mode of analysis is clearly irreconcilable with *Vongxay*.

Finally, this Court's prior precedents do not stand in the way of vindicating Mr. Rojo's Second Amendment rights. This Court last upheld § 922(g)(1)'s constitutionality more than a decade ago in *United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010). But *Vongxay* is now overruled, because it is clearly irreconcilable with *Bruen*.

"[W]here intervening Supreme Court authority is clearly irreconcilable with [this Court's] prior circuit authority," three-judge panels "should consider themselves bound by the intervening higher authority and reject the prior opinion of this court as having been effectively overruled." *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). To determine whether a prior opinion was overruled, courts look to both "the holdings of higher courts' decisions" and their "mode of analysis." *Id*. (simplified). The issues decided in the intervening case "need not be identical in order to be controlling," so long as the case "undercut[s] the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." *Id*.

*Vongxay* employed two strands of reasoning to uphold § 922(g)(1). First, *Vongxay* relied on a paragraph from *Heller*, which warned that

63

"the Second Amendment is not unlimited." 594 F.3d at 1115 (quoting *Heller*, 554 U.S. at 626). That paragraph continued,

> the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues. Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Heller*, 554 U.S. at 626–27 (simplified). A footnote appended to the paragraph added, "We identify these presumptively lawful regulatory measures only as examples[.]" *Id.* at 627 n.26.

Based solely on that paragraph, *Vongxay* concluded that "felons are categorically different from the individuals who have a fundamental right to bear arms." 594 F.3d at 1115; *see also United States v. Phillips*, 827 F.3d 1171, 1174 (9th Cir. 2016) (noting that *Vongxay*'s holding was "[b]ased on this language" in *Heller*). Additionally, *Vongxay* determined that *United States v. Younger*, 398 F.3d 1179 (9th Cir. 2005), a pre-*Heller* case upholding § 922(g)(1), remained binding. *Vongxay*, 594 F.3d at 1115.

64

These points were dispositive. As the Court put it, "our legal inquiry ends with *Younger*." *Id.* But the Court went on to "observe that most scholars of the Second Amendment agree that the right to bear arms was inextricably tied to the concept of a virtuous citizenry," such that "the right to bear arms does not preclude laws disarming the unvirtuous citizens (i.e. criminals)." *Id.* at 1118 (simplified) (citing Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143, 146 (1986), and Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L.Rev. 461, 480 (1995)). The Court "recognize[d], however, that the historical question has not been definitively resolved." *Id.* (citing Marshall, *supra*, at 714–28).

Later circuit cases cited *Vongxay* for the proposition that any regulation on *Heller*'s "presumptively lawful" list is exempt from Second Amendment scrutiny. *See, e.g.*, *Mai v. United States*, 952 F.3d 1106, 1114 (9th Cir. 2020); *United States v. Torres*, 911 F.3d 1253, 1258 (9th Cir. 2019). Thus, building on *Vongxay*, this Court came to recognize *two* ways for the government to sidestep the Second Amendment, even before getting to means-ends balancing: (1) The government could show that the regulation accords with text and history, or (2) it could simply point to *Heller*'s presumptively lawful list. *See id.* This Court was

65

explicit in divorcing the second approach from the first, writing, "[W]e may uphold a law *without further analysis* if it falls within the 'presumptively lawful regulatory measures' that *Heller* identified." *Young v. Hawaii*, 992 F.3d 765, 783 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022) (emphasis added).

*Bruen* is clearly irreconcilable with *Vongxay* and the bifurcated approach it spawned. Most fundamentally, *Vongxay* and its progeny provide *two* avenues (aside from means-ends balancing) to validate a gun regulation: *either* through text and history *or* by way of *Heller*'s list. But *Bruen* permits just one. "*Only* if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Bruen*, 142 S. Ct. at 2126 (simplified) (emphasis added); *see also id.* at 2130, 2135 (reiterating that this is the "only" acceptable method).

Any suggestion that the *Heller* list is exempt from the text-and-history test runs headlong into *Bruen* itself. "[P]rohibitions on carrying concealed weapons" were among *Heller*'s presumptively lawful regulatory measures. 554 U.S. at 626–27. Yet far from placing New York's concealed-carry prohibition above constitutional scrutiny, the

66

Supreme Court undertook a full textual and historical analysis, then struck down the law. *Bruen*, 142 S. Ct. at 2122.

