CA NO. 23-598

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | DC NO. 21-CR-682-GPC |
| Plaintiff-Appellee, | |
| v. | |
| ORLANDO ROJO, | |
| Defendant-Appellant. | |

―――――――――

**BRIEF OF NINTH CIRCUIT FEDERAL PUBLIC AND COMMUNITY DEFENDER OFFICES AS AMICI CURIAE IN SUPPORT OF APPELLANT**

―――――――――

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

HONORABLE GONZALO P. CURIEL
United States District Judge

CUAUHTEMOC ORTEGA
Federal Public Defender
MARGARET A. FARRAND
ANDREW B. TALAI
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Email: Margaret_Farrand@fd.org

Attorneys for Amici Curiae

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................1

II.   LEGAL BACKGROUND ....................................................3

    A.    This Court's pre-*Bruen* Framework for Analyzing Second Amendment Claims ................................................3

        1.    *United States v. Vongxay* (2010) ....................................4

        2.    *United States v. Chovan* (2013) ....................................7

        3.    *Young v. Hawaii* (2021) ..................................................8

    B.    *New York State Rifle & Pistol Ass'n, Inc. v. Bruen* (2022) .....9

III.  ARGUMENT ....................................................................11

    A.    *Bruen* Worked Four Fundamental Changes to This Court's Second Amendment Analytical Framework ............11

    B.    *Bruen* Is a Textbook Example of the Types of Jurisprudential Shifts This Court Has Held to Abrogate Prior Precedent Under *Miller v. Gammie* ...........................15

        1.    *Miller v. Gammie*'s Standard ......................................16

        2.    *Miller* Is Satisfied Where Intervening Authority Adds Steps to an Existing Method of Analysis............16

        3.    *Miller* Is Satisfied Where Intervening Authority Shifts the Applicable Presumptions.............................19

        4.    *Miller* Is Satisfied Where Intervening Authority Changes the Governing Legal Analysis......................25

# TABLE OF CONTENTS

**Page**

5. *Miller* Is Satisfied Where Intervening Authority Actually Engages in an Analysis Inconsistent with Prior Circuit Precedent.................................................29

IV. CONCLUSION .................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*United States v. Alaniz*,
   69 F.4th 1124 (9th Cir. 2023) ........................................................ 14, 29

*United States v. Bullock*,
   2023 WL 4232309 (S.D. Miss. June 28, 2023) .................................. 26

*United States v. Castillo*,
   69 F.4th 648 (9th Cir. 2023) ............................................................. 27

*United States v. Chovan*,
   735 F.3d 1127 (9th Cir. 2013) ................................................... 1, 7, 20

*Cottonwood Environmental Law Center v. United States*
*Forest Service*,
   789 F.3d 1075 (9th Cir. 2015) ...................................................... 21, 22

*United States v. Dixon*,
   984 F.3d 814 (9th Cir. 2020) ............................................................. 26

*Indiana v. Edwards*,
   554 U.S. 164 (2008) ........................................................................... 27

*United States v. Ferguson*,
   560 F.3d 1060 (9th Cir. 2009) ........................................................... 27

*Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc.*,
   63 F.4th 747 (9th Cir. 2023) ................................................... 17, 18, 29

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ..................................................................*passim*

*Florida v. Jardines*,
   569 U.S. 1 (2013) ............................................................................... 26

*United States v. Jones*,
   565 U.S. 400 (2012) ........................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

*Jordan v. Nationstar Mortgage, LLC,*
  781 F.3d 1178 (9th Cir. 2015)......................................................22, 23

*Kisor v. Wilkie,*
  139 S. Ct. 2400 (2019).........................................................................27

*Lambert v. Saul,*
  980 F.3d 1266 (9th Cir. 2020).............................................................24

*Lawrence v. Texas,*
  539 U.S. 558 (2003).............................................................................33

*McDonald v. City of Chicago,*
  561 U.S. 742 (2010).............................................................................12

*Miller v. Gammie,*
  335 F.3d 889 (9th Cir. 2003) (en banc).....................................*passim*

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
  142 S. Ct. 2111 (2022)................................................................*passim*

*United States v. Paixao,*
  885 F.3d 1203 (9th Cir. 2018).............................................................26

*Pliler v. Ford,*
  542 U.S. 225 (2004).............................................................................32

*United States v. Plouffe,*
  445 F.3d 1126 (9th Cir. 2006)......................................................30, 31

*Robbins v. Carey,*
  481 F.3d 1143 (9th Cir. 2007)......................................................31, 32

*Rodriguez v. AT&T Mobility Servs., LLC,*
  728 F.3d 975 (9th Cir. 2013)...............................................16, 22, 23

*SEIU Local 121RN v. Los Robles Regional Medical Center,*
  976 F.3d 849 (9th Cir. 2020)...............................................................24

iv

# TABLE OF AUTHORITIES

**Page(s)**

*Sell v. United States*,
    539 U.S. 166 (2003) ................................................................ 34

*In re Stern*,
    345 F.3d 1036 (9th Cir. 2003) ............................................... 29

*United States v. Vongxay*,
    594 F.3d 1111 (9th Cir. 2010) ................................... 1, 4, 6, 20

*Witt v. Dept. of Air Force*,
    527 F.3d 806 (9th Cir. 2008) ............................................ 33, 34

*Young v. Hawaii*,
    992 F.3d 765 (9th Cir. 2021) ........................................... 1, 8, 9

*Young v. Hawaii*,
    142 S. Ct. 2895 (2022) ............................................................ 9

*United States v. Younger*,
    398 F.3d 1179 (9th Cir. 2005) ................................................. 6

## Federal Statutes

18 U.S.C. § 666 ................................................................................ 26

18 U.S.C. § 922 ........................................................................ *passim*

18 U.S.C. § 3553 ............................................................................. 31

## Other Authorities

U.S. Const. amend. II .............................................................. *passim*

U.S. Const. amend. IV ................................................................... 26

U.S. Const. amend. XIV ................................................................ 12

