No. 23-598

# United States Court of Appeals
### FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
PLAINTIFF-APPELLEE

*v.*

ORLANDO ROJO,
DEFENDANT-APPELLANT

*On Appeal from the United States District Court
for the Southern District of California
21CR682-GPC*

**ANSWERING BRIEF FOR THE UNITED STATES**

TARA K. MCGRATH
*United States Attorney*

DANIEL E. ZIPP
*Assistant U.S. Attorney
Chief, Appellate Section
Criminal Division*

ZACHARY J. HOWE
*Assistant U.S. Attorney*

*880 Front St., Rm. 6293
San Diego, CA 92101
(619) 546-8693*

**TABLE OF CONTENTS**

Page

Introduction ............................................................. 1

Jurisdiction and Bail Status ..................................... 3

Question Presented ................................................. 3

Relevant Laws ........................................................ 3

Statement ............................................................... 4

Summary of Argument ............................................ 6

Argument ............................................................... 8

A. The standard of review is *de novo*. ................... 8

B. The felon-in-possession law is constitutional. ................. 8

    1. Precedent forecloses Rojo's constitutional challenge. . 9

        a. This Court has held that the felon-in-possession law is constitutional. ................ 9

        b. *Bruen* is not clearly irreconcilable with this Court's cases upholding § 922(g)(1). .................. 12

        c. Rojo offers no convincing reason to hold otherwise. ........................................... 17

    2. Historical analysis shows that the felon-in-possession law is constitutional. ................. 20

        a. Historical felony penalties, which were more severe than gun bans, support § 922(g)(1)'s validity. ................. 20

        b. Laws disarming the dangerous and unlawful support § 922(g)(1)'s validity ................ 30

        c. Convention proposals also support § 922(g)(1). .... 36

i

d.  Section 922(g)(1) is relevantly similar to historical laws regulating firearms. ................... 39

e.  Rojo offers no convincing reason to hold otherwise. ........................................... 41

3.  Even if a version of Rojo's analysis were right, § 922(g)(1) would still be valid as applied to him...... 48

Conclusion .............................................................. 50

Certificate of Compliance

**TABLE OF AUTHORITIES**

Cases:

*Atkinson v. Garland*,
70 F.4th 1018 (7th Cir. 2023) ............................. 12, 19, 34

*Barrett v. United States*,
423 U.S. 212 (1976) ....................................... 41

*Baze v. Rees*,
553 U.S. 35 (2008) ........................................ 23

*Bose Corp. v. Consumers Union of U.S., Inc.*,
466 U.S. 485 (1984) ....................................... 29

*CoreCivic, Inc. v. Candide Grp., LLC*,
46 F.4th 1136 (9th Cir. 2022) ......................... 13

*D.C. v. Heller*,
554 U.S. 570 (2008) .............................. passim

*Day v. Apoliona*,
496 F.3d 1027 (9th Cir. 2007) ...................... 13

*Duncan v. Bonta*,
83 F.4th 803 (9th Cir. 2023) (en banc) .......... 47

*Folajtar v. Att'y Gen.*,
  980 F.3d 897 (3d Cir. 2020) .................................... passim

*Heller v. D.C.*,
  670 F.3d 1244 (D.C. Cir. 2011) ................................ 10, 36

*Huddleston v. United States*,
  415 U.S. 814 (1974) ......................................................41

*Kaemmerling v. Lappin*,
  553 F.3d 669 (D.C. Cir. 2008) ........................................41

*Kanter v. Barr*,
  919 F.3d 437 (7th Cir. 2019) ................................. passim

*Mai v. United States*,
  952 F.3d 1106 (9th Cir. 2020) .......................................44

*Mai v. United States*,
  974 F.3d 1082 (9th Cir. 2020) .......................................11

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010) ......................................................10

*Medina v. Whitaker*,
  913 F.3d 152 (D.C. Cir. 2019) ................ 19, 21, 27, 36, 39

*Miller v. Gammie*,
  335 F.3d 889 (9th Cir. 2003) (en banc) ......................8, 12

*Musladin v. Lamarque*,
  555 F.3d 830 (9th Cir. 2009) ....................................12-13

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  142 S. Ct. 2111 (2022) ........................................... passim

*Range v. Att'y Gen.*,
  69 F.4th 96 (3d Cir. 2023) (en banc) ........... 12, 22, 34, 48

*Sanchez v. Mayorkas*,
  141 S. Ct. 1809 (2021) ................................................8-9

iii

*Teter v. Lopez,*
  76 F.4th 938 (9th Cir. 2023) ............................................ 43

*Tingley v. Ferguson,*
  47 F.4th 1055 (9th Cir. 2022) ........................................ 12

*Tyler v. Hillsdale Cty. Sheriff's Dep't,*
  837 F.3d 678 (6th Cir. 2016) ......................................... 27

*United States v. Alaniz,*
  69 F.4th 1124 (9th Cir. 2023) ............................ 43, 47, 49

*United States v. Bryant,*
  643 F.3d 28 (1st Cir. 2011) ............................................ 29

*United States v. Butts,*
  637 F.Supp.3d 1134 (D. Mont. 2022) ....................... 12, 19

*United States v. Charles,*
  633 F.Supp.3d 874 (W.D. Tex. 2022)............................. 28

*United States v. Davila,*
  --- F.Supp.3d ----, 2023 WL 5361799
  (S.D.N.Y. 2023) ...................................................... 19, 33

*United States v. Delpriore,*
  634 F.Supp.3d 654 (D. Alaska 2022)............................. 12

*United States v. Dunn,*
  728 F.3d 1151 (9th Cir. 2013) .................................. 12, 13

*United States v. Eckford,*
  77 F.4th 1228 (9th Cir. 2023) ........................................ 12

*United States v. Green,*
  722 F.3d 1146 (9th Cir. 2013) .................................. 13, 19

*United States v. Hill,*
  629 F.Supp.3d 1027 (S.D. Cal. 2022) ............................ 12

iv

*United States v. Jackson*,
  69 F.4th 495 (8th Cir. 2023) ................................... passim

*United States v. Jackson*,
  --- F.Supp.3d ----, 2023 WL 1967199
  (W.D. Wash. 2023) .................................................. 12, 19

*United States v. Jimenez-Shilon*,
  34 F.4th 1042 (11th Cir. 2022) ....................................... 32

*United States v. Lowry*,
  No. 22CR10031-CBK, 2023 WL 3587309
  (D.S.D. May 5, 2023) (unpublished) ............................... 36

*United States v. Kelly*,
  No. 22CR37-AAT, 2022 WL 17336578
  (M.D. Tenn. Nov. 16, 2022) (unpublished) .............. 44, 45

*United States v. Melendrez-Machado*,
  --- F.Supp.3d ----, 2023 WL 4003508
  (W.D. Tex. 2023) .............................................................. 35

*United States v. Phillips*,
  827 F.3d 1171 (9th Cir. 2016) ........................................ 11

*United States v. Price*,
  635 F.Supp.3d 455 (S.D.W. Va. 2022) ............................ 19

*United States v. Rozier*,
  598 F.3d 768 (11th Cir. 2010) ........................................ 10

*United States v. Schnur*,
  --- F.Supp.3d. ----, 2023 WL 4881383
  (S.D. Miss. 2023) ............................................................ 47

*United States v. Serrano*,
  --- F.Supp.3d ----, 2023 WL 2297447 (S.D. Cal. 2023) ... 12

*United States v. Skoien*,
  614 F.3d 638 (7th Cir. 2010) ......................................... 38

v

*United States v. Tooley*,
 717 F.Supp.2d 580 (S.D.W. Va. 2010) ............................ 39

*United States v. Vongxay*,
 594 F.3d 1111 (9th Cir. 2010) ................................ passim

*United States v. Yancey*,
 621 F.3d 681 (7th Cir. 2010) ........................................ 41

*United States v. Younger*,
 398 F.3d 1179 (9th Cir. 2005) ................................... 9, 10

*Van Der Hule v. Holder*,
 759 F.3d 1043 (9th Cir. 2014) ...................................... 11

Constitution and Statutes:

 18 Pa. Const. Stat. § 6109(e)(1)(viii) ................................ 15

 18 U.S.C. § 921(a)(20) ..................................................... 40

 18 U.S.C. § 922(g)(1) ...........................................................

 18 U.S.C. § 3231 ............................................................... 3

 28 U.S.C. § 1291 ............................................................... 3

 31 U.S.C. § 5332 ............................................................... 4

 Ga. Code § 16-11-129(b)(2)(B) ........................................ 15

 Haw. Rev. Stat. § 134-7(b) .............................................. 15

 La. Stat. § 40:1379.3(C)(6) .............................................. 15

 Tex. Gov't Code § 411.172(a)(3) ...................................... 15

 U.S. Const. amend II ................................................ passim

 W. Va. Code § 61-7-4(b)(5) ............................................. 15

Rules:

Fed. R. App. P. 4(b)(1)(A)(i) ...............................................3

Other Authorities:

1 *The Laws of Maryland[,] With the Charter, The Bill of Rights, the Constitution of the State, and its Alterations, The Declaration of Independence, and the Constitution of the United States, and its Amendments* (1811)..............24

1 William Blackstone, *Commentaries on the Laws of England* (1765)....................................................................28

2 Bernard Schwartz, *The Bill of Rights: A Documentary History* (1971) ...............................................................37

2 *Statutes at Large of Pennsylvania from 1682 to 1801* (1896) ................................................................24

2 *Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788)* (1886).....................25, 26, 27

3 Acts and Resolves, *Public and Private, of the Province of the Massachusetts Bay* 545 (1878) .................................24

4 *Journals of the Continental Congress 1774–1789* (1906)...........................................................................33

4 William Blackstone, *Commentaries on the Laws of England* (1769)....................................20, 21, 22, 28

7 The Statutes at Large; *Being A Collection of All the Laws of Virginia* (1820)....................................................32