Likewise, *Bruen* acknowledged "*Heller*'s discussion of 'longstanding' 'laws forbidding the carrying of firearms in sensitive places.'" *Id.* at 2133. But when New York tried to invoke *Heller*'s sensitive-places exception, the Court demanded a basis for that comparison in the "historical record." *Id.* When New York could not provide one, this Court rejected New York's argument. *Id.* Thus, in its statements and mode of analysis, the Court made clear that *all* gun laws must be historically vetted, even if they appear on *Heller*'s list.

*Vongxay* did not even arguably employ *Bruen*'s text-and-history approach. *Vongxay* included no discussion whatsoever of Second Amendment text. And *Vongxay* identified not a single founding-era regulation to support its conclusions—let alone a deeply rooted regulatory tradition.

*Vongxay*'s "observ[ations]" about some scholars' "virtuous citizenry" theory do not fill the gaps. 594 F.3d at 1118. For starters, these observations were not part of *Vongxay*'s "legal inquiry." *Id.* at 1116. Plus, this Court acknowledged that the historical question was not "definitively resolved." *Id.* at 1118. Under *Bruen*, "ambiguous

67

history" is "not sufficiently probative" to uphold a gun law. 142 S. Ct. at 2139. But most importantly, *Vongxay*'s scholarly sources inferred this "virtue" limitation from "classical republican political philosophy"—not from historical regulations. Reynolds, *supra*, at 480; Kates, *supra*, at 146. *Bruen* stresses repeatedly that only "regulations" can satisfy the government's burden. *See supra*, Section III.A.1. A philosophy-based approach is clearly irreconcilable with that command.

Finally, *Bruen* and *Heller* together conclusively overrule the *Younger* case on which *Vongxay* relied. *Younger* upheld § 922(g)(1) based on (1) Ninth Circuit precedent holding that there is no individual right to gun ownership, and (2) Fifth Circuit precedent holding that § 922(g)(1) passed means-ends scrutiny. 398 F.3d at 1192. As *Vongxay* recognized, the former "was invalidated by *Heller*." 594 F.3d at 1116. The latter is now invalidated by *Bruen*. 142 S. Ct. at 2127. Thus, that last pillar of *Vongxay*'s reasoning falls, too.

For all these reasons, *Vongxay* is overruled. Instead of relying on *Heller* to "sidestep *Bruen*," this Court "must undertake the text-and-history inquiry the Court so plainly announced and expounded upon at great length." *Atkinson v. Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023).

Under that test, disarming Mr. Rojo based on his 10-year-old marijuana importation conviction violates the Second Amendment.

## CONCLUSION

For the foregoing reasons, this Court should reverse and remand with instructions to dismiss Mr. Rojo's indictment.

Respectfully submitted,

DATED: July 19, 2023

*s/Katie M. Hurrelbrink*
Katie M. Hurrelbrink
Daniel J. Yadron, Jr.
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California 92101
619.234.8467
Katie_Hurrelbrink@fd.org

Attorneys for Mr. Rojo

69

## CERTIFICATE OF RELATED CASES

Undersigned counsel is aware that the defendants in the following pending cases have also challenged 18 U.S.C. § 922(g)(1) under the Second Amendment: *United States v. Registe*, No. 20-30042, and *United States v. Duarte*, No. 22-50048. But the legal issues in those cases may differ from the issue raised here depending on whether this Court applies plain error review. *United States v. Registe*, No. 20-30042, Doc. 45, at 15 (government arguing that plain error review should apply); *United States v. Duarte*, No. 22-50048, Doc. 33, at 26 (same).

Respectfully submitted,

DATED: July 19, 2023          *s/Katie Hurrelbrink*
                              Katie Hurrelbrink
                              Daniel J. Yadron, Jr.
                              Federal Defenders of San Diego, Inc.
                              225 Broadway, Suite 900
                              San Diego, California 92101
                              619.234.8467
                              Katie_Hurrelbrink@fd.org

                              Attorneys for Mr. Rojo

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-598

I am the attorney or self-represented party.

**This brief contains** 13,755 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Katie Hurrelbrink **Date** 7/19/2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/22*