## STATEMENT OF THE INTEREST OF AMICI CURIAE AND STATEMENT OF AUTHORITY TO FILE

The Ninth Circuit Federal Public and Community Defenders represent indigent defendants in this Court. Because these organizations serve as the institutional defenders for indigent federal defendants, they have an interest in all issues of federal criminal law and procedure. These organizations also defend significant numbers of clients prosecuted under 18 U.S.C. § 922(g), which prohibits specified categories of individuals from possessing firearms or ammunition. Because § 922(g) penalizes individuals' possession of firearms, prosecutions under that provision frequently present the question whether § 922(g)'s penalties violate defendants' Second Amendment rights. The outcome and reasoning in this case will significantly affect the ability of the Ninth Circuit Federal Public and Community Defenders to pursue Second Amendment challenges to prosecution under § 922(g). Accordingly, Amici have a strong interest in the accurate and coherent development of the law in this area.

Amici affirm that no publicly held corporation owns stock in them; no counsel for either party authored this brief in whole or in part; and no party, party's counsel, person, or other entity contributed money to preparing this brief.

///

Both parties have consented to this brief's filing.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: July 26, 2023        By  */s/ Margaret A. Farrand*
                            MARGARET A. FARRAND
                            ANDREW B. TALAI
                            Deputy Federal Public Defenders
                            Attorneys for Amici Curiae

## NINTH CIRCUIT FEDERAL PUBLIC AND COMMUNITY DEFENDER ORGANIZATIONS

| | |
|---|---|
| Jodi Linker<br>Federal Public Defender for the Northern District of California | Jamie McGrady<br>Federal Public Defender for the District of Alaska |
| Jon Sands<br>Federal Public Defender for the District of Arizona | Cuauhtemoc Ortega<br>Federal Public Defender for the Central District of California |
| Heather Williams<br>Federal Public Defender for the Eastern District of California | Rene Valladares<br>Federal Public Defender for the District of Nevada |
| John T. Gorman<br>Federal Public Defender for the District of Guam | Salina M. Kanai<br>Federal Public Defender for the District of Hawaii |
| Nicole Owens<br>Executive Director of Federal Defender Services of Idaho, Inc. | Rachel Julagay<br>Executive Director for the Federal Defenders of Montana, Inc. |
| Fidel Cassino-DuCloux<br>Federal Public Defender for the District of Oregon | Andrea K. George<br>Executive Director, Federal Defenders of Eastern Washington and Idaho |
| Colin Fieman<br>Federal Public Defender for the Western District of Washington | |

## I.  INTRODUCTION

The Supreme Court's recent decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), fundamentally altered the analysis this Court must use to evaluate Second Amendment challenges to firearm regulations. Its methodology is irreconcilable with this Court's pre-*Bruen* Second Amendment precedents: *United States v. Vongxay*,[1] *United States v. Chovan*,[2] and *Young v. Hawaii*.[3] *Vongxay* deemed felon-in-possession laws wholly outside the Second Amendment's scope based on outdated and minimally-reasoned Circuit precedent disclaiming the existence of any individual Second Amendment right at all, as well as a list of "presumptively lawful" regulations in *District of Columbia v. Heller*, 554 U.S. 570 (2008). *Chovan* and *Young* subjected other firearm laws to means-end scrutiny whereby judges compared the strength of the regulation's policy justifications against the methods the regulation uses to achieve them.

---

[1] 594 F.3d 1111 (9th Cir. 2010).

[2] 735 F.3d 1127 (9th Cir. 2013).

[3] 992 F.3d 765 (9th Cir. 2021).

*Bruen* requires a completely different analysis. Instead of automatically declaring regulations on *Heller*'s "presumptively lawful" list constitutional—as *Vongxay* did—*Bruen* requires that courts first determine whether the Second Amendment's plain text extends to the regulated conduct. If it does, the regulation is presumptively *un*constitutional unless the government can meet its burden to show a historical tradition of analogous regulation. *Bruen* explicitly rejected the means-end balancing approach *Chovan* and *Young* embraced, instead requiring courts to focus solely on the Second Amendment's text and history. And *Bruen* contradicted *Vongxay*'s dispositive treatment of *Heller*'s "presumptively lawful" list by subjecting one of the very regulations on that list—a concealed-carry law—to the same history-based test it prescribes for all firearm laws. Because *Bruen*'s text-and-history framework is fundamentally irreconcilable with *Vongxay*, *Chovan*, and *Young*, this Court should hold those precedents are no longer good law under *Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003) (en banc).

The discrepancy between *Bruen*'s methodology and that of this Court's prior precedents constitutes a textbook example of the type of

jurisprudential shift this Court has previously found clearly irreconcilable with prior authority under *Miller*'s standard. In this brief, Amici identify and describe four categories of cases in which this Court has found *Miller*'s standard met—and its prior precedent overruled—because of jurisprudential changes analogous to those *Bruen* wrought over this Court's prior precedents. In these case categories, intervening Supreme Court authority: (1) adds steps to an existing analytical framework; (2) modifies or redirects previously-applicable presumptions; (3) changes the governing legal analysis; or (4) actually engages in a legal analysis incompatible with that applied by prior precedent. Significantly, *Bruen*'s change in this Court's governing legal doctrine meets the *Miller* standard under each of these four rationales.

## II. LEGAL BACKGROUND

### A. This Court's pre-*Bruen* Framework for Analyzing Second Amendment Claims

Before *Bruen*, this Court used a two-track mode of analysis for Second Amendment challenges to firearm laws. The first track encompassed challenges to regulations described as "presumptively lawful" in *Heller*, which this Court held constitutional without further inquiry. The second track, for laws not on *Heller*'s list, relied primarily

3

on means-end scrutiny: comparing the regulation's policy justifications against the precision of the regulatory means employed. This section describes how this Court applied that two-track framework in *Vongxay*, *Chovan*, and *Young*.