9 William Waller Hening, *Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature* (1821) ...........................................25, 26

An Act for the Punishment of Certain Crimes Against the United States 1 Stat. 112–15 (1790)..............................26

*Acts and Laws of The English Colony of Rhode Island and Providence-Plantations in New-England in America* (1767) ...........................................................................24

Akil Reed Amar, *The Bill of Rights and the Fourteenth Amendment*, 101 Yale L.J. 1193 (1992) .........................28

Alec C. Ewald, *"Civil Death": The Ideological Paradox of Criminal Disenfranchisement Law in the United States*, 2002 Wis. L. Rev. 1045 (2002)............................ 21, 22, 23

Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277 (2014) ..................................................23

Bos. Indep. Chronicle, Phila. Indep. Gazetteer (Aug. 20, 1789) ..........................................................................38

*A Digest of the Laws of Maryland* (1799) .........................26

Dru Stevenson, *In Defense of Felon-in-Possession Laws*, 43 Cardozo L. Rev. 1573 (2022).....................................27

English Bill of Rights, 1 W. & M. § 7 (1689) ...................31

Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191 (2006) ..............35

Javier Bleichmar, *Deportation As Punishment: A Historical Analysis of the British Practice of Banishment and Its Impact on Modern Constitut*ional Law, 14 Geo. Immigr. L.J. 115 (1999).....................................22

Jim Wedeking, *Quaker State: Pennsylvania's Guide to Reducing the Friction for Religious Outsiders Under the Establishment Clause*, 2 N.Y.U. J.L. & Liberty 28 (2006)...................................33

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249 (2020).......................................30, 31

viii

Kevin Francis O'Neill, *Muzzling Death Row Inmates: Applying the First Amendment to Regulations That Restrict A Condemned Prisoner's Last Words*, 33 Ariz. St. L.J. 1159 (2001) ..................................... 29, 30

Letter from Rep. Frederick A. Muhlenberg to Benjamin Rush (Aug. 18, 1789) ..................................................... 38

Militia Act of 1662, 13 & 14 Car. 2, c.3, § 13 ................... 30

Nora V. Demleitner, *Continuing Payment on One's Debt to Society: The German Model of Felon Disenfranchisement As an Alternative*, 84 Minn. L. Rev. 753 (2000) ............. 21

*The Public Records of the Colony of Connecticut From May, 1775 to June, 1776* (1890) ..................................... 32

Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487 (2004) ................................. 34-35

Stephen P. Halbrook, *The Founders' Second Amendment* (2008) ............................................................... 28, 37, 38

Stuart Banner, *The Death Penalty: An American History* (2002) ............................................................. 23

*Whether the Second Amendment Secures an Individual Right*, Op. Off. Legal Counsel (2004), *available at* http://www.usdoj.gov/olc/opinions.htm ......................... 38

Will Tress, *Unintended Collateral Consequences: Defining Felony in the Early American Republic*, 57 Clev. St. L. Rev. 461 (2009) ....................................... 21

ix

No. 23-598

# United States Court of Appeals
### FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
PLAINTIFF-APPELLEE

*v.*

ORLANDO ROJO,
DEFENDANT-APPELLANT

*On Appeal from the United States District Court
for the Southern District of California
21CR682-GPC*

## INTRODUCTION

The Second Amendment protects "the right of the people to keep and bear Arms." U.S. Const. amend II. Yet that right "is not unlimited," *D.C. v. Heller*, 554 U.S. 570, 626 (2008), and the Second Amendment is not "a regulatory straightjacket," *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2133 (2022). Thus, while the Supreme Court has struck down some laws, it has stressed that its decisions protect "law-abiding, responsible citizens" and do not "cast doubt on longstanding prohibitions on the possession of firearms by felons." *Heller*, 554 U.S. at 626, 635. Consistent with that guidance, this Court has held many times that 18 U.S.C. § 922(g)(1), the federal felon-in-possession law, "does not violate the

Second Amendment." *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010).

Rojo disagrees. But the Supreme Court never has. *Bruen*, the Supreme Court's most recent Second Amendment decision, described the rights it addressed as those of "law-abiding citizens." 142 S. Ct. at 2122, 2125, 2131, 2133-34, 2135 n.8, 2138 & n.9, 2150, 2156. Otherwise, it said "nothing about who may lawfully possess a firearm." *Id.* at 2157 (Alito, J., concurring). And certainly, it did not "disturb[] anything . . . said in *Heller*," *id.*, or "cast doubt on longstanding prohibitions on the possession of firearms by felons," *id.* at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 626). On that point everyone agreed. *See id.* at 2189 (Breyer, J., dissenting) (decision "cast[s] no doubt on" felon-in-possession laws). Thus, just as *Heller* gave this Court no license to revisit cases upholding § 922(g)(1), *see Vongxay*, 594 F.3d at 1116–18, *Bruen* gives the Court no license to do that either. Indeed, the case for throwing out precedent after *Bruen* is even weaker. While *Heller* recognized an "individual right" to bear arms and "set forth" a "methodological approach" for analyzing gun laws, *Bruen* simply "appli[ed]" that "test" and made it "more explicit." *Id.* at 2127, 2131, 2134.

Even if the Court were free to reconsider, historical precedent shows that felon-in-possession laws are constitutional. At the time

2

of the Second Amendment's adoption, felons were often put to death, stripped of their estates, or stripped of political rights like the ability to vote or hold office. That a public that approved of killing or disenfranchising felons drew the line at disarming them is not plausible. Early laws and practices disarming various groups deemed to be unlawful or dangerous and early proposals from the ratification conventions reinforce that conclusion. Thus, even if this Court takes a fresh look, it should hold that the felon-in-possession law comports with the Second Amendment.

## JURISDICTION AND BAIL STATUS

The district court had jurisdiction under 18 U.S.C. § 3231 since Rojo was charged with federal offenses. ER-76–77. The court sentenced Rojo to 30 months in custody and entered final judgment on April 4, 2023. ER-3–7. Rojo timely appealed the next day. ER-78; Fed. R. App. P. 4(b)(1)(A)(i). This Court has jurisdiction under 28 U.S.C. § 1291. Rojo is not in custody.

## QUESTION PRESENTED

Does the felon-in-possession law violate the Second Amendment?

## RELEVANT LAWS

The Second Amendment states, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend II.

The felon-in-possession law states, "It shall be unlawful for any person . . . who has been convicted in any court, of a crime punishable by imprisonment for a term exceeding one year" to "possess in or affecting or affecting commerce, any firearm or ammunition." 18 U.S.C. § 922(g)(1).

### STATEMENT

In 2010, Rojo pled guilty to possessing drugs with intent to distribute, a felony, after he was arrested trying to smuggle 79 kilograms (about 174 pounds) of marijuana into the United States from Mexico. Presentence Report (PSR) ¶ 44.

Ten years later, in 2020, Rojo was arrested again while entering Mexico from the United States with a loaded handgun and $50,000 hidden in his car. PSR ¶¶ 4, 6. Rojo waived his *Miranda* rights and denied knowing about the money or gun in his car. PSR ¶¶ 7–8. He noted that his drug dealers used his car after he smoked methamphetamine and feel asleep the night before, and that a mechanic in Mexico might also have been involved. PSR ¶¶ 8–9.

The government charged Rojo with possessing a gun as a felon in violation of 18 U.S.C. § 922(g)(1) and bulk-cash smuggling in violation of 31 U.S.C. § 5332. ER-76–77. It issued him a notice to appear in court for an initial appearance, but Rojo failed to appear and was later detained. PSR ¶ 10.

4

Rojo moved to dismiss the felon-in-possession charge. ER-53–75. He argued that the felon-in-possession law violated the Second Amendment. *Id.* As support, he cited the Supreme Court's recent *Bruen* decision, which voided a state law that conditioned handgun licenses on a showing of "special need." *Id.* The government opposed. ER-33–52. It argued that cases upholding the felon-in-possession law foreclosed Rojo's argument, that *Bruen* did not upset that precedent, and that history showed the law's constitutionality in any event. *Id.*

After a lengthy discussion at a hearing, the district court rejected the argument and denied dismissal. ER-15–24, 30–31.[1] It concluded

---

[1] Other judges in the district have done the same. *See United States v. Durland*, No. 21CR2928-JLS (S.D. Cal. Oct. 13, 2023) (ECF No. 135) (oral ruling); *United States v. Robles*, 23CR2034-LAB (S.D. Cal. Nov. 13, 2023) (ECF No. 29) (oral ruling); *United States v. Hatch*, No. 23CR1201-CAB (S.D. Cal. Aug. 7, 2023) (ECF No. 43) (written order); *United States v. Serrano*, No. 21CR1590-JLS (S.D. Cal. Jan. 17, 2023) (ECF No. 65) (written order); *United States v. Mugavero*, No. 22CR1716-LL (S.D. Cal. Dec. 19, 2022) (ECF No. 29) (oral ruling); *United States v. Dotson*, No. 22CR1502-W (S.D. Cal. Dec. 12, 2022) (ECF No. 26) (oral ruling); *United States v. Tran*, No. 22CR331-BAS (S.D. Cal. Dec. 12, 2022) (ECF No. 63) (oral ruling); *United States v. Brunson*, No. 22CR149-JLS (S.D. Cal. Nov. 18, 2022) (ECF No. 66) (oral ruling); *United States v. Ridgeway*, No. 22CR175-CAB (S.D. Cal. Oct. 17, 2022) (written order); *United States v. Ortiz*, No. 21CR2503-GPC (S.D. Cal. Oct. 14, 2022) (ECF No. 91) (oral ruling); *United States v. Negron*, No. 21CR2687-BAS (S.D. Cal. Oct. 3, 2022) (ECF No. 45) (oral ruling); *United States v. Williams*, No. 21CR478-DMS (S.D. Cal. Sept. 30, 2022) (ECF No.

that precedent foreclosed Rojo's argument and that *Bruen* did not overrule that precedent. ER-30–31. Rojo later pled guilty. PSR ¶ 2.