### 1. *United States v. Vongxay* (2010)

In *Vongxay*, the defendant argued that the federal felon-in-possession statute, 18 U.S.C. § 922(g)(1), violated the individually-focused Second Amendment right to bear arms that the Supreme Court had first recognized two years earlier in *Heller*. *Vongxay*, 594 F.3d at 1114. *Heller* had relied on that right to invalidate District of Columbia laws banning handguns in the home and requiring that other firearms be kept inoperable at all times. *Heller*, 554 U.S. at 629-36. But the Second Amendment right was not absolute, the *Heller* Court cautioned, and legislatures retain "a variety of tools for combating [gun violence], including some measures regulating handguns." 554 U.S. at 636.

*Heller* was therefore careful to limit the scope of its holding and admonished that "nothing in our opinion should be taken to cast doubt on" certain types of firearm-possession regulations not before it. *Id.* at 626. It specifically noted that "the majority of the 19th-century courts to

4

consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." *Id.* While disclaiming any "exhaustive historical analysis today of the full scope of the Second Amendment," the Court cautioned that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27. The Court stated that it "identif[ied] these presumptively lawful regulatory measures only as examples," and that "our list does not purport to be exhaustive." *Id.* at 627 n.26. Yet the *Heller* Court did not conduct any historical inquiry as to those "presumptively lawful" measures' antecedents; it instead deferred that analysis for another day, saying "there will be time enough to expound upon the[ir] historical justifications . . . if and when those [regulations] come before us." *Id.* at 635.

Although *Heller* did not conduct that historical analysis, *Vongxay* nevertheless relied on *Heller*'s "presumptively lawful" list to rule

5

§ 922(g)(1) constitutional and felons wholly outside the Second Amendment, construing *Heller* to hold that "felons are categorically different from the individuals who have a fundamental right to bear arms." *Vongxay*, 594 F.3d at 1115. *Vongxay* thus elevated *Heller*'s "presumptively lawful" dicta to a threshold limitation on the scope of the Second Amendment's reach.

*Vongxay* also relied on this Court's own pre-*Heller* precedent, *United States v. Younger*, 398 F.3d 1179 (9th Cir. 2005), which had employed only "minimal analysis" to rule § 922(g)(1) constitutional based on the premise that the Second Amendment does not provide any individual right to bear arms at all. *Vongxay*, 594 F.3d at 1116. While *Vongxay* acknowledged that *Heller* had "invalidated" *Younger*'s "reasoning" that individuals lack Second Amendment rights, it still declared itself "bound by *Younger*['s]" holding. *Vongxay*, 594 F.3d at 1116. As additional support for its result, *Vongxay* cited Fifth Circuit case law employing a means-end analysis to hold § 922(g)(1) a "limited and narrowly tailored exception to the freedom to possess firearms" and constitutional "under heightened scrutiny." *Id.* at 1117 (quoting and discussing *United States v. Everist*, 368 F.3d 517, 519 (5th Cir. 2004)).

6

## 2. *United States v. Chovan* (2013)

In *United States v. Chovan*, this Court addressed a Second Amendment challenge to 18 U.S.C. § 922(g)(9), which bars gun possession by individuals with prior misdemeanor domestic violence convictions. *Chovan*, 735 F.3d at 1133. After acknowledging that *Heller* required a different framework for Second Amendment challenges than this Court had previously employed, this Court instructed lower courts to first determine whether the relevant law burdens Second Amendment-protected conduct and then—if it does—identify and "apply an appropriate level of [means-end] scrutiny" to assess its constitutionality. *Chovan*, 735 F.3d at 1136. This Court then selected intermediate means-end scrutiny for § 922(g) after balancing "how close the law comes to the core of the Second Amendment right" against the extent of § 922(g)'s "burden on that right." *Id.* at 1138 (internal citation and quotations omitted). Applying that intermediate scrutiny, it upheld § 922(g)(9) as substantially related to the government's "important" policy objective of "preventing domestic gun violence." *Id.* at 1139-41.

### 3. *Young v. Hawaii* (2021)

This Court reaffirmed its presumption and means-end scrutiny approach in *Young v. Hawaii*, which rejected a Second Amendment challenge to Hawaii's open-carry licensing regime. *Young*, 992 F.3d at 826. Like *Vongxay*, *Young* held that firearm laws can be upheld "without further analysis" if they fall within *Heller*'s list of "presumptively lawful regulatory measures." *Young*, 992 F.3d at 783. Otherwise, *Young* explained, courts must analyze whether the regulation burdens conduct protected by the Second Amendment, with no such burden existing if the law's targets "have been the subject of longstanding, accepted regulation." *Id.* at 783 (internal citation and quotation omitted). Regulations that are found to burden Second Amendment-protected conduct must then be assessed by "determin[ing] the appropriate level of [means-end] scrutiny" based on a three-part framework. *Id.* at 784. "If a regulation amounts to a destruction of the Second Amendment right, it is unconstitutional under any level of scrutiny; a law that implicates the core of the Second Amendment right and severely burdens that right receives strict scrutiny; and in other cases in which Second Amendment rights are affected in some lesser

way, we apply intermediate scrutiny." *Id.* (internal citation and quotations omitted). *Young* then applied this framework to hold the Hawaii open-carry scheme constitutional, reasoning that the Second Amendment provided "no right to carry arms openly in public" at all, without reaching its level-of-scrutiny stage of analysis. *Id.* at 821, 826.