This appeal follows. ER-78.

## SUMMARY OF ARGUMENT

This Court should affirm Rojo's conviction and reject his argument that the felon-in-possession law is unconstitutional.

First, precedent forecloses that claim. This Court has held that § 922(g)(1) does not violate the Second Amendment. *Bruen* did not overrule that precedent. It had nothing to do with felons, and in fact clarified that the rights it addressed were those of law-abiding citizens. As a majority of justices clarified in various opinions, the decision said nothing about who could lawfully own guns and did not cast doubt on felon-in-possession laws. Even the general methodological points in *Bruen* created limited, if any, tension with this Court's precedent. *Bruen* clarified that history must guide the analysis of gun rights and that tiers of scrutiny play no role. But this Court looked to "historical gun restrictions" and the analysis of "most scholars of the Second Amendment" who had studied the history to uphold § 922(g)(1) after *Heller*. *Vongxay*, 594 F.3d at 1116–

76) (oral ruling); *United States v. Perez*, No. 21CR508-CAB (S.D. Cal. Sept. 26, 2022) (ECF No. 78) (written order); *United States v. Hill*, No. 21CR107-WQH (S.D. Cal. Sept. 21, 2022) (ECF No. 70) (written order); *United States v. Havins*, No. 21CR1515-H (S.D. Cal. Sept. 12, 2022) (ECF No. 62) (oral ruling).

18. And it never used tiers of scrutiny. So *Bruen* is not plainly irreconcilable with that precedent. The Court should thus apply that precedent here and reject Rojo's arguments as foreclosed.

Second, text, history, and tradition show that the felon-in-possession law is lawful. At the time of the Second Amendment's adoption, felons were often put to death or imprisoned. And even if released, they were often stripped of their estates, and stripped of civic and other rights. That suggests they could be stripped of their gun rights too, and that the public would have understood the Second Amendment to countenance that result. Early laws and practices also disarmed those who were deemed dangerous or unlawful, again suggesting that legislatures were understood to possess the power to designate a group like felons for disarmament. Early ratification-convention proposals to limit gun rights to lawful and peaceable citizens offer still more support for that conclusion, as those proposals were widely understood to be adopted in the Second Amendment. Thus, ample historical precedent supports the felon-in-possession law.

Finally, even the authorities Rojo cites suggest that § 922(g)(1) may be valid in at least some of its applications. Then-Judge Barrett concluded, for example, that "the state can take the right to bear arms away from a category of people that it deems dangerous"

7

but cannot take that right away from non-violent felons unless their "history or characteristics make [them] likely to misuse firearms." *Kanter v. Barr*, 919 F.3d 437, 464, 468 (7th Cir. 2019) (Barrett, J., dissenting). Yet even if that is right, Rojo meets that test. He is a drug user with drug-smuggling and cash-smuggling felony convictions (seemingly involving to drug proceedings) and an arrest for failing to appear in court, all of which suggests a serious risk that he will misuse firearms. More importantly, he was carrying a gun *while committing his cash-smuggling felony*, so there is no doubt that he will misuse guns if given the chance. Thus, even if the Court believes that § 922(g)(1) may not be constitutional in all its applications, it should uphold the law as applied to Rojo.

## ARGUMENT

A.    The standard of review is *de novo*.

This Court "review[s] the constitutionality of a statute" and "constitutional challenges to the district court's denial of a motion to dismiss de novo." *Vongxay*, 594 F.3d at 1114.

B.    The felon-in-possession law is constitutional.

Over and over, this Court has upheld § 922(g)(1) against Second Amendment challenges. *Bruen* is not "clearly irreconcilable" with that precedent. *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc), *overruled on other grounds by Sanchez v. Mayorkas*, 141

8

S. Ct. 1809 (2021). But even if this Court were to conclude otherwise and start from a blank slate, the historical analysis *Bruen* prescribes would lead to the same conclusion as this Court's earlier cases. The Court should thus reject Rojo's challenge to § 922(g)(1).

 1. *Precedent forecloses Rojo's constitutional challenge.*

This Court has repeatedly held that the federal felon-in-possession law comports with the Second Amendment. That precedent is dispositive here.

 a. *This Court has held that the felon-in-possession law is constitutional.*

Before *Heller*, this Court held that a "defendant's Second Amendment challenge to the constitutionality of § 922(g)[(1)] is without merit" because the Second Amendment did not confer an individual right to keep and bear arms. *United States v. Younger*, 398 F.3d 1179, 1192 (9th Cir. 2005).

*Heller* altered the rationale but not the result. It held "that the Second Amendment conferred an individual right to keep and bear arms" and that D.C.'s "ban on handgun possession in the home" violated that right. 554 U.S. at 595, 635. But in reaching that conclusion, the Court referenced gun possession "by law-abiding citizens." *Id.* at 625, 635; *see also id.* at 644 (Stevens, J., dissenting) ("the Court limits the protected class to 'law-abiding, responsible citizens'"). Elsewhere, it said that "nothing in our opinion should be

9

taken to cast doubt on longstanding prohibitions on the possession of firearms by felons," which the Court deemed "presumptively lawful regulatory measures." *Id.* at 626 & n.26. In *McDonald v. City of Chicago*, which held that the Second Amendment applies to the states, the Court reiterated that statement: "We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons[.]' . . . We repeat th[at] assurance[] here." 561 U.S. 742, 786 (2010) (plurality opinion).

After *Heller* and *McDonald*, this Court confirmed that § 922(g)(1) remained valid and that, while *Younger*'s rationale "was invalided," its holding still "controls." *Vongxay*, 594 F.3d at 1116. The Court cited *Heller*'s language on felon-in-possession laws. *See id.* at 1115. It deemed the language "binding," noting that "[c]ourts often limit the scope of their holdings, and such limitations are integral to those holdings." *Id.*; *see United States v. Rozier*, 598 F.3d 768, 771 n.5 (11th Cir. 2010) (similar); *see also Heller v. D.C.*, 670 F.3d 1244, 1273, 1278 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (*Heller* "affirmatively *approved*" and "prospectively approve[d] the constitutionality of several kinds of gun laws," such as "felon-in-possession laws," based on "text, history, and tradition"). The Court also found support in "cases from other circuits," "historical gun restrictions,"

10

and the analysis of "most scholars of the Second Amendment." *Vongxay*, 594 F.3d at 1116–18. It thus held that "felons are categorically different from the individuals who have a fundamental right to bear arms" and "that § 922(g)(1) does not violate the Second Amendment." *Id.* at 1115, 1118.

Since *Vongxay*, the Court has reaffirmed that holding twice in published opinions. *See United States v. Phillips*, 827 F.3d 1171, 1173–74 (9th Cir. 2016) (affirming "denial of Phillip's motion to dismiss the indictment" "(for felon in possession) on Second Amendment grounds"); *Van Der Hule v. Holder*, 759 F.3d 1043, 1051 (9th Cir. 2014) ("§ 922(g)(1) continues to pass constitutional muster"). It has also reaffirmed those published holdings nearly a dozen times in unpublished opinions. *See* ER-41 n.1 (collecting cases). And even judges who have dissented from Second Amendment rulings affirming firearms restrictions have relied on *Vongxay*. *See Mai v. United States*, 974 F.3d 1082, 1093 (9th Cir. 2020) (Bumatay, J., dissenting from denial of rehearing en banc). This Court should apply that binding precedent here.[2]

---

[2] This Court is not alone. Before *Bruen*, every other circuit rejected challenges to § 922(g)(1) too. *See* ER-43 n.2 (collecting cases). Post-*Bruen*, one circuit has confirmed that "Congress acted within the historical tradition when it enacted § 922(g)(1)." *United States v. Jackson*, 69 F.4th 495, 505 (8th Cir. 2023). Another declined to address the issue, but one judge who did concluded that "§ 922(g)(1) is

> b. Bruen *is not clearly irreconcilable with this Court's cases upholding § 922(g)(1).*

*Bruen* did not expressly overrule any § 922(g)(1) cases. Nor is its holding or mode of analysis "clearly irreconcilable" with those cases, as courts in this circuit have repeatedly held.[3] *Miller*, 335 F.3d at 893. Clear irreconcilability is a "narrow," "high standard." *United States v. Eckford*, 77 F.4th 1228, 1233 (9th Cir. 2023) (citations omitted). It requires a case "closely on point." *United States v. Dunn*, 728 F.3d 1151, 1156 (9th Cir. 2013) (quoting *Miller*, 335 F.3d at 899). And that case cannot simply create "tension" or "cast doubt" on earlier cases. *Tingley v. Ferguson*, 47 F.4th 1055, 1075 (9th Cir. 2022) (citations omitted) *cf. Musladin v. Lamarque*, 555 F.3d 830,

---

constitutional as written." *Atkinson v. Garland*, 70 F.4th 1018, 1038 (7th Cir. 2023) (Wood, J., dissenting). Only the Third Circuit has disagreed post-*Bruen*. *See Range v. Att'y Gen.*, 69 F.4th 96, 106 (3d Cir. 2023) (en banc). But that divided decision was "narrow." *Id.* It held only that § 922(g)(1) was invalid as applied to a man convicted of food-stamp fraud, a state-law misdemeanor that qualified as a federal felony. *See id.* at 98, 106; *see also id.* at 109 (Ambro, J., concurring) ("the Government's failure to carry its burden in this case does not spell doom for § 922(g)(1)"). Suffice it to say, the bulk of authority has agreed with this Court's cases upholding § 922(g)(1).
[3] *See United States v. Jackson*, --- F.Supp.3d ----, 2023 WL 1967199, at *5 & n.4 (W.D. Wash. 2023) (collecting cases); *United States v. Serrano*, --- F.Supp.3d ----, 2023 WL 2297447, at *10 (S.D. Cal. 2023); *United States v. Butts*, 637 F.Supp.3d 1134, 1138 (D. Mont. 2022); *United States v. Delpriore*, 634 F.Supp.3d 654, 658 (D. Alaska 2022); *United States v. Hill*, 629 F.Supp.3d 1027, 1030 (S.D. Cal. 2022).