## B.   *New York State Rifle & Pistol Ass'n, Inc. v. Bruen* (2022)

One year after *Young*, *Bruen* fundamentally altered the analysis governing Second Amendment challenges to firearm laws. Addressing a challenge to New York State's restrictions on concealed carry—one of *Heller*'s "presumptively lawful" regulations—the Supreme Court expressly repudiated the means-end scrutiny approach *Vongxay*, *Chovan*, and *Young* had employed. *Bruen,* 142 S. Ct. at 2125-27.[4] Noting that Circuits post-*Heller* had "coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny," *id.* at 2125, *Bruen* explicitly "decline[d] to adopt that two-part approach," *id.* at 2126. Instead, it adopted a new, two-part

---

[4] The Supreme Court expressly vacated this Court's judgment in *Young* and remanded for further consideration in light of *Bruen*. *Young v. Hawaii*, 142 S. Ct. 2895 (2022).

approach of its own that relied solely on plain text at step one and history at step two. At step one, "when the Second Amendment's plain text covers an individual's conduct," it said, "the Constitution presumptively protects that conduct," such that any regulation of it is presumptively unconstitutional. *Id.* At step two, the government has the burden to counteract that presumption against the regulation's constitutionality, but cannot meet its burden by "simply posit[ing] that the regulation promotes an important [government] interest." *Id.* Instead, *Bruen* explained, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation," *id.*, by "identify[ing] a well-established and representative historical analogue" to the regulation it seeks to uphold, *id.* at 2133. Only on such a showing "may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* at 2126 (cleaned up).

10

# III.   ARGUMENT

## A.   *Bruen* Worked Four Fundamental Changes to This Court's Second Amendment Analytical Framework

*Bruen* is irreconcilable in four respects with this Court's prior Second Amendment analytical framework from *Vongxay*, *Chovan*, and *Young*.

*First*, *Bruen* added steps to *Vongxay*'s and *Young*'s truncated inquiry that had either blessed regulations on *Heller*'s "presumptively lawful" list without further analysis or required means-end scrutiny. *Bruen* requires a more nuanced approach: first focusing on the Second Amendment's "plain text" to ask whether it covers the conduct at issue, and then—if so—examining history to determine whether a historical tradition of similar regulation exists.

*Second*, *Bruen* modified and redirected the presumptions involved in evaluating Second Amendment challenges to firearm regulations. Whereas *Vongxay*, *Chovan,* and *Young* relied on *Heller* to automatically presume the *validity* of laws they addressed, *Bruen* demands an initial determination whether conduct falls within the Second Amendment's scope and then—if it does—points the presumption *against* the

11

regulation's validity, placing the burden on the government to show the regulation is lawful because it falls within a historical tradition.[5]

*Third*, *Bruen* explicitly employed a fundamentally different analytical framework. *Vongxay*, *Chovan*, and *Young*—like other pre-*Bruen* federal appellate decisions—embraced a means-end interest-balancing analysis that empowered judges to map the government's policy reasons for the challenged regulation onto the methods by which the challenged regulation addressed those concerns. But *Bruen* explicitly repudiated that approach, stating that "*Heller* and [the subsequent decision in] *McDonald [v. City of Chicago]*[6] do not support applying means-end scrutiny in the Second Amendment context" at all. *Id.* at 2127. *Bruen* instead recognized an impermeable Second

---

[5] The government has already acknowledged that "*Bruen* abrogated both steps of *Chovan*'s analysis" under *Miller v. Gammie*, and therefore required this Court to take "a fresh look at the constitutionality of" the provision *Chovan* addressed, 18 U.S.C. § 922(g)(9). Gov't Answering Br. at 11-13, *United States v. Yates*, No. 22-30051, Dkt. 12 (9th Cir. Aug. 31, 2022), *available at* 2022 WL 4101104.

[6] *McDonald v. City of Chicago*, 561 U.S. 742, 778 (2010), held that individuals' Second Amendment right to keep and bear arms, first recognized in *Heller*, applies to the states by virtue of the Fourteenth Amendment.

Amendment right "to keep and bear arms" that—instead of being
susceptible to subordination by countervailing interests—requires the
government to "affirmatively prove that its firearms regulation is part
of the historical tradition that delimits the outer bounds of th[at] right."
*Id.*

    *Fourth* and finally, *Bruen* implicitly invalidated *Vonxay*'s,
*Chovan*'s, and *Young*'s reliance on *Heller*'s "presumptively lawful
regulatory measures" to determine what conduct is protected by the
Second Amendment. *Bruen* itself addressed one of the types of
regulations on *Heller*'s list—a restriction on "carrying concealed
weapons." *Heller*, 554 U.S. at 626. Yet, rather than declaring that
regulation constitutional without further analysis, as *Vongxay*, *Chovan*,
and *Young* would have required—*Bruen* instead subjected it to the
same two-step text-and-history analysis it prescribed for all other
regulations alleged to impinge on Second Amendment-protected
conduct. *Bruen*, 142 S. Ct. at 2134-56.[7]

---

    [7] If anything, the New York licensing scheme addressed in *Bruen*
would have been more entitled to a presumption of constitutionality
than the outright "*prohibitions* on carrying concealed weapons"
addressed in *Heller*, 554 U.S. at 626 (emphasis added), because the New

This Court recently acknowledged *Bruen*'s irreconcilability with this Court's prior law in *United States v. Alaniz*, 69 F.4th 1124 (9th Cir. 2023). While *Alaniz* did not explicitly address whether *Bruen* satisfied the *Miller v. Gammie* standard, it recognized that *Bruen* occasioned fundamental analytical changes. Specifically, *Alaniz* noted that *Bruen* "rejected" *Chovan*'s and *Young*'s presumptive-lawfulness and means-end framework by instead demanding a purely "textual analysis" at step one, jettisoning any "means-end analysis" at step two, and "adopt[ing]" a new "two-part test": first asking whether the Second Amendment's "plain text" covers the conduct at issue and then—if so—requiring the government to "justify its regulation" by "produc[ing] representative analogs to demonstrate that the challenged law is consistent with a historical tradition of regulation." *Alaniz*, 69 F.4th at 1128. *Alaniz* relied exclusively on *Bruen* for this test; it neither cited *Vongxay*, *Chovan*, or *Young* in articulating it, nor indicated that those cases' approach was consistent with *Bruen*. *Alaniz* thus implicitly

---

York scheme in *Bruen*, though highly restrictive, did not outright prohibit concealed carry.

acknowledged that *Bruen*'s new standard worked a sea change in

Second Amendment law.