837 (9th Cir. 2009) (courts must follow "directly on point" Supreme Court cases even if "subsequent decisions cast strong doubt on" them). Nor can a later case merely "chip[] away at" or give "strong[] signals" about earlier cases. *United States v. Green*, 722 F.3d 1146, 1150 (9th Cir. 2013). Instead, the case must clearly "compel" a "holding" at odds with earlier ones. *Dunn*, 728 F.3d at 1157. *Bruen* does not meet that rigorous test.

First, *Bruen* simply "appl[ied]" *Heller*. 142 S. Ct. at 2131, 2134. And "[n]othing in *Heller* can be read legitimately to cast doubt on the constitutionality of § 922(g)(1)." *Vongxay*, 594 F.3d at 1114. So it follows that nothing in *Bruen* can be read to cast doubt on § 922(g)(1) or cases upholding it either. True, *Bruen* made parts of *Heller* "more explicit." 142 S. Ct. at 2134. But cases that offer only new framing or focus seldom upend precedent. *See CoreCivic, Inc. v. Candide Grp., LLC*, 46 F.4th 1136, 1143 (9th Cir. 2022) (case that "framed the . . . inquiry in a different way" was not enough (citation omitted)); *Day v. Apoliona*, 496 F.3d 1027, 1035 (9th Cir. 2007) (case that "shifted the focus" was not enough).

That is especially true here, as *Bruen*'s illuminations are broadly consistent with this Court's cases. *Bruen* clarified that "the Constitution presumptively protects" conduct covered by its "plain text," that a law regulating that conduct must be "consistent with this

13

Nation's historical tradition of firearm regulation," and that the government can show consistency by "identify[ing] a well-established and representative historical *analogue*" ("not a historical *twin*"). 142 S. Ct. at 2126, 2133. Consistent with that approach, this Court looked to "historical gun restrictions" and the views of "most scholars" who had read the history to uphold § 922(g)(1). *Vongxay*, 594 F.3d at 1116–18.

*Bruen* also issued another clarification. After noting that courts generally applied a test like the one it endorsed as a "first step," it nixed a "means-end scrutiny" "second step" that courts had also applied. *Bruen*, 142 S. Ct. at 2125–27. Again, this Court's cases are consistent with that approach. In *Vongxay*, this Court declined to apply means-end scrutiny in upholding § 922(g)(1) and even said means-end scrutiny was "inapplicable." *Vongxay*, 594 F.3d at 1118. Thus, there is no basis for finding that *Bruen* voided this Court's precedent by making *Heller* more explicit.

Second, in *Bruen*, the Court described the gun rights at issue— as well as the rights at issue in *Heller* and *McDonald*—as the rights of "ordinary, law-abiding citizens." *Bruen*, 142 S. Ct. at 2122. Indeed, the Court used the term "law-abiding" 14 times. *Id.* at 2122, 2125, 2131, 2133-34, 2135 n.8, 2138 & n.9, 2150, 2156. It also noted that "nothing in our analysis should be interpreted to suggest the

14

unconstitutionality" of licensing regimes that "require applicants to undergo a background check" to "ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* at 2138 n.9 (quoting *Heller*, 554 U.S. at 635). Many of those regimes bar giving felons guns.[4]

Of course, one can debate the import of the focus on law-abiding citizens. Perhaps it suggests that "the people" the Second Amendment protects does not include felons, or that "the right . . . to keep and bear Arms" does not include the right to do those things after committing a felony, or that felon-in-possession laws do not "infringe" the right to keep and bear arms. Or perhaps, as Rojo argues, it suggests only that the Court wanted "to focus narrowly on the questions presented," which "did not implicate law-breakers," and leave those difficult questions for another day. Appellant's Opening

---

[4] *See, e.g.*, Ga. Code § 16-11-129(b)(2)(B) (no license for "[a]ny person who has been convicted of a felony"); Haw. Rev. Stat. § 134-7(b) ("No person who . . . has been convicted in this State or elsewhere of having committed a felony . . . shall own, possess, or control any firearm."); La. Stat. § 40:1379.3(C)(6) (licensee must "[n]ot be ineligible to possess a firearm by virtue of having been convicted of a felony"); 18 Pa. Const. Stat. § 6109(e)(1)(viii) (no license for "[a]n individual who is charged with or has been convicted of a crime punishable by imprisonment for a term exceeding one year"); Tex. Gov't Code § 411.172(a)(3) (licensee must not have "been convicted of a felony"); W. Va. Code § 61-7-4(b)(5) (licensee must not have "been convicted of a felony").

Brief (AOB) 21. Whatever the case, the limitation offers a strong reason not to read *Bruen* as overruling cases upholding § 922(g)(1). That is, if *Bruen* did not "flesh[] out all the details of Second Amendment analysis," AOB 18—like whether "the people" includes felons, AOB 20, among other questions—then it cannot credibly be deemed to have overruled this Court's cases upholding § 922(g)(1).

Finally, a majority of justices made explicit what everything above suggests: that *Bruen* did not affect felon-in-possession laws. Justice Alito noted that "[o]ur holding decides nothing about who may lawfully possess a firearm" and does not "disturb[] anything that we said in *Heller*." *Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring). Similarly, Justice Kavanaugh, joined by Chief Justice Roberts, reiterated that "[n]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons," which are "presumptively lawful." *Id.* at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 626 & n.26). And Justice Breyer, joined by two other justices, also stated that the opinion "cast[s] no doubt on th[e] aspect of *Heller*'s holding" affirming the validity of felon-in-possession laws and certain other longstanding regulatory measures. *Id.* at 2189 (Breyer, J., dissenting). This Court should take the justices at their word.

16

Precedent supports that conclusion. In *Vongxay*, this Court held that prior precedent on § 922(g)(1) still "controls" even though *Heller* "invalidated" its "reasoning." 594 F.3d at 1115–18. Here, it is an even lighter lift to apply precedent. Unlike *Heller*, *Bruen* did not recognize an "individual right" to bear arms and erect a "methodological approach" to analyzing gun laws; it simply "appli[ed]" *Heller* and made it "more explicit." 142 S. Ct. at 2127, 2131, 2134. And unlike *Heller*, *Bruen* did not wholly invalidate this Court's reasoning in prior cases. So if *Heller* offered no convincing reason to eschew prior precedent, then *Bruen* doesn't either. The Court should thus apply its precedent here and hold that Rojo's constitutional challenge to § 922(g)(1) is foreclosed.

> c. *Rojo offers no convincing reason to hold otherwise.*

Rojo does not address most of the above language from *Bruen*, like the many statements from the justices making clear that the case says nothing about who may lawfully possess guns and does not cast doubt on felon-in-possession laws. He does discuss *Bruen*'s "law-abiding" qualifiers, but that discussion only underscores that the case left open all questions relating to felon-in-possession laws. *See* AOB 17–22. As for this Court's cases, Rojo does not argue that they used means-ends scrutiny, which *Bruen* invalidated. And he agrees that *Vongxay* (or at least cases "building on" it) support

17

upholding gun laws if "[t]he government c[an] show that the regulation accords with text and history," as *Bruen* prescribes. AOB 65. Yet still he says *Bruen* overruled this Court's cases.

Rojo first argues that this Court's cases allow one too many ways to affirm a gun law: "text and history" (okay) or "*Heller*'s presumptively lawful list" (not okay). AOB 65–66. There are two problems with that argument. First, *Bruen* said that it was applying *Heller* and reiterated its "law-abiding" language, but otherwise said nothing about how to interpret *Heller*'s language on felon-in-possession laws. And as a majority of justices clarified, *Bruen* did not alter *Heller*, say anything about who may lawfully possess a gun, or call into question felon-in-possession laws. So there is no basis for concluding that *Bruen* upset this Court's prior interpretations of *Heller*'s language on felon-in-possession laws. Second, even if *Bruen* could be read the way Rojo urges, that would still leave intact the history-centric piece of this Court's precedent affirming § 922(g)(1).

Given the last point, Rojo's next claim is that this Court actually never looked to history at all to uphold § 922(g)(1), or at least that it didn't do a good enough job. AOB 67–68. The first claim is wrong; this Court cited "historical gun restrictions" and the views of "most scholars" who had analyzed Second Amendment history. *Vongxay*, 594 F.3d at 1116–18. Of course, the Court could have said more.

And it is true that the Court said "the historical question has not been definitively resolved." *Id.* at 1118. But that does not make the case clearly irreconcilable with *Bruen*. At most, *Bruen* suggests that the Court rightly looked to historical gun restrictions but should have delved into the history more deeply. That is hardly a wholesale invalidation of this Court's mode of analysis. On the contrary, it at most created "limited tension," which has never been enough to deem a case overruled. *Jackson*, 2023 WL 1967199, at *4 (rejecting same argument); *Butts*, 637 F.Supp.3d at 1138 (same).