**B.** ***Bruen* Is a Textbook Example of the Types of Jurisprudential Shifts This Court Has Held to Abrogate Prior Precedent Under *Miller v. Gammie***

This Court should make explicit what *Alaniz* already recognized:

that the changes *Bruen* wrought in Second Amendment law—adding

analytical steps, redirecting the presumptions, changing the analytical

framework, and implicitly eschewing dispositive treatment of *Heller*'s

"presumptively lawful" list—overruled *Vongxay*, *Chovan*, and *Young*

under *Miller v. Gammie*. Indeed, these analytical changes constitute the

precise types of jurisprudential shifts this Court has previously held to

satisfy *Miller*'s "irreconcilab[ility]" standard. *Miller*, 335 F.3d at 900.

In this section, Amici discuss four categories of cases in which this

Court found *Miller*'s standard met based on jurisprudential shifts

indistinguishable from those *Bruen* worked with respect to *Vongxay*,

*Chovan*, and *Young*. Those decisions' reasoning requires the same

conclusion here: that *Bruen* abrogated this Court's prior Second

Amendment precedents.

15

1. ***Miller v. Gammie*'s Standard**

In *Miller v. Gammie*, this Court addressed when a three-judge panel can disregard its prior precedent in the face of an intervening Supreme Court decision. *Miller*, 335 F.3d at 892-93. It should do so, this Court held, "where the reasoning or theory of . . . prior circuit authority is clearly irreconcilable with the reasoning or theory of [that] intervening higher authority." *Id.* at 893. Even when the "issues" decided by prior and intervening authority are not "identical," *Miller* said, its standard is met if the intervening authority "undercut[s] the [prior precedent's underlying] theory or reasoning . . . in such a way that the cases are clearly irreconcilable." *Id.* at 900. Courts must "focus on the *reasoning* and *analysis* in support of a holding, rather than the holding alone." *Rodriguez v. AT&T Mobility Servs., LLC,* 728 F.3d 975, 979 (9th Cir. 2013) (internal citation and quotation omitted) (emphasis in original).

2. ***Miller* Is Satisfied Where Intervening Authority Adds Steps to an Existing Method of Analysis**

Since *Miller*, this Court has held its standard met by intervening authority that adds steps to its prior mode of legal analysis. *Bruen* worked precisely such a change over this Court's prior precedent.

16

*Vongxay* and *Young* engaged in a truncated step one analysis by holding regulations constitutional "without further inquiry" if they appeared on *Heller*'s presumptively constitutional list. In so doing, those decisions avoided any genuine textual or historical analysis for what had been deemed presumptively-lawful regulations. *Bruen* instead clarified that step one must focus on the Second Amendment's "plain text," with history coming into play at step two, once the Second Amendment's text has been found to apply to the regulated conduct. And it did so even for one of the very types of regulations *Heller* had listed among its presumptively-constitutional measures: a regulation on concealed carrying of firearms. Under *Bruen*, even measures *Heller* described as presumptively lawful must undergo textual scrutiny at step one, and historical analysis at step two, before they may be held constitutional.

A similar Supreme Court addition of steps to a governing legal analysis prompted this Court to hold *Miller*'s standard met—and prior precedent overruled—in *Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747 (9th Cir. 2023). *Glazer* examined prior Circuit precedent holding that the sufficiency of a securities fraud plaintiff's pleadings as to falsity and scienter must be assessed together, as a

17

"single inquiry," such that the high, "strong inference," standard for pleading scienter also resulted in a stricter standard for pleading falsity. *Id*. at 766. But intervening Supreme Court authority instead "treated falsity and scienter as separate requirements," and required that the adequacy of pleadings as to those two prongs must be evaluated separately. *Id.* This Court thus held its prior precedent extending the "strong inference of scienter" standard to falsity had been abrogated under *Miller* and was no longer good law; while scienter still had to be pled to a "strong inference," falsity now needed only to be pled only to the lesser "reasonable inference" standard applicable to pleadings outside the securities fraud context. *Id.* This Court also noted that its own precedent post-dating the intervening Supreme Court decisions had implicitly recognized this shift by "refrain[ing] from co-mingling the [falsity and scienter] inquiries." *Id*. That implicit change in Circuit practice, this Court said, confirmed that its prior precedent had been implicitly overruled. *Id.*

*Glazer*'s *Miller v. Gammie* analysis is directly applicable to the change *Bruen* implemented over *Vongxay*'s and *Young*'s prior analytical approach to Second Amendment claims. Just as the intervening

Supreme Court precedent addressed in *Glazer* separated the falsity and scienter pleading requirements in securities fraud cases, *Bruen* requires distinct textual and historical Second Amendment analyses instead of *Vongxay's* and *Young*'s short-circuiting of those inquiries based on *Heller*'s presumptively-lawful list. And just as the intervening Supreme Court precedent in *Glazer* required two distinct inquiries and legal standards that Circuit authority had previously amalgamated, *Bruen* demands a text-based step one and history-based step two analysis instead of the abbreviated inquiry *Vongxay* and *Young* endorsed.

### 3. *Miller* Is Satisfied Where Intervening Authority Shifts the Applicable Presumptions

Another category of this Court's post-*Miller* decisions holds *Miller*'s standard met, and prior Circuit authority overruled, when intervening Supreme Court precedent shifts or modifies the presumptions involved in the relevant legal analysis. *Bruen* worked precisely such a change. This Court's pre-*Bruen* precedents in *Vongxay, Chovan,* and *Young* had applied a conclusive presumption *in favor of* firearm regulations' constitutionality: automatically presuming regulations on *Heller*'s "presumptively lawful" list to be constitutional and—even for regulations not on *Heller*'s list—demanding only a

19

moderate governmental justification for them under intermediate scrutiny. *See Chovan*, 735 F.3d at 1139-40 (finding intermediate scrutiny satisfied by "important" government interest in preventing domestic gun violence, and ban on domestic violence misdemeanants possessing guns "substantially" related to that interest). Those decisions also implicitly placed the burden on the party claiming Second Amendment protection to provide historical justification for her position: *Vongxay*, for instance, relied on the historically-ambiguous idea of a "virtuous citizen[ry]" to resolve the Second Amendment question against the 18 U.S.C. § 922(g) defendant even as it acknowledged that "the historical question has not been definitively resolved." *Vongxay*, 594 F.3d at 1118; *see also Chovan*, 735 F.3d at 1138 (narrowly defining the Second Amendment's historical right as possessed by "*law-abiding, responsible* citizen[s]") (emphasis in original).