That is all the more true since many courts have done deep dives into historical analogs and concluded, like this Court, that those analogs supported upholding § 922(g)(1). Some of those cases pre-date *Bruen*. *See Folajtar v. Att'y Gen.*, 980 F.3d 897, 904–05 (3d Cir. 2020); *Medina v. Whitaker*, 913 F.3d 152, 158–61 (D.C. Cir. 2019); *see also United States v. Price*, 635 F.Supp.3d 455, 466 (S.D.W. Va. 2022) (collecting pre-*Bruen* cases concluding that historical record supported § 922(g)(1)). Others post-date it. *See Jackson*, 69 F.4th at 502–06; *United States v. Davila*, --- F.Supp.3d ----, 2023 WL 5361799, at *3–5 (S.D.N.Y. 2023); *Atkinson*, 70 F.4th at 1025–38 (Wood, J., dissenting). Those cases all show that "[i]t's far from 'clear[]'" *Green*, 722 F.3d at 1150, that this Court's reliance on

historical gun restrictions or conclusion that they justified upholding § 922(g)(1) are irreconcilable with *Bruen*.

>    2.    *Historical analysis shows that the felon-in-possession law is constitutional.*

Even if this Court were to revisit § 922(g)(1)'s constitutionality, it should hold that the statute is supported by historical analogs and thus does not violate the Second Amendment.

>    a.    *Historical felony penalties, which were more severe than gun bans, support § 922(g)(1)'s validity.*

At the time of the founding, legislatures in both England and America defined felonies to encompass a broad range of violent and non-violent crimes and imposed a broad range of punishments for those crimes. Those penalties, like death, were often far more severe than bans on gun possession, and thus support the constitutionality of banning firearm possession by felons.

"The nine traditional felonies at common law [we]re murder, manslaughter, arson, burglary, robbery, rape, sodomy, mayhem, and larceny." *Folajtar*, 980 F.3d at 904 n.9. But by 1765, "no less than" 160 crimes had "been declared by act of parliament to be felonies . . . worthy of instant death." 4 William Blackstone, *Commentaries on the Laws of England* 18 (1769). Crimes qualifying as felonies "included nonviolent offenses that we would recognize as felonies today, such as counterfeiting currency, embezzlement, and

desertion from the army." *Medina*, 913 F.3d at 158. They also included more obscure crimes, like offenses for tampering with fishponds, chopping down cherry trees, or consorting with Egyptians. *See* Blackstone, *supra*, at 4. Other examples "includ[ed] witchcraft and harboring a priest." Will Tress, *Unintended Collateral Consequences: Defining Felony in the Early American Republic*, 57 Clev. St. L. Rev. 461, 464 (2009).

Penalties for felonies were severe. "The law treated felony offenders as if they had died, depriving them of their property and their civil and political rights, dissolving their marriages, and prohibiting them from concluding any contracts or bringing suit." Nora V. Demleitner, *Continuing Payment on One's Debt to Society: The German Model of Felon Disenfranchisement As an Alternative*, 84 Minn. L. Rev. 753, 766 (2000). The loss of civil and political rights included bans on "holding offices or employments" and "being heirs" or "executors." Blackstone, *supra*, at 370. It also included, "of course, voting." Alec C. Ewald, *"Civil Death": The Ideological Paradox of Criminal Disenfranchisement Law in the United States*, 2002 Wis. L. Rev. 1045, 1060 (2002).

Punishments for felonies involved not only death in law, but also death in fact. "The idea of felony is indeed so generally connected with that of capital punishment," said Blackstone, "that we find it

hard to separate them." Blackstone, *supra*, at 98. And when death was not prescribed, "perpetual or temporary imprisonment" often was. *Id.* at 370. "[E]xile or banishment" from England was also possible. *Id.* In fact, it was likely. By one estimate, between 1718 to 1769, a criminal court with jurisdiction over London and Middlesex banished "almost seventy percent of felons" not sentenced to death. Javier Bleichmar, *Deportation As Punishment: A Historical Analysis of the British Practice of Banishment and Its Impact on Modern Constitutional Law*, 14 Geo. Immigr. L.J. 115, 126 (1999).

Those crimes and punishments were the result of "the arbitration of the legislature." Blackstone, *supra*, at 12. As Blackstone noted, people, "in forming societies, did ether tacitly or expressly invest the sovereign power with a right of making laws, and of enforcing obedience to them." *Id.* at 8. The legislature could thus fashion punishments to "amend[]" (rehabilitate) an offender, "depriv[e] [him] of the power to do future mischief," and "deter[] others by the dread of his example." *Id.* at 11–12. It could, in other words, "prevent[] or punish[] every breach and violation of those laws, which the sovereign power has thought proper to establish, for the government and tranquility of the whole." *Id.* at 7. And while Blackstone believed the law should use severe penalties like death only when "no lighter penalty will be effectual"—a principle he believed the

law too seldom followed—he could not "*deny* the right of the legislature in any country to [e]nforce it[s] own laws by the death of the transgressor." *Id.* at 8, 11.

"American colonists imported the English concept of felonies and their consequences into their legal systems." *Folajtar*, 980 F.3d at 904. Thus, as in England, legislatures "authorized punishments that subsumed disarmament" even "for non-violent offenses." *Jackson*, 69 F.4th at 503 (collecting authorities). Capital punishment, for example, was "ubiquitous in the Founding Era, . . . even to punish non-violent felonies" like forgery, counterfeiting, horse theft, and dealing in forged securities. *Folajtar*, 980 F.3d at 904. In fact, through the late eighteenth century, death was "the standard penalty for all serious crimes." *See Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring in the judgment) (quoting Stuart Banner, *The Death Penalty: An American History* 23 (2002)). Laws calling for estate forfeiture also remained "in vogue" in America through the founding. Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 & nn.275–76 (2014) (collecting examples). So too did laws, or in many cases constitutional provisions, imposing disenfranchisement as a penalty. *See* Ewald, *supra*, at 1061–63. And many laws included still other penalties.

23

Examples abound. A 1700 Pennsylvania law stated that an arsonist "shall forfeit his or her whole estate to the party suffering, and be imprisoned all their lives . . . at hard labor." 2 *Statutes at Large of Pennsylvania from 1682 to 1801*, at 12 (1896). A 1705 law said that anyone guilty of rape "shall forfeit all his estate" if unmarried and "one-third" if married, receive 31 lashes, and be imprisoned for "seven years at hard labor." *Id.* at 178. A 1715 Maryland law stated that anyone guilty of "corruptly embezzling, impairing, razing, or altering any will or record . . . shall forfeit all his goods and chattels, lands and tenements." 1 *The Laws of Maryland[,] With the Charter, The Bill of Rights, the Constitution of the State, and its Alterations, The Declaration of Independence, and the Constitution of the United States, and its Amendments* 79 (1811). A 1743 Rhode Island law ordered that forgers and counterfeiters "suffer the Pains of Death" and that anyone passing a counterfeit bill be imprisoned, pay double damages, and "forfeit the remaining Part of his Estate." *Acts and Laws of The English Colony of Rhode Island and Providence-Plantations in New-England in America* 33–34 (1767). And a 1750 Massachusetts law stated that rioters "shall forfeit all their lands and tenements, goods and chatt[el]s;" receive 39 lashes; and be imprisoned for a year. 3 Acts and Resolves, *Public and Private, of the Province of the Massachusetts Bay* 545 (1878).

24

Laws in the second half of the century passed just years before the Second Amendment's ratification were similarly harsh. For example, a 1786 New York severely punished counterfeiting of bills of credit. 2 *Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788)*, at 260–61 (1886). It stated that a counterfeiter "shall be guilty of felony, and being thereof convicted, shall forfeit all his or her estate both real and personal to the people of this State, and shall be committed to the [correction house] of the city of New York for life, and there confined to hard labor." *Id.* at 261. And "to prevent escape," the defendant was to be "branded on the left cheek with the letter C, with a red hot iron." *Id.*

Similarly, in 1777, Virginia adopted a law for the punishment of forgery, which the legislature believed previously "ha[d] not a punishment sufficiently exemplary annexed thereto." 9 William Waller Hening, *Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature* 302 (1821). The act stated that anyone convicted of forging, counterfeiting, or presenting for payment a wide range of forged documents "shall be deemed and holden guilty of felony, shall forfeit his whole estate, real and personal, shall receive on his bare back, at the publick whipping post, thirty nine lashes, and shall serve on board some armed vessel in the service of this commonwealth, without wages, for a term not

25

exceeding seven years." *Id.* at 302–03; *see also, e.g.*, *A Digest of the Laws of Maryland* 255–56 (1799) (collecting Maryland forgery laws enacted between 1776 and 1778, each of which provided that those convicted "shall suffer death as a felon, without benefit of clergy").

The next year, in 1788, New York passed a law imposing the death penalty for crimes such as burglary, robbery, arson, malicious maiming and wounding, and counterfeiting. *Laws of the State of New York*, *supra*, at 664–65. The act also established that every person convicted of an offense making the person "liable to suffer death, shall forfeit to the people of this State, all his, or her goods and chattels, and also all such lands, tenements, or hereditaments" the person possessed "at the time of any such offence committed, or at any time after." *Id.* at 666. For all other felonies, the authorized punishment for "the first offence" was a "fine, imprisonment, or corporal punishment," and the punishment "for any second offense or felony committed after such first conviction" was "death." *Id.* at 665.

The federal government followed suit in its treatment of felonies. Most notably, the First Congress, which drafted and proposed the Second Amendment, made a variety of felonies punishable by death. Those included treason, murder on federal land, forging or counterfeiting a public security, and piracy on the high seas. *See* An

26

Act for the Punishment of Certain Crimes Against the United States, 1 Stat. 112–15 (1790).

Of course, "[t]he framers could not have intended Second Amendment guarantees to apply to felons if, as a rule, all the felons were dead." Dru Stevenson, *In Defense of Felon-in-Possession Laws*, 43 Cardozo L. Rev. 1573, 1587 (2022). Stated more broadly, "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture"—among many other severe penalties—"to be within the scope of those entitled to possess arms." *Folajtar*, 980 F.3d at 905 (quoting *Medina*, 913 F.3d at 158). Instead, given "these historically grounded and sensible explanations," this Court should conclude that Congress may "impose lifetime gun-possession bans on felons as a safety measure and as a legitimate consequence of a felony conviction." *Id.* (quoting *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 708 (6th Cir. 2016) (Sutton, J., concurring)).