But *Bruen* modified those presumptions. Instead of automatically presuming the lawfulness of regulations listed in *Heller*, it requires affirmative historical justification for regulation of *any* conduct subsumed by the Second Amendment's "plain text"—even conduct

targeted by the sort of regulations *Heller* described as historically founded, like the concealed-carry regulation *Bruen* addressed. *Bruen* thus accepted *Heller*'s invitation to undertake a fulsome historical analysis of even the regulations *Heller* identified as rooted in history,[8] and—even for those regulations—requires the government to produce historical analogs. And instead of resolving historical ambiguity against Second Amendment protections, as *Vongxay* did, or allowing presumptive unconstitutionality to be overcome by policy justifications, as *Chovan* and *Young* permitted, *Bruen* requires the government to produce affirmative evidence of analogous historical exemplars to prove the regulations fall within a historical tradition. After *Bruen*, that burden rests squarely on the government.

This Court has repeatedly held these types of shifts in presumptions or burdens of proof to meet *Miller*'s standard for overruling its prior precedent. In *Cottonwood Environmental Law Center v. United States Forest Service*, 789 F.3d 1075, 1088-91 (9th Cir.

---

[8] *See Heller*, 554 U.S. at 635 ("[T]here will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us.").

2015), this Court addressed prior Circuit precedent that had presumed the irreparable injury requirement for obtaining injunctive relief to be automatically satisfied when the underlying claim is a procedural violation of the Endangered Species Act ("ESA"). But *Cottonwood* held that those prior circuit precedents had been fatally undermined by intervening Supreme Court precedent that—instead of presuming irreparable injury—required plaintiffs pursuing claims under the National Environmental Protection Act ("NEPA") to affirmatively show irreparable injury was "likely" and forbade courts from putting their "thumb[s] on the scales" in favor of an irreparable injury finding. *Id.* at 1089-90. Although the intervening Supreme Court precedent addressed NEPA instead of the ESA, this Court held it nevertheless invalidated prior Circuit precedent regarding injunctive relief in the ESA context, because those prior Circuit precedents had themselves drawn on this Court's presumption of irreparability under NEPA. *Id.* at 1090-91.

This Court again held burden-altering Supreme Court precedent to satisfy *Miller*'s standard in *Jordan v. Nationstar Mortgage, LLC*, 781 F.3d 1178 (9th Cir. 2015), and *Rodriguez v. AT&T Mobility Servs., LLC*, 728 F.3d 975 (9th Cir. 2013), two cases involving the preconditions for

removing multistate class action cases from state to federal court. Prior Ninth Circuit precedent had required courts to strictly construe the requirements for removal of Class Action Fairness Act ("CAFA") claims against federal jurisdiction. *Jordan*, 781 F.3d at 1182-83; *Rodriguez*, 728 F.3d at 980. But this Court in *Jordan* and *Rodriguez* held those prior precedents had been overruled under *Miller v. Gammie* by intervening Supreme Court precedent requiring a strong preference for federal jurisdiction in CAFA cases, and precluding plaintiffs from defeating such jurisdiction through strategic pleading. *Jordan*, 781 F.3d at 1183; *Rodriguez*, 728 F.3d at 980-81. *Jordan* held the intervening precedent presuming federal jurisdiction overruled prior Ninth Circuit precedent that had barred resetting the 30-day removal period from the date the CAFA removal basis became apparent. *Jordan*, 781 F.3d at 1183-84. *Rodriguez*, similarly, held the intervening Supreme Court precedent effectively overruled prior Circuit precedent that had required the party seeking removal to show the $500,000 amount-in-controversy for class action removals "to a legal certainty." *Rodriguez*, 728 F.3d at 981.

This Court has also held *Miller v. Gammie*'s "irreconcilability" standard met because of shifted presumptions in cases from the labor and Social Security disability contexts. In *SEIU Local 121RN v. Los Robles Regional Medical Center*, 976 F.3d 849, 855-56 (9th Cir. 2020), a labor dispute, this Court held that its prior precedents construing arbitration clauses in labor agreements to permit arbitrators to determine arbitrability had been effectively overruled by intervening Supreme Court authority presuming arbitrability in labor agreements to be a question for the court. And in *Lambert v. Saul*, 980 F.3d 1266 (9th Cir. 2020), a case regarding Social Security disability benefits, this Court held that intervening Supreme Court authority requiring deference to agency interpretations of ambiguous statutes undermined this Court's prior, judicially-applied presumption of continuing disability once a person was initially declared disabled. *Id.* at 1274. The agency's interpretation was irreconcilable with the presumption, because it required disability determinations to be made on a neutral basis. *Id.* at 1273-74.

In each of these cases the addition, elimination, or redirecting of a presumption was held to constitute a sea change in governing law

24

sufficient to overrule prior Circuit authority under *Miller*. *Bruen's* shift away from *Vongxay*'s and *Young*'s automatic presumption of validity for regulations on *Heller*'s "presumptively lawful" list, to a requirement of historical inquiry and affirmative historical justification by the government, constitutes precisely this type of change. *Bruen* made clear that this shift applies across the board, even to regulations included on *Heller*'s "presumptively lawful" list, because it applied its new approach to one of the very regulations on that list, a concealed-carry restriction. Like the other presumption-shifting Supreme Court precedents this Court has held to meet *Miller's* standard for abrogating prior precedent, *Bruen* is fundamentally irreconcilable with *Vongxay*'s and *Young*'s approach of declaring regulations on *Heller*'s list valid without further analysis.