Rojo says the availability of the death penalty for felons does not support upholding § 922(g)(1). AOB 48–50. But it is not clear why. Executing or permanently imprisoning felons all entailed *de facto* gun bans. And if legislatures could do that, it suggests that they could also bar guns without taking such drastic steps. Still, Rojo overlooks the permanent impediments governments imposed on

even those felons it released. Felons often lost civic rights, like the rights to vote, serve on a jury, or hold public office. Gun rights are arguably akin to those rights.[5] Felons lost other rights too, like inheritance and contractual rights, and perhaps even the right to accumulate property (as in the case of the 1788 New York law discussed above). Those laws all suggest that legislatures could bar felons from possessing guns.

---

[5] Civic rights are "individual rights that 'require[] citizens to act in a collective manner for distinctly public purposes.'" *Kanter*, 919 F.3d at 462 (Barrett, J., dissenting) (citation omitted). Yet they need not *exclusively* serve public purposes. For example, the right to participate in government serves public ends, *see id.*, but also guards "the sacred and inviolable rights of private property" by ensuring that a person is not subject to "aids or taxes" except "by his own consent, or that of his representatives," 1 William Blackstone, *Commentaries on the Laws of England* 135 (1765). Similarly, while the Second Amendment protects the "core lawful purpose of self-defense," it also "prevent[s] elimination of the militia" and arguably promotes "public[ ]safety." *Heller*, 554 U.S. at 599, 601, 630; *cf.* Stephen P. Halbrook, *The Founders' Second Amendment* 158 (2008) (right was "a right of the people" but also served as "defense against foreign invasion" and upheld "institutions such as the hue and cry in which citizens defended themselves from and pursued felons"). So gun rights arguably qualify as civic rights. *See United States v. Charles*, 633 F.Supp.3d 874, 880 (W.D. Tex. 2022) ("the right to vote, hold public office, or serve on a jury were thought of as equal to keeping and bearing arms because all were so-called 'political rights'"); Akhil Reed Amar, *The Bill of Rights and the Fourteenth Amendment*, 101 Yale L.J. 1193, 1265 (1992) (the Second Amendment "marbled together" "individual rights" and "'public' rights'").

Yet if that is true, says Rojo, then the historical precedents would also support denying felons the right to free speech. AOB 49 (citing *Kanter*, 919 F.3d at 461–62 (Barrett, J., dissenting)). But unlike gun rights, speech rights do not always derive solely from historical precedents. *See, e.g.*, *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 502 (1984) ("actual malice" test in libel cases is "largely a judge-made rule of law"). And unlike gun rights, speech rights are subject to tiers-of-scrutiny analysis. So the framework here would not necessarily govern there.

More importantly, history shows that felons were still given speech rights, as well as certain other rights, like criminal-procedure rights. *See, e.g.*, *United States v. Bryant*, 643 F.3d 28, 32 & nn.3–4 (1st Cir. 2011) (noting sentencing rights). Notably, even felons who were put to death were allowed to give a dying speech. Indeed, "[t]he privilege to utter a last dying speech in the moments just before one's execution is a freedom that is deeply ingrained in Anglo-American history and tradition." Kevin Francis O'Neill, *Muzzling Death Row Inmates: Applying the First Amendment to Regulations That Restrict A Condemned Prisoner's Last Words*, 33 Ariz. St. L.J. 1159, 1159 (2001). That practice appeared as early as 1388, "was consistently honored at English executions throughout the sixteenth century" and American executions "in the seventeenth

29

century," and applied to "everyone." *Id.* at 1159–60. So, while history points to a different conclusion for speech rights, it supports the notion that legislatures may bar gun possession by felons.

> b. *Laws disarming the dangerous and unlawful support § 922(g)(1)'s validity.*

Historical laws barring gun possession by people or groups deemed dangerous or unlawful also support the constitutionality of the felon-in-possession law.

In England, the government's ability to disarm groups that, in its view, would not obey the law or were otherwise dangerous was well-established. Since "at least 602 A.D.," the country has at various times employed "sweeping prohibitions" on guns "that included entire regions or religions suspected of disloyal sympathies" unless those covered by the bans swore loyalty oaths. Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249, 258 (2020). For example, an early 1400s law restricted Welshmen's ability to carry guns, and laws in the late 1500s and early 1600s barred Catholics from owning guns. *See id.* In the 1660s, broader measures were taken. Under a 1662 law, officials could "seize all arms in the custody or possession of any person" whom they "judge[d] dangerous to the Peace of the Kingdom." Militia Act of 1662, 13 & 14 Car. 2, c.3, § 13. The Crown also issued various orders calling for officials to

30

seize guns from all "dangerous" or "disaffected persons" and all "factious and seditious spirits." Greenlee, *supra*, at 259 (citations omitted). Until the Glorious Revolution of 1688, disaffected persons "typically included Whigs and non-Anglican Protestants," who were deemed disloyal to King James II. *Id.* After the Glorious Revolution, during which King James II was deposed, disaffected persons typically "included Tories loyal to James II." *Id.*

Laws passed after the Glorious Revolution were similar. In 1689, Parliament "forbade ownership of firearms by Catholics who refused to renounce their faith." *Jackson*, 69 F.4th at 502. That same year, it enacted the English Bill of Rights, which contained the "predecessor to our Second Amendment." *Bruen*, 142 S. Ct. at 2141 (quoting *Heller*, 554 U.S. at 593). But that provision said only that "[s]ubjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by Law." 1 W. & M., Sess. 2, ch. 2, § 7 (1689). So the right was "restricted to Protestants and held only against the Crown, but not Parliament." *Bruen*, 142 S. Ct. at 2142. And after the enactment of the Bill of Rights, Parliament and the Crown continued to take measures to disarm Catholics and "dangerous" and "disaffected" persons. Greenlee, *supra*, at 260–61 (discussing measures taken between 1695 and 1748). So "by the time of American independence, England had established a

well-practiced tradition of disarming" groups "perceived as threatening to the crown." *Id.* at 261.

The American colonies kept up the tradition of disarming groups deemed dangerous or unlawful. "For example, several colonies enacted 'complete bans on gun ownership' by slaves and Native Americans" based on "'alienage' or lack of allegiance to the sovereign." *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1047 (11th Cir. 2022) (citations omitted). And during the French and Indian War, Virginia imported the English practice of disarming Catholics who refused to swear a loyalty oath. *See* 7 The Statutes at Large; *Being A Collection of All the Laws of Virginia* 35–39 (1820) (1756 Va. law). Maryland and Pennsylvania also confiscated firearms from Catholics. *See Jackson*, 69 F.4th at 502–03.

More disarmament followed during the Revolutionary War. In 1775, Connecticut enacted a law stating that any person who libeled or defamed acts of the Continental Congress or the Connecticut General Assembly "shall be disarmed and not allowed to have or keep any arms." *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776*, at 1993 (1890). A year later, the Continental Congress recommended that the colonies disarm those who were "notoriously disaffected to the cause of America" or who simply "have not associated" with the colonial governments in the

war effort. 4 *Journals of the Continental Congress 1774–1789*, at 205 (1906) (resolution of March 14, 1776). At least seven colonies responded by passing legislation disarming the "disaffected" who refused to take an oath of allegiance. *See Davila*, 2023 WL 5361799, at *4 n.5 (collecting laws).

As those enactments show, "colonies did not require violence or dangerousness for disarmament." *Folajtar*, 980 F.3d at 908. Indeed, "[n]ot all persons disarmed under historical precedents—not all Protestants or Catholics in England, not all Native Americans, not all Catholics in Maryland, not all early Americans who declined to swear an oath of loyalty—were violent or dangerous." *Jackson*, 69 F.4th at 504. Likewise, "defaming acts of Congress[] or failing to defend the colonies do not of themselves qualify as dangerous. The same is true of . . . refusing to swear allegiance or loyalty to the sovereign." *Folajtar*, 980 F.3d at 908 n.11. That was especially true for groups like the Quakers in Pennsylvania, who refused to swear loyalty oaths on religious grounds and yet were avowed pacifists. *See* Jim Wedeking, *Quaker State: Pennsylvania's Guide to Reducing the Friction for Religious Outsiders Under the Establishment Clause*, 2 N.Y.U. J.L. & Liberty 28, 51–52 (2006).

Nor is there any basis for interpreting the laws in the cramped fashion Rojo urges. He suggests that the English laws are all

33

irrelevant since American guns rights are broader than English gun rights. AOB 29–35. But the scope of the "pre-existing right in English law" remains relevant to deciding the scope of the Second Amendment right. *Heller*, 554 U.S. at 592 n.16. Even the cases Rojo cites agree. *See Kanter*, 919 F.3d at 457 n.5 (Barrett, J., dissenting) ("English practice" is "instructive"). And English practice is especially relevant when "the patterns from English practice repeat themselves in American law." *Id*. That is the case here, as American colonies passed "[s]imilar laws and restrictions," *id*. at 457, like those barring gun possession by Catholics or the disaffected.

Rojo also says American laws are irrelevant since they barred gun possession only by non-citizens or, during times of emergency, those perceived as a threat. AOB 35–41. But again, even the cases he cites do not say that. *See Range* 69 F.4th at 104–05 (analyzing same laws without suggesting that they support limiting gun possession only for non-citizens or during emergencies); *Kanter*, 919 F.3d at 456–58 (same). And with good reason. Catholics, those who defame acts of Congress, and the "disaffected" may include citizens. And "[t]he practice of disarming those whose loyalty was questionable continued after the Revolution." *Atkinson*, 70 F.4th at 1034 (Wood, J., dissenting) (citing Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73

34

Fordham L. Rev. 487, 507–08 (2004)); *see also Kanter*, 919 F.3d at 458 (Barrett, J., dissenting) ("this practice of keeping guns out of the hands of 'distrusted' groups continued after the Revolution" (citing Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191, 208–09 (2006))). So there is no basis for limiting the examples in the manner Rojo urges.