### 4. *Miller* Is Satisfied Where Intervening Authority Changes the Governing Legal Analysis

Yet another category of this Court's decisions have held *Miller v. Gammie*'s standard met when an intervening Supreme Court decision repudiates a previously-employed analytical framework—as *Bruen* did with the "judge-empowering interest-balancing inquiry" utilized by *Vongxay*, *Chovan*, and *Young*, *Bruen*, 142 S. Ct. at 2129 (cleaned up)—

25

and substitutes a different legal mode of analysis. *Bruen* did just that when it discarded this Court's previously-applicable interest-balancing inquiry and adopted a "new standard," *United States v. Bullock*, 2023 WL 4232309, at *3 (S.D. Miss. June 28, 2023), requiring courts to focus solely on whether history revealed a tradition of firearm regulations analogous to the challenged restriction.

Myriad Ninth Circuit decisions hold *Miller*'s standard met based on this type of change in legal methodology. In *United States v. Dixon*, 984 F.3d 814, 819-20 (9th Cir. 2020), for instance, this Court held the Supreme Court's decisions in *United States v. Jones*, 565 U.S. 400, 408-09 (2012), and *Florida v. Jardines*, 569 U.S. 1, 11 (2013)—holding that an unreasonable Fourth Amendment search can consist of *either* an invasion of a reasonable expectation of privacy *or* a physical trespass onto property—was fundamentally irreconcilable with prior Circuit precedent holding only the former violation qualified. In *United States v. Paixao*, 885 F.3d 1203, 1208 n.2 (9th Cir. 2018), this Court held its prior rule for determining whether an institution qualifies as one receiving federal benefits under 18 U.S.C. § 666—*i.e.*, whether the institution itself receives the funds—had been overruled by intervening

26

Supreme Court precedent looking instead to "the purposes and operation of the . . . federal program" at issue. In *United States v. Castillo*, 69 F.4th 648, 656-58 (9th Cir. 2023), this Court held that the Supreme Court's decision in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019)—allowing deference to agencies' reasonable interpretations of their regulations only when the regulations are "genuinely ambiguous"—abrogated this Court's prior rule that Sentencing Guidelines commentary controlled so long as not inconsistent with the applicable Guideline. And in *United States v. Ferguson*, 560 F.3d 1060, 1068 & n.4 (9th Cir. 2009), this Court held that the Supreme Court's decision in *Indiana v. Edwards*, 554 U.S. 164 (2008)—permitting courts to apply a higher standard for evaluating a criminal defendant's competency to represent herself at trial than for competency to stand trial—had effectively overruled prior Circuit precedent equating the two standards.

Each of these cases held the Supreme Court's substitution of a new legal test for a prior mode of analysis employed by Circuit precedent to be a fundamental change in the law overruling the prior Circuit precedent. The same conclusion should apply here, where *Bruen*

27

not only actually but expressly jettisoned this and other Circuits'
employment of what *Bruen* called a "judge-empowering interest-
balancing inquiry that asks whether the statute burdens a protected
interest in a way or to an extent that is out of proportion to the statute's
salutary effects upon other important governmental interests." *Bruen*,
142 S. Ct. at 2129 (cleaned up). *Bruen* explained that its prior decisions
in *Heller* and *McDonald* had "declined to engage in means-end scrutiny"
because "the very enumeration of the right takes out of the hands of
government—even the Third Branch of Government—the power to
decide on a case-by-case basis whether the right is *really worth* insisting
upon." *Id.* (internal quotation and citation omitted) (emphasis in
original). *Bruen* thus expressly rejected the means-end balancing
approach around which the Circuits had "coalesced" after *Heller* as a
misguided gloss on *Heller* itself, *id.* at 2125, 2129, and mandated an
entirely new analysis focused on the Second Amendment's text and
history. Indeed, this Court's decision in *Alaniz* already recognized the
disjunction between *Bruen* and its prior law: it cited its own pre-*Bruen*
*Chovan* decision as an example of "means-end" scrutiny, said *Bruen* had
rejected *Chovan*'s two-step approach as "one step too many," and did not

rely on *Vongxay*, *Chovan,* or *Young* for its legal standard at all. *Alaniz*, 69 F.4th at 1127-28; *cf. Glazer*, 63 F.4th at 766 (finding *Miller*'s standard met while noting that Circuit precedents post-dating the intervening Supreme Court decisions had implicitly acknowledged the doctrinal change).

This Court should expressly recognize, as *Alaniz* already implicitly did, that *Bruen* abrogated its prior precedent. That conclusion is justified by the same changes in legal frameworks that prompted this Court to hold its prior precedents overruled in *Dixon*, *Paixao*, *Castillo*, and *Ferguson*.

### 5. *Miller* Is Satisfied Where Intervening Authority Actually Engages in an Analysis Inconsistent with Prior Circuit Precedent

Finally, this Court has repeatedly found *Miller v. Gammie*'s standard met when intervening Supreme Court authority—though not expressly repudiating a preexisting legal rule or framework—actually engages in a "mode of analysis" inconsistent with a rule employed in prior circuit cases. *In re Stern*, 345 F.3d 1036, 1043 (9th Cir. 2003). *Bruen* did precisely that by actually treating one of *Heller*'s "presumptively lawful" types of regulations *not* as per se

29

constitutional—as *Vongxay*, *Chovan*, and *Young* would have required—but instead as subject to the same two-part text-and-history analysis applicable to all other firearm regulations. In so doing, *Bruen* implicitly held that *Heller* did not conclusively resolve the legality of the firearm regulations it listed, because *Heller* had not undertaken, as to those regulations, the comprehensive historical analysis *Bruen* placed at the center of its methodology.