Finally, Rojo says there is "affirmative evidence that people with felony convictions were expected to keep and bear arms." AOB 43. He reasons that the Militia Act and some state acts required certain men to keep arms, did not exempt felons, and thus "appeared to include felons." AOB 42. But that "does not support the proposition that felons were necessarily part of the militia pool." *United States v. Melendrez-Machado*, --- F.Supp.3d ----, 2023 WL 4003508, at *5 (W.D. Tex. 2023). Regardless, the right to keep and bear arms is "unconnected with militia service," which is why *Heller* declined to look to "militia laws from the founding period" to define the right. 554 U.S. at 582–83. Those laws are just legislative choices about which "able-bodied men" to turn into a fighting force. *Id.* at 596. Thus, that they omitted women, free black men, the disabled, the elderly, and those with certain jobs, *see* AOB 42–43, does not mean those groups lacked gun rights. And that the acts did not exclude groups like the disaffected or felons does not mean those groups had

35

gun rights. Any other view "mistakes a legal obligation for a right." *United States v. Lowry*, No. 22CR10031-CBK, 2023 WL 3587309, at *6 (D.S.D. May 5, 2023) (unpublished) (citation omitted).

In sum, some of the "categorical prohibitions" on gun ownership discussed above are repugnant, and "of course would be impermissible today under other constitutional provisions" (like the First or Fourteenth Amendments). *Jackson*, 69 F.4th at 503. But "they are relevant here in determining the historical understanding of the right to keep and bear arms." *Id.* And they show that "the founders thought the legislature should decide which groups pose a threat to the social order or the community." Stevenson, *supra*, at 1586. Stated differently, "the public in the founding era understood that the right to bear arms could exclude" "dangerous persons" and "at least some nonviolent persons," *Medina*, 913 F.3d at 159, including those deemed dangerous or deemed to "act counter to society's welfare," *Folajtar*, 980 F.3d at 909. And, contrary to Rojo's claims, no contrary history points to a different conclusion.

    c.    *Convention proposals also support § 922(g)(1).*

Proposals from the ratification conventions also suggest that the right to keep and bear arms does not extend to felons. For example, in 1787, the Pennsylvania Antifederalists issued The Address and Reasons of Dissent of the Minority of the Convention of the State of

36

Pennsylvania to their Constituents, which proposed an amendment stating that "no law shall be passed for disarming the people . . . unless *for crimes committed*, or real danger of public injury from individuals." *Folajtar*, 980 F.3d at 908 (quoting 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 662, 665 (1971)). As the text indicates, under that amendment, "criminals or other dangerous persons could be disarmed." Halbrook, *supra*, at 196.

"Other states proposed similar amendments." *Folajtar*, 980 F.3d at 908. New Hampshire proposed an amendment stating that "Congress shall never disarm any citizen, unless such as are or have been in actual rebellion." *Id.* (citation omitted). And Samuel Adams of Massachusetts proposed an amendment requiring that "the said Constitution be never construed . . . to prevent the people of the United States[] who are peaceable citizens . . . from keeping their own arms." *Id.* (citation omitted). That amendment, in other words, clarified that "the right to keep arms extended only to 'peaceable citizens,' not to criminals." Halbrook, *supra*, at 206.

Of course, those proposals differed from each other somewhat, and the Second Amendment did not include all of their language. *See* AOB 44–48. Still, those proposals are relevant here, as they were understood to be broadly consistent with right the Second Amendment codified. That is, "Samuel Adams and the drafters of

the New Hampshire proposal did not object to the lack of an explicit exclusion of criminals from the individual right to keep and bear arms, because this . . . was understood." Halbrook, *supra*, at 273; *see also United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (similar). As an article printed in Boston and Philadelphia noted, the Second Amendment was deemed to contain "[e]very one of" the amendments "introduced to the convention of [Massachusetts] by . . . Samuel Adams" (except the bar on standing armies). Bos. Indep. Chronicle, Phila. Indep. Gazetteer 2 (Aug. 20, 1789). Similarly, the Speaker of the House from Pennsylvania wrote in a letter that the Second Amendment "t[ook] in the principal Amendments which our Minority had so much at heart." Letter from Rep. Frederick A. Muhlenberg to Benjamin Rush (Aug. 18, 1789); *see also Whether the Second Amendment Secures an Individual Right*, Op. Off. Legal Counsel, pt. III.C.2, at 198–99 & nn.297–98 (2004), *available at* http://www.usdoj.gov/olc/opinions.htm (discussing article from Boston and Philadelphia and letter from Speaker of the House).

In *Heller*, the Court deemed "New Hampshire's proposal, the Pennsylvania minority's proposal, and Samuel Adams' proposal in Massachusetts"—the proposals just cited—accurate reflections of the right to keep and bear arms, at least regarding its individual nature. 554 U.S. at 604. It also deemed the Pennsylvania proposal

"highly influential." *Id.*; *see also United States v. Tooley*, 717 F.Supp.2d 580, 590 (S.D.W. Va. 2010) (deeming the proposal notable because it showed that "[e]ven these advocates of broad individual and state rights viewed the right to possess and carry arms as limited—particularly from those who had committed crimes or were a danger to the public"), *aff'd*, 468 F. App'x 357 (4th Cir. 2012) (unpublished). And no court has "unearthed any evidence that the . . . proposed amendments were then thought to be unconstitutional." *Folajtar*, 980 F.3d at 909.

Taken together, those proposals support the notion that founding-era Americans did not understand the right to keep and bear arms to extend to felons who committed serious crimes. *See id.* at 908; *Medina*, 913 F.3d at 158–59.

> ### d. *Section 922(g)(1) is relevantly similar to historical laws regulating firearms.*

The laws discussed above show that § 922(g)(1) is constitutional. *Bruen* told courts to "reason[] by analogy—a commonplace task for any lawyer or judge." 142 S. Ct. at 2132. In doing so, a court should ask "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. Put another way, the "central considerations" are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* (cleaned up).

Under the first metric, § 922(g)(1) imposes no "burden" on "a law-abiding citizen's right to armed self-defense." *Id.* Unlike the laws in *Heller*, *McDonald*, and *Bruen*, the law here does not affect society at large. It affects only those tried and convicted of the most serious designation of crime. Even then, it excludes non-violent crimes "relating to the regulation of business practices" and state "misdemeanor[s] punishable by a term of imprisonment of two years or less." 18 U.S.C. § 921(a)(20). It also excludes "[a]ny conviction which has been expunged, or set aside[,] or for which a person has been pardoned or has had civil rights restored." *Id.* As for the burden on non-excluded felons' rights, it is comparable to the burden imposed by historical laws disarming the dangerous and unlawful and less severe than historical felony-punishment laws, which often included the death penalty, forfeiture of one's estate, and the loss of numerous rights.

The modern and historical laws are also "comparably justified." *Id.* Historical felony-punishment laws sought to punish felons and deter reoffending, and historical gun laws sought to protect the public from the unlawful or dangerous. Section 922(g)(1) serves a similar but more limited purpose. It seeks to "curb 'lawlessness and violent crime.'" *Jackson*, 69 F.4th at 504 (quoting *Huddleston v. United States*, 415 U.S. 814, 824 (1974)). Stated differently, the law

40

seeks to protect society from those deemed "potentially irresponsible and dangerous." *Id.* (quoting *Barrett v. United States*, 423 U.S. 212, 218 (1976)). And it does that by barring gun possession by felons, who have previously shown disregard for society's laws and who are more likely to reoffend, potentially in dangerous ways. *See Folajtar*, 980 F.3d at 909 (noting that, as studies show, even "nonviolent [felons] are at a higher propensity for committing violent crimes"); *Kanter*, 919 F.3d at 448–49 (similar); *United States v. Yancey*, 621 F.3d 681, 685 (7th Cir. 2010) (similar); *Kaemmerling v. Lappin*, 553 F.3d 669, 683 (D.C. Cir. 2008) (similar). The Court should thus hold that the historical laws discussed above show that § 922(g)(1) is constitutional.

e.    *Rojo offers no convincing reason to hold otherwise.*

Rojo resists those conclusions by trying to break *Bruen* into two tests. If the law tackles a novel issue, he says, it need only be "relevantly similar" to historical laws. AOB 25–28. If, instead, the law tackles an old issue, it must be "distinctly similar," which apparently means *exactly identical*. AOB 26 (no similarity unless founders adopted "particular regulation" at issue). He says § 922(g)(1) addresses an old problem, and thus that this Court should apply the harder test. AOB 27. This Court should reject that argument.

First, *Bruen* neither created nor applied different tests. It said the inquiry may be "straightforward" if a law addresses an old problem, such as when there is no "distinctly similar historical regulation addressing that problem." *Bruen*, 142 S. Ct. at 2131. But it did not say "distinctly similar" means identical, or even that the issue was dispositive (only that it was "relevant"). *Id.* Thus, it did not foreclose the possibility that historical laws, while not identical, may still show that a modern law would have been acceptable in the founding era. Indeed, the Court later clarified that the government must identify a "historical *analogue*, not a historical *twin*." *Id.* at 2133. And at no point did the Court purport to foreclose analogical reasoning or to limit "historical, analogical questions" to cases where a modern law regulates novel problems. *Id.*

In fact, if the analysis were as narrow as Rojo contends, then *Bruen* and *Heller* would have been much shorter opinions. *Heller* "addressed a perceived societal problem" and law "that the Founders themselves could have adopted to confront that problem." *Id.* And *Bruen* involved a law that "concerns the same alleged societal problem." *Id.* Thus, under Rojo's approach, the only question was whether the founders adopted the exact laws at issue. So the Court should simply have ticked off the cited historical laws, noted that none was an exact match, and struck down the modern laws. Yet

42

the Court didn't do that. Instead, it considered "historical analogies," albeit ones that it found insufficient to uphold the laws. *Id.* at 2132. In *Bruen*, analysis of those historical analogs involved a "long journey through the Anglo-American history of public carry," including lengthy discussions of common-law offenses, statutory prohibitions, surety statutes, and other laws. *Id.* at 2138–56. In short, both *Bruen*'s formulation and implementation of the historical inquiry show that, while the novelty of the problem addressed is relevant, it does mean the government must show the existence of an identical law or otherwise foreclose analogical reasoning.