An early example of this Court's decisions finding *Miller*'s standard met by intervening Supreme Court decisions embodying a conflicting mode of analysis is *United States v. Plouffe*, 445 F.3d 1126, 1128 (9th Cir. 2006). There, this Court noted that pre-*Booker* precedent had precluded appellate jurisdiction over criminal sentences that fell within the applicable Guidelines range. *Id.* But *Booker* was clearly irreconcilable with that precedent, this Court held, because it had transformed Guidelines ranges from mandatory to advisory. The prior jurisdiction-precluding precedent "made sense," this Court held, "when the Guidelines were considered mandatory, with only a limited scope of permissible departure," but no longer made sense "now that the Guidelines must be viewed [under *Booker*] as merely advisory, with

sentencing courts exercising discretion within and beyond Guidelines ranges, guided by the statutory purposes of sentencing," and now that "*Booker* requires that appellate courts review the reasonableness of all sentences" under 18 U.S.C. § 3553(a). *Id.* Precluding jurisdiction over such appeals would "contravene *Booker*'s mandate regarding appellate review" by eliminating review of the non-Guidelines factors relevant to sentencing under *Booker*'s new framework. *Id.* at 1130. As it was now possible, post-*Booker*, for a sentence to be "in violation of law" even if it fell within the correct Guidelines range, the prior precedent could not coexist with *Booker*'s regime. *Id.*

Another example of a *Miller*-qualifying Supreme Court decision that actually employed a mode of analysis contrary to prior Circuit law is *Robbins v. Carey*, 481 F.3d 1143 (9th Cir. 2007). There, this Court examined its own prior precedent that had required district courts *sua sponte* to inform pro se habeas corpus petitioners of the possibility that their partially-unexhausted habeas corpus petitions—instead of being dismissed, and possibly becoming time-barred—could instead be subjected to a "stay and abey" procedure permitting the petitioner to delete unexhausted claims and return to state court to exhaust them

31

while the district court held the already-exhausted remainder of the petition in abeyance. *Id.* at 1148. Other Circuit precedent had further obligated district courts *sua sponte* to inform pro se habeas petitioners of the applicable statute of limitations for federal habeas corpus petitions, and that they would be barred from seeking habeas relief in federal court if they failed to amend their petitions or dismissed them to exhaust unexhausted claims. *Id.* But this Court held that prior precedent had been effectively overruled, under *Miller*, by the Supreme Court's intervening decision in *Pliler v. Ford*, 542 U.S. 225 (2004). *Id.* at 1148-49. Though *Pliler* only expressly rejected courts' *sua sponte* obligation to advise pro se petitioners about the stay-and-abey procedure, this Court held its reasoning and mode of analysis also undermined prior precedent obligating *sua sponte* warnings about the statute of limitations and possible dismissal, because *Pliler* broadly held that district courts "have no obligation to act as counsel or paralegal to *pro se* litigants" or "take over chores for a *pro se* defendant that would normally be attended to by trained counsel as a matter of course." *Id.* at 1148.

This Court confronted a similar disjunction between its prior precedent and the Supreme Court's mode of analysis in an intervening decision in *Witt v. Dept. of Air Force*, 527 F.3d 806 (9th Cir. 2008), a case in which a discharged Air Force nurse brought Equal Protection and substantive and procedural due process challenges to the military's "Don't Ask, Don't Tell" ("DADT") policy barring gay and lesbian individuals from employment. *Witt* recognized that prior Ninth Circuit precedent had applied mere rational basis review to Equal Protection and substantive and procedural due process challenges to DADT; but it held that the Supreme Court's intervening decision in *Lawrence v. Texas*, 539 U.S. 558 (2003)—though "silent as to the level of scrutiny that it applied"—had effectively overruled this Court's prior rational-basis precedents by effectively "appl[ying] a heightened level of scrutiny." *Id.* at 814-16. It explained that the Supreme Court in *Lawrence* overruled its own prior precedent that had upheld a state sodomy law under rational basis review, criticized its own prior failure to appreciate the gravity of individuals' liberty interest in same-sex sexual activity, relied on cases applying heightened scrutiny, and required the state to justify its intrusion into individuals' private lives

(which would not have been required under rational basis review). *Id.* at 816-17. This Court held its precedents further undermined by *Sell v. United States*, 539 U.S. 166, 178 (2003), which had similarly required the government to "justify" its intrusion into individuals' liberty interest against being forcibly medicated for trial. *Witt*, 527 F.3d at 818. Based on *Sell*, this Court held that attempted governmental intrusions on gay and lesbian individuals' "personal and private lives" must satisfy a four-part test requiring an important governmental interest, that the intrusion significantly further that interest, and that it be necessary to do so. *Id.* at 819. Thus, although no intervening Supreme Court precedent had addressed the precise question or situation at issue in *Witt*, this Court extrapolated from the actual method of analysis employed by intervening Supreme Court decisions to conclude its prior precedent had been overruled.

Like the intervening decisions in *Plouffe*, *Robbins*, and *Witt*, *Bruen*'s mode of analysis invalidates that employed in *Vongxay*, *Chovan*, and *Young*. The Supreme Court in *Bruen* explicitly rejected, and declined to engage in, the means-end approaches required by those decisions, instead applying its new, history-focused mode of scrutiny to

New York's concealed-carry licensing scheme. And it required the government to produce historical justification to support one of the very types of regulations—a concealed-carry regulation—that *Vongxay*, *Chovan*, and *Young* would previously have held presumptively valid because included under *Heller*'s presumptively-lawful list.

## IV.   CONCLUSION

For the foregoing reasons, and those stated in Appellant's opening brief, this Court should reverse the judgment of the district court. In doing so, it should rule that *Bruen* is clearly irreconcilable with, and thus overrules, its prior precedents in *Vongxay*, *Chovan*, and *Young* under *Miller v. Gammie*.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: July 26, 2023          By  */s/ Margaret A. Farrand*
MARGARET A. FARRAND
ANDREW B. TALAI
Deputy Federal Public Defenders
Attorneys for Amici Curiae

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 29(a)(4)(G), and 29(a)(5), I certify that this brief is proportionally spaced, has a typeface of 14 points or more, and contains 6,288 words.


DATED: July 26, 2023          */s/ Margaret A. Farrand*
                              MARGARET A. FARRAND