This Court's cases are similar. In *United States v. Alaniz*, which upheld a provision imposing sentence enhancements for carrying guns during drug crimes, the Court agreed that "unprecedented societal concerns . . . may require a more nuanced approach." *United States v. Alaniz*, 69 F.4th 1124, 1130 (9th Cir. 2023) (quoting *Bruen*, 142 S. Ct. at 2132). But it never said an altogether different test applied or that analogues were off limits absent novel concerns. Nor did it say that when explaining the *Bruen* standard earlier in its opinion. *See id.* at 1128. And in *Teter v. Lopez*, which struck down Hawaii's butterfly knife ban, the Court also never suggested that different tests apply in discussing *Bruen* or analyzing the law at issue. *See* 76 F.4th 938, 951–54 (9th Cir. 2023).

43

Second, there are good reasons why the Court never mentioned or applied the no-analogues test Rojo advocates. Notably, legislatures can, and in some contexts no doubt do, "legislate well above th[e] floor" set by the Second Amendment. *Mai v. United States*, 952 F.3d 1106, 1120 n.9 (9th Cir. 2020). Thus, a "list of the laws that happened to exist in the founding era is . . . not the same thing as an exhaustive account of what laws would have been theoretically *believed to be permissible* by an individual sharing the original public understanding of the Constitution." *United States v. Kelly*, No. 22CR37-AAT, 2022 WL 17336578, at *2 (M.D. Tenn. Nov. 16, 2022) (unpublished). So looking only for a historical "dead ringer" would make the inquiry too narrow. *Bruen*, 142 S. Ct. at 2134. Instead, the inquiry must focus on whether historical examples, while not identical, are "analogous enough" to show that a certain category of regulation would be acceptable. *Id.* If so, then modern laws falling within that category should be upheld.

That approach is consistent with the Supreme Court's use of history to identify *categories* of laws that are proper—like bans on "dangerous and unusual weapons" and bans on weapons in "sensitive places"—not merely civil-code-like lists of specific laws that are proper. For example, the Court has noted that, while "the historical record yields relatively few 18th- and 19th-century 'sensitive places'

44

where weapons were altogether prohibited—*e.g.,* legislative assemblies, polling places, and courthouses—[the Court was] also aware of no disputes regarding the lawfulness of such prohibitions." *Id.* at 2133. The Court thus had no problem "assum[ing] it settled that these locations were 'sensitive places' where arms carrying could be prohibited." *Id.* Here, similarly, the historical laws support the principle that legislatures may disarm the unlawful and dangerous, and § 922(g)(1) falls within that category of legislation.

Yet Rojo's approach would bar that analysis. Under his method, for example, no matter how well the history supports banning guns in sensitive places, a modern gun ban in courthouses would still fail absent novel concerns if there were few or no gun bans in courthouses specifically at the time of the founding (as *Bruen* suggests). And in Rojo's view, virtually no concerns are novel, since novel "severity," "context," and "risks" are not enough so long as an issue can somehow still be called the same "problem." AOB 27 (citation omitted). Thus, since the "problem" of access to guns in courtrooms existed at the founding—like the "problem" of access to guns by felons, *see id.*—modern regulations of that activity must fail. In short, under Rojo's view, the Court's approach to expounding categories of permissible and impermissible regulations is wrong.

45

Third, Rojo's approach would hamper not only the formulation of Second Amendment principles but also their application. While the Second Amendment's "meaning is fixed," its application is not. *Bruen*, 142 S. Ct. at 2132. Thus, it would "border[] on the frivolous" to claim "that only those arms in existence in the 18th century are protected." *Heller*, 554 U.S. at 582. Similarly, "even if . . . colonial laws prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today." *Bruen*, 142 S. Ct. at 2143. And legislatures can make "present-day judgments about categories of people whose possession of guns would endanger the public safety; . . . 'exclusions need not mirror limits that were on the books in 1791.'" *Kanter*, 919 F.3d at 464–65 (Barrett, J., dissenting) (citation omitted).

Again, Rojo's approach conflicts with much of that. For example, in his formulation, handguns must be deemed dangerous and unusual even today because the "problem" of handguns existed at the founding. And there is no basis for deeming any groups dangerous or unlawful today that weren't already deemed so at the founding. So under his test, even if the historical laws show that the legislature can disarm groups deemed dangerous and unlawful and thus

that a modern law targeting felons for disarmament would have been acceptable at the founding, that law must fail because it did not exist at the founding and no analogues are allowed. That view simply cannot be squared with the Supreme Court's approach to applying fixed meaning to moderation applications.

Rojo's view is also inconsistent with this Court's cases, which have upheld laws against Second Amendment attacks even when identical laws did not exist in the founding era. *See Duncan v. Bonta*, 83 F.4th 803, 806 (9th Cir. 2023) (en banc) (holding that ban on high-capacity magazines was likely to survive Second Amendment challenge); *Alaniz*, 69 F.4th at 1129–30 (upholding sentence enhancements for carrying guns during drug crimes); Order, *United States v. Perez Garcia*, No. 22-50314 (9th Cir. 2023) (ECF No. 21) (upholding law letting courts impose gun ban as condition of pretrial release in some cases and stating that an opinion explaining the order would follow).

Fourth, even if *Bruen* had set up a more lenient test for regulations addressing modern concerns, § 922(g)(1) arguably is such a regulation. It was enacted to address "unprecedented rises in crime rates, organized crime, gangster violence, and racketeering." *United States v. Schnur*, --- F.Supp.3d ----, 2023 WL 4881383, at *7 (S.D. Miss. 2023) (citation omitted). That "the lethality of today's

47

weaponry, the ubiquity of gun violence, the size and anonymity of the population, and the extent of interstate travel were unknown at the Founding" also supports the conclusion that the law addressed novel concerns. *Range*, 69 F.4th at 120 (Krause, J., dissenting). Still, even if the stricter test applied, § 922(g)(1) satisfies it too. Since historical laws often imposed even harsher penalties for felonies and often restricted gun ownership by even broader groups to protect the public from those deemed untrustworthy, they are "distinctly similar" (by any normal understanding of those words, which would exclude defining "similar" to mean "identical") to § 922(g)(1), which simply places a clearly limited definition on who may be disarmed for committing serious crimes. In sum, § 922(g)(1) comports with the nation's historical tradition of firearm regulation and this Court should reject Rojo's Second Amendment challenge to the law.

3. *Even if a version of Rojo's analysis were right, § 922(g)(1) would still be valid as applied to him.*

If the Court believes § 922(g)(1) may be invalid in some respects, it should still uphold the law as applied to Rojo. Notably, even the authorities Rojo cites conclude that § 922(g)(1) may be valid in some of its applications. Then-Judge Barrett concluded, for example, that "the state can take the right to bear arms away from a category of people that it deems dangerous" but cannot take that right away

from non-violent felons unless their "history or characteristics make [them] likely to misuse firearms." *Kanter*, 919 F.3d at 464, 468 (Barrett, J., dissenting). Arguably, felons as a class meet that test. *See supra* § (B)(2)(d) (collecting authorities concluding that even non-violent felons are more likely to commit violent crimes). But even if they do not, Rojo does.

As noted, Rojo has a prior felony conviction for drug smuggling. *See* PSR ¶ 44. And his cash-smuggling crime here, during which he had a gun in his car, related to smuggling drug proceeds and implicated Rojo's own drug use. *See* PSR ¶¶ 8–9. Rojo has also failed to appear in court and had to be detained in this case. PSR ¶ 10. The drug use, drug smuggling, and drug-proceeds smuggling would all be enough to show a serious risk that he will misuse guns. *See Kanter*, 919 F.3d at 466 (Barrett, J., dissenting) (approving of prior precedent upholding law banning guns for those who abuse drugs given connection between drug abuse and violence). Yet the fact that he carried a gun *while committing a felony in this case* leaves no doubt on the matter. *Cf. Alaniz*, 69 F.4th at 1129–30 (holding that enhancing sentences for carrying guns during drug crimes "clearly comports with . . . history and tradition" and noting "the increased risk of violence created by mere possession of a firearm during the commission of certain crimes"). So Rojo's history and characteristics

49

indicate that he is likely to misuse firearms. Thus, even if the Court believes that § 922(g)(1) may not be constitutional in all its applications, it should uphold the law as applied to Rojo.

CONCLUSION

This Court should affirm Rojo's conviction.

Respectfully submitted,

TARA K. MCGRATH
*United States Attorney*

DANIEL E. ZIPP
*Assistant U.S. Attorney*
*Chief, Appellate Section*
*Criminal Division*

s/ZACHARY J. HOWE
*Assistant U.S. Attorney*

NOVEMBER 17, 2023.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-598

I am the attorney or self-represented party.

**This brief contains** | 11,360 | **words,** including [          ] words

manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
   [ ] it is a joint brief submitted by separately represented parties.
   [ ] a party or parties are filing a single brief in response to multiple briefs.
   [ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [          ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Zachary J. Howe | **Date** | November 17, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**        *Rev. 12/01/22*