**No. 23-598**

_____

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———

**UNITED STATES OF AMERICA,**

Plaintiff-Appellee,

v.

**ORLANDO ROJO,**

Defendant-Appellant.

———

Appeal from the
United States District Court
for the Southern District of California
Honorable Gonzalo P. Curiel, Presiding,
No. 21-CR-682-GPC

———

**APPELLANT'S REPLY BRIEF**

_____

KATIE HURRELBRINK
DANIEL J. YADRON, JR.
FEDERAL DEFENDERS OF SAN DIEGO, INC.
225 Broadway, Suite 900
San Diego, CA 92101
(619) 234-8467
Katie_Hurrelbrink@fd.org

Attorneys for Mr. Rojo

## TABLE OF CONTENTS

TABLE OF AUTHORITIES......................................................................iii

INTRODUCTION....................................................................................1

ARGUMENT..........................................................................................2

    I.    The government does not engage constitutional text or dispute that Mr. Rojo is among "the people."............................2

    II.   The government does not show that § 922(g)(1) falls within a "historical tradition of firearm regulation."................2

        A.    The government does not square its arguments or evidence with *Bruen*.........................................................3

        B.    Applying the right methods, the government's evidence does not justify lifetime disarmament for all felons....................................................................7

            1.    The public would not have "understood," from the consequences of felony conviction, that felons also lost their fundamental, individual rights.....................................................7

                a.    All the felons were not dead, literally or civilly. ...........................................................8

                b.    The public would have differentiated between unprotected privileges and individual, fundamental rights. ...............10

            2.    The government cannot distill, from a hodgepodge of dissimilar regulations, the power to disarm anyone deemed "dangerous" or "unlawful."..................................16

a.  The Solicitor General conceded that racist laws do not reflect "the people's" rights, and by her logic, most of the remaining evidence is irrelevant too. ........................................... 16

b.  Laws designed to win wars and avert rebellions do not confer unbounded authority to disarm the "dangerous" and "unlawful." ................................................ 22

3.  *Heller* renounced reliance on constitutional convention proposals, and the irreconcilable contradictions between them validate that choice. ................................................ 26

III.  As-applied analyses are limited to a statute's "application," that is, what the statute actually authorizes or prohibits—not facts irrelevant to the conviction. ................................................ 29

IV.  *Bruen*'s mode of analysis is clearly irreconcilable with *Vongxay*. ................................................ 33

CONCLUSION ................................................ 37

## TABLE OF AUTHORITIES

**Cases**                                                    **Page(s)**

*Bounds v. Smith,*
   430 U.S. 817 (1977)................................................................11

*City of Los Angeles, Calif. v. Patel,*
   576 U.S. 409 (2015).........................................................30, 31

*District of Columbia v. Heller,*
   554 U.S. 570 (2008)....................................................*passim*

*Firearms Pol'y Coal., Inc. v. McCraw,*
   623 F. Supp. 3d 740 (N.D. Tex. 2022) ...............................15

*Fraser v. ATF,*
   ___ F. Supp. 3d ___, 2023 WL 3355339 (E.D. Va. May 10, 2023)........16

*Frein v. Pennsylvania State Police,*
   47 F.4th 247 (3d Cir. 2022)................................................20

*Garcia v. City of Los Angeles,*
   11 F.4th 1113 (9th Cir. 2021) ..........................................30

*Kanter v. Barr,*
   919 F.3d 437 (7th Cir. 2019) (Barrett, J., dissenting) ...............*passim*

*MacDonald v. Moose,*
   710 F.3d 154 (4th Cir. 2013)...............................................31

*Maryland Shall Issue, Inc. v. Moore,*
   ___ F.4th ___, 2023 WL 8043827 (4th Cir. Nov. 21, 2023) .................37

*Miller v. Gammie,*
   335 F.3d 889 (9th Cir. 2003) (en banc)................................35

iii

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  597 U.S. 1 (2022).............................................................*passim*

*Range v. Att'y Gen. United States of Am.*,
  69 F.4th 96 (3d Cir. 2023)...........................................6, 9, 14

*Rhodes v. Chapman*,
  452 U.S. 337 (1981)...........................................................11

*Samson v. California*,
  547 U.S. 843 (2006)...........................................................15

*Solorio-Ruiz v. Sessions*,
  881 F.3d 733 (9th Cir. 2018)..............................................35

*Teter v. Lopez*,
  76 F.4th 938 (9th Cir. 2023) ...............................................3

*Texas v. Johnson*,
  491 U.S. 397 (1989)...........................................................31

*Toussaint v. McCarthy*,
  801 F.2d 1080 (9th Cir. 1986).............................................11

*United States v. Alaniz,*
  69 F.4th 1124 (9th Cir. 2023) ..............................................3

*United States v. Bajakajian*,
  524 U.S. 321 (1998).............................................................9

*United States v. Cotterman*,
  709 F.3d 952 (9th Cir. 2013)..............................................15

*United States v. Eichman*,
  496 U.S. 310 (1990)...........................................................32

*United States v. Emerson,*
   270 F.3d 203 (5th Cir. 2001)................................................................28

*United States v. Harrison,*
   654 F. Supp. 3d 1191 (W.D. Okla. 2023)..........................................20

*United States v. Vongxay,*
   594 F.3d 1111 (9th Cir. 2010)......................................... 33, 34, 35, 36

*Young v. Hawaii,*
   992 F.3d 765 (9th Cir. 2021)..............................................................36

**Statutes and the Constitution**                                    **Page(s)**

U.S. Const. art. III, § 3, cl. 2 ...............................................................9

U.S. Const. amend. I ..........................................................................12

U.S. Const. amend. II .................................................................*passim*

18 U.S.C. § 922 .........................................................................*passim*

1 Cong. Ch. 9, April 30, 1790, 1 Stat. 112.........................................9

1 Laws of Ky., ch. 54, § 5, p. 106 (1799)..........................................23

Colonial and State Records of North Carolina 88-89 (William Saunders,
   ed. 2007)............................................................................ 19, 24, 25

Hanson's Laws of Maryland 1763-1784 (1787)................................24

Journals of the Continental Congress 1774-1789 (Worthington
   Chauncey Ford ed., 1906)...............................................................25

Muster Rolls and Other Records of Service of Maryland Troops in the
   American Revolution, 1775-1783 (1900) .........................................19

v

State Library of Massachusetts, Acts and Resolves 1692-1780, *available at* https://tinyurl.com/yc2jt9wy........................................................ 19, 25

Statutes at Large of Pennsylvania from 1682-1801 (1986).............. 18, 24

William Waller Hening, The Statutes at Large; A Collection of All the Laws of Virginia (1820) ........................................................................24

## Other Authorities                        Page(s)

3 Works of Thomas Jefferson (H.A. Washington, ed. 1884)...................25

A. Roger Ekirch, *Bound for America: A Profile of British Convicts Transported to the Colonies, 1718-1775*, 42 William and Mary Q. 184 (1987) ................................................................................................. 8

Adam Winkler, Gunfight (2011) ............................................................23

Black's Law Dictionary (11th Ed. 2019) ..................................................9

Bos. Indep. Chronicle, Phila. Indep. Gazetteer (Aug. 20, 1789)............28

C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Policy 695 (2009) ............................................................23

*Deportation As Punishment: A Historical Analysis of the British Practice of Banishment and Its Impact on Modern Constitutional Law*, 14 Geo. Immigr. L.J. 115 (1999) ........................................................................ 8

Don B. Kates, Jr., *The Second Amendment: A Dialogue,* 49 Law & Contemp. Probs. 143 (1986) ...............................................................34

Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment,* 62 Tenn. L.Rev. 461 (1995)......................................................................34

Jacob Katz Cogan, *The Look Within: Property, Capacity, and Suffrage in Nineteenth-Century America*, 107 Yale L.J. 473 (1997) .................13

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249 (2020) ......................................................................... 23, 24

Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* (1994).................................................. 17, 23

Letter from Rep. Frederick A. Muhlenberg to Benjamin Rush (Aug. 18, 1789).................................................................... 27

Nino C. Monea, *Vanguards of Democracy: Juries As Forerunners of Representative Government*, 28 UCLA Women's L.J. 169 (2021) ........ 13

Nora V. Demleitner, *Continuing Payment on One's Debt to Society: The German Model of Felon Disenfranchisement As an Alternative*, 84 Minn. L. Rev. 753 (2000) ...................................................... 9

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 Law & Hist. Rev. 139 (2007) .......................................................................... *passim*

Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487 (2004) .... 18

Stephen P. Halbrook, A Right to Bear Arms (1989)............................... 28

Transcript of Oral Argument, United States v. Rahimi, No. 22-915 ...................................................................... 17, 34

Will Tress, *Unintended Collateral Consequences: Defining Felony in the Early American Republic*, 57 Clev. St. L. Rev. 461 (2009) .................... 8

vii

## INTRODUCTION

*New York State Rifle & Pistol Association, Inc. v. Bruen* clarified that there is "only" one way to validate a gun law. 597 U.S. 1, 34 (2022). When the Second Amendment's text guarantees a person's right to bear arms, infringements on that right must accord with a "historical tradition of firearm regulation." *Id*. It is now uncontested that Mr. Rojo falls within the amendment's text. And following *Bruen*'s careful, evidence-based methodology, no historical tradition supports disarming him for life.

The government does not employ that methodology. Instead, the government claims amorphous powers to disarm anyone it deems "dangerous," "unlawful," "disaffected," un-"peaceable," and/or "likely to misuse firearms." The government neither defines these terms nor explains how courts can police their bounds. The hodgepodge of historical evidence supporting these powers is often unrelated to firearms regulation, and it tends to fall on persons without rights. It ranges from indignities visited on slaves, to rejected proposals, to laws addressing marriage, estates, and migration. The government rarely cites *Bruen* to defend these choices. It often cites pre-*Bruen* circuit court cases and scholars' naked assertions.

It should come as no surprise that history does not support these breathtaking claims to power. Constitutional guarantees do not admit to vague exceptions, with no limiting principle, defined at Congress's

1

discretion. We do not measure our liberties by the rights of slaves. And even when the government can visit harsh treatment on our property or persons, we set a much higher bar for revoking fundamental rights. Because the Second Amendment is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees," this Court must reverse. *Bruen*, 597 U.S. at 70.

ARGUMENT

## I. The government does not engage constitutional text or dispute that Mr. Rojo is among "the people."

Second Amendment analysis begins with whether the "plain text covers [the] individual's conduct." *Bruen*, 597 U.S. at 17. Here, Mr. Rojo is among "the people" with a right to bear arms. Appellant's Opening Brief ("AOB") 13-22. The government does not argue otherwise or engage the amendment's text. Thus, it is now uncontested that his conduct is "presumptively protect[ed]," and the government bears the burden to rebut that presumption. *Id.*

## II. The government does not show that § 922(g)(1) falls within a "historical tradition of firearm regulation."

To meet its burden, the government must locate 18 U.S.C. § 922(g)(1) in "this Nation's historical tradition of firearm regulation." *Id.* It has not done so.

### A. The government does not square its arguments or evidence with *Bruen*.

First, the government's arguments use the wrong methodology and the wrong evidence. *Bruen* described and modeled the right approach. The government must offer "regulations"; those regulations must be part of American "tradition"; and they must be sufficiently "similar" to § 922(g)(1). *Bruen*, 597 U.S. at 26. A "straightforward" comparative inquiry applies to laws addressing longstanding problems: The government must identify "distinctly similar" historical precursors. *Id.* Novel problems require a more "nuanced" inquiry, permitting analogies to "relevantly similar" regulations. *Id.* at 29. Either way, the analysis must proceed at a reasonable level of generality. The government cannot derive vast, ill-defined powers from miscellaneous laws. AOB-23-28, 53-59.

Methodology-wise, the government devotes the most energy to disputing that straightforward and nuanced problems demand distinct inquiries. Appellant's Answering Brief ("AAB") 41-47. But this Court can read for itself: *Bruen* drew a clear distinction, 597 U.S. 26–27, and this Court has used the "straightforward" or "nuanced" tests as appropriate. *United States v. Alaniz,* 69 F.4th 1124, 1130 (9th Cir. 2023) ("nuanced"); *Teter v. Lopez*, 76 F.4th 938, 954 (9th Cir. 2023)

3

("straightforward"). Contrary to the government's understanding, the "straightforward" test requires a "distinctly *similar*" law, not an identical one. *Bruen*, 597 U.S. at 26. In marginal cases, courts will decide how similar is similar enough. But here, there is no ambiguity. No historical firearms regulation of any kind directly or even indirectly targeted felons.

More importantly, the straightforward/nuanced divide does not make the difference here. Even assuming there is no straightforward/nuanced distinction—or that the nuanced inquiry applies—the government's evidence and arguments still fall far short. That's because the government's analysis is impossible to square with *Bruen*.

***First***, the government relies on the wrong evidence. *Bruen* demands that gun laws fall within a "historical tradition of firearm regulation." *Id*. at 24. The entire opinion reviews state action targeting guns ("firearm") having the force of law ("regulation"). *Id*. at 31–70.

Here, however, the government's laws cover various subjects— marriage and estates, floggings and brandings, voting and juries— having nothing to do with guns. AAB-20-30. Worse, the government does not confine itself to regulations. It relies, for example, on mere

4

proposals voted down in their own conventions. AAB-36-39. And it speculates about what the public would have "understood" about felons. AAB-7, 27, 36, 38. The government does not try to explain how any of this reflects a "historical tradition of firearm regulation," or how laws unrelated to firearms could impose a "comparable burden *on the right of armed self-defense*." *Bruen*, 597 U.S. at 29, 34 (emphasis added).

**Third,** the government analyzes this evidence at a sky-high level of generality. AOB-53-59. *Bruen* already rejected this maneuver. There, New York provided diverse public-carry restrictions, then claimed generalized power to regulate public carry. *Id.* at 31–70. The Court rebuffed those arguments. Instead, it compared New York's law to historical regulations, deciding individually if they were sufficiently similar. *Id.* When it found only "well-defined" public-carry prohibitions, it rejected claims to "broad" regulatory authority. *Id.* at 70.

The government replicates the rejected analysis. The results speak for themselves. Using the very same laws, the government has arrived at six significantly different descriptions of persons whom it can disarm: the "dangerous," "unlawful," "disaffected," un-"peaceable," "unvirtuous," and/or "likely to misuse firearms." AAB-3, 31, 36, 37, 50; Doc. 44 at 17. The government offers no way to choose among these

5

descriptors. It defines none of them. And it proposes no way to police the categories' bounds, except to defer to legislatures, AAB-22, 36— deference that defeats the point of a constitutional right, *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 103 (3d Cir. 2023).

The government does not try to square this method with *Bruen*'s painstaking comparisons. Instead, the government justifies its generalizations by noting that *Bruen* occasionally defined categories of permissible laws, like "sensitive places" regulations. AAB-44–45.

But *Bruen*'s "sensitive places" discussion perfectly captures the problem. To defend its law, New York began with "sensitive places" prohibitions in, e.g., legislatures and courthouses. *Bruen*, 597 U.S. at 30–31. It then derived an extremely general description of sensitive places: "places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." *Id.* Finally, it asserted power to "declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." *Id.* at 31. The Court rejected this effort to "expand[] the category of 'sensitive places'" through extreme generalization; New York "define[d] the category of 'sensitive places' far too broadly." *Id.* Instead, to invoke the

6

sensitive-places *category*, the government had to compare to particular *laws*. The government's hyper-generalizations, unmoored from particulars, fail for the same reason.

In short, the government has not attempted to show that § 922(g)(1) is similar or even analogous to historical firearms regulations. And *Bruen* does not permit the freewheeling, unprincipled, and speculative generalizing to which it resorts instead. Staying true to *Bruen*'s method, the government's arguments fail.

## B. Applying the right methods, the government's evidence does not justify lifetime disarmament for all felons.

Apart from these overarching methodological issues, the government's individual arguments suffer from evidentiary, legal, and logical infirmities.

### 1. The public would not have "understood," from the consequences of felony conviction, that felons also lost their fundamental, individual rights.

The government first claims that the "severe" consequences of felony conviction validate § 922(g)(1). Its reasoning collapses under scrutiny.

### a.  All the felons were not dead, literally or civilly.

First, the government reasons that because execution was the "standard" felony sentence, "all the felons were dead," disarming them without further legislative action. AAB-27 (simplified). That is demonstrably false per the government's own evidence. London court records cited by the government reflect that, between 1718 and 1769, 8 to 15% of felons were executed. *Deportation As Punishment: A Historical Analysis of the British Practice of Banishment and Its Impact on Modern Constitutional Law*, 14 Geo. Immigr. L.J. 115, 126 (1999). Almost 70% were exiled to America, where they henceforth lived. *Id*. By one estimate, these convict-exiles were 50,000 strong. A. Roger Ekirch, *Bound for America: A Profile of British Convicts Transported to the Colonies, 1718-1775*, 42 William and Mary Q. 184, 188 (1987).

Execution was even rarer in America, especially when—around the Second Amendment's adoption—states moved away from the death penalty. Within two decades of independence, the states "had replaced execution with incarceration as the punishment for all but a few crimes." Will Tress, *Unintended Collateral Consequences: Defining Felony in the Early American Republic*, 57 Clev. St. L. Rev. 461, 468 (2009). The First Congress itself defined 18 federal crimes—just 8 of

8

which were punishable by death. 1 Cong. Ch. 9, April 30, 1790, 1 Stat. 112.

The First Congress also forbade estate forfeiture and "corruption of blood," *id*. § 24, the loss of the right "to inherit or pass property," Black's Law Dictionary (11th Ed. 2019). The Constitution itself prohibited these punishments even for treason. U.S. Const. art. III, § 3, cl. 2. This is emblematic of the fact that, as the government's source relates, Americans did not wholesale adopt English forfeiture and "civil death" practices. Nora V. Demleitner, *Continuing Payment on One's Debt to Society: The German Model of Felon Disenfranchisement As an Alternative*, 84 Minn. L. Rev. 753, 766 (2000). In particular, the new republic "rejected" common law "*in personam* criminal forfeitures," generally opting for narrower *in rem* forfeitures. *United States v. Bajakajian*, 524 U.S. 321, 332 & n.7 (1998). Finally, even when forfeiture was imposed, felons could later purchase new property, including firearms. *Range*, 69 F.4th at 105.

In short, the government's evidence reflects that many felons lived and participated in community life. Thus, felon execution and "civil death" cannot explain the absence of regulations like § 922(g)(1).

9

### b. The public would have differentiated between unprotected privileges and individual, fundamental rights.

The government next argues that, because legislatures at least had the power to impose these consequences, the public "would have understood" that they could strip felons of Second Amendment rights, too. AAB-27. But there is no evidence that the founding generation "understood" fundamental rights as the government proposes—and its logic is certainly anathema to how we think of them today. Without some evidence that the government's logic chimes with historical understandings about individual, fundamental rights, the government's claims are not just speculative. They also threaten to subject the Second Amendment "to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen*, 597 U.S. at 70.

*First*, the government notes that severe consequences sometimes followed felony conviction, like forfeiture, exile, whippings, and brandings. AAB-20-30. Because these consequences are "harsher" than disarmament, says the government, the public "would have understood" that legislatures could disarm felons, too. AAB-20, 27, 48.

This logic founders on the fact that the Second Amendment protects a fundamental right. That is the dispositive difference between

10

a gun-possession ban and, for example, estate forfeiture. There is no fundamental, individual right to keep one's estate, but there is a fundamental right to keep and bear arms. The same distinction applies to whipping, branding, inheritance, and the other disabilities. None threatens a fundamental right ultimately enshrined in the Constitution.

That matters, because the public understands that there is a difference between protected rights and unprotected privileges. We do not think a fundamental right will be treated *the same* as unprotected privileges, but believe it will be honored *far above* them. To take a contemporary example, states have power to treat prisoners "harsh[ly]," from imposing visitation prohibitions to solitary confinement. *Toussaint v. McCarthy*, 801 F.2d 1080, 1092, 1114 (9th Cir. 1986). But states may not take away postage prisoners need to file legal pleadings. *Bounds v. Smith*, 430 U.S. 817, 825 (1977). This is not a matter of relative severity; prisoners daily suffer harsher treatment than being deprived of stamps. It's because access to courts is constitutionally protected, *id.*, while "comfortable prisons" are not, *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981).

11

A public that understood fundamental rights therefore would not buy the government's logic. Upon seeing the harshness of forfeiture, they would not think legislatures could deny free speech. *Cf. Kanter v. Barr*, 919 F.3d 437, 462 (7th Cir. 2019), *abrogated by Bruen*, 597 U.S. 1 (2022) (same, regarding execution). Nor, from the harshness of whippings, would they believe legislatures could revoke the right to petition. U.S. Const. amend. I. The same goes for the Second Amendment.

If anything, the government's evidence suggests that the arms right enjoyed special solicitude. Per the government, statute books abound with felony punishments, detailed down to the number of lashes and shape of the brand. AAB-20-30. Yet no legislature called for felons to lose their right to bear arms—not once, not here or in England, not in hundreds of years.

*Second*, the government says that some states did deprive felons of actual rights, specifically, the "civic rights" to vote, serve on juries, and hold office. AAB-28. But that does not show that the Founders approved revoking all felons' fundamental, individual Second Amendment rights. AAB-28.

12

First off, at the Founding, there was no right to vote, serve on juries, or hold office. The Constitution enshrined no such protections, and states denied these privileges at will. For instance, at ratification, "nearly every state required some form of property ownership to qualify for the vote." Jacob Katz Cogan, *The Look Within: Property, Capacity, and Suffrage in Nineteenth-Century America*, 107 Yale L.J. 473, 476 (1997). And all but Vermont limited jury service to property owners or taxpayers. Nino C. Monea, *Vanguards of Democracy: Juries As Forerunners of Representative Government*, 28 UCLA Women's L.J. 169, 184 (2021). Yet persons without property still had Second Amendment rights. Indeed, English game laws—designed to disarm non-landowners—helped galvanize the Second Amendment. AOB-34-35.

More importantly, these are all "civic" or "collective" rights, distinguishable from "individual" rights protected in the First, Second, and Fourth Amendments. *Kanter*, 919 F.3d at 462–64 (Barrett, J., dissenting). That matters, as there is "no evidence that [conviction-based] exclusions ever applied to individual, as opposed to civic, rights." *Id.* at 463. And *Heller* holds that "'the Second Amendment confer[s] an individual'—as opposed to a collective —'right to keep and bear arms.'" *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1044 (11th Cir. 2022)

13

(quoting *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008)); *contra* AAB-28 n.5.

If anything, these restrictions militate against the government's view. "[E]xclusions from the exercise of civic rights were explicit" at the Founding, appearing in numerous state constitutions. *Kanter*, 919 F.3d at 463 (Barrett, J., dissenting). But none of these constitutions excluded felons from the right to bear arms—or any other individual right. *Id.* at 463–64. This illustrates that individual rights were treated differently.

***Third***, the government reasons that if legislatures can "de facto" disarm felons through imprisonment or execution, they must also be able to disarm upon release. AAB-27. Once again, that is not how fundamental, individual rights work, historically or today. *Range*, 69 F.4th at 105.

Consider how this logic would apply to speech. Historical legislatures could "de facto" silence felons via execution. Following the government's logic, legislatures could also silence them while letting them live. *Kanter*, 919 F.3d at 462 (Barrett, J., dissenting). But the government concedes that this is not true. Historically, "felons were still given speech rights," including the right to a "dying speech" before execution. AAB-29.

14

Likewise, today, legislatures can restrict felons' privacy rights by imprisoning them or placing them on supervision. *See Samson v. California*, 547 U.S. 843, 847 (2006). But once felons finish their sentences, they receive full Fourth Amendment protection. *See United States v. Cotterman*, 709 F.3d 952, 968 (9th Cir. 2013).

There is no evidence that the arms right functioned differently. Instead, the government complains that the defense has not proved felons retained their right to bear arms. AAB-29. But the burden of proof falls squarely on the government, *Bruen*, 597 U.S. at 34, and the only evidence it provides refutes its hypothesis. The defense need not further *dis*prove a baseless theory.

Furthermore, militia laws affirmatively support that felons retained arms rights. AOB-42-43. Though the militia does not set the Second Amendment's *ceiling*, *see* AAB-35-36, it stands to reason that it sets a floor. Because the Second Amendment was partially intended to protect militias, courts have inferred that Congress lacks authority to categorically disarm groups traditionally comprising the militia. *E.g.*, *Firearms Pol'y Coal., Inc. v. McCraw*, 623 F. Supp. 3d 740, 750 (N.D. Tex. 2022). Several militia statutes covered felons by their plain terms, despite containing a detailed list of exclusions. AOB-42-43. This is

15

"important circumstantial evidence" that felons could not be categorically disarmed. *Fraser v. ATF*, ___ F. Supp. 3d ___, 2023 WL 3355339, at *15 (E.D. Va. May 10, 2023).

> **2.  The government cannot distill, from a hodgepodge of dissimilar regulations, the power to disarm anyone deemed "dangerous" or "unlawful."**

Next, the government points to miscellaneous laws—none similar to § 922(g)(1)—and infers sweeping power to disarm anyone deemed "dangerous" or "unlawful." The government relies on (1) the Militia Act of 1662 and (2) the Crown's pre-Glorious-Revolution disarmament practices, and laws targeting (3) Catholics, (4) enslaved people, (5) Native Americans, and (6) those who would not swear loyalty. AAB-30-33. These laws do not support the government's claims. AOB-53-59.

> **a.  The Solicitor General conceded that racist laws do not reflect "the people's" rights, and by her logic, most of the remaining evidence is irrelevant, too.**

First, these laws are not proper comparators. The opening brief gave many reasons why, AOB-28-53, few of which the government addresses. But one cross-cutting insight best explains why these laws are unilluminating here: These groups lacked the right to bear arms.

16

For instance, "[n]either the Indian nor the slave was a citizen" with individual liberties. Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 140 (1994). Because these groups did not have a right to bear arms, laws regulating them say nothing about legislatures' power over people who do enjoy that right. That is the only sensible conclusion. It is preposterous to suggest that the Constitution guarantees us no more rights than slaves.

The Solicitor General agrees. At an oral argument, Justice Thomas asked her why the government "drop[ped]" previously cited laws about "slaves and Native Americans." Transcript of Oral Argument at 7, United States v. Rahimi, No. 22-915. She answered that "those categories of people were viewed as being not among the people protected by the Second Amendment," so laws regulating them were not "directly relevant" to those who are "among the people." *Id*.

The same logic defeats reliance on revolutionary-era loyalty-oath statutes. These emergency measures are weak evidence anyway, as they arose amidst "acute disorder." *Bruen*, 597 U.S. at 40.[1] But they

---

[1] In arguing that these statutes persisted post-revolution, the government cites an article that describes consequences for *participants* in Shay's Rebellion. AAB-34 (citing Saul Cornell & Nathan DeDino, *A*

17

also do not reflect the rights of the "the people," as swearing loyalty "defined membership in the body politic." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 Law & Hist. Rev. 139, 158 (2007).

Consider Pennsylvania's loyalty-oath scheme. Quakers balked at taking the oath in the original, 1777 statute. AAB-33. The assembly therefore "revised the test law in 1786 to try to meet Quaker objections." Churchill, *supra*, at 159. The revised law's title announced its purpose: "Admitting Certain Persons to the Rights of Citizenship." 12 Statutes at Large of Pennsylvania from 1682-1801 178 (1986). The law recognized that those who "omitted or neglected to take and subscribe the oaths" had "deprived themselves of the privileges of citizenship." *Id*. But the new statute provided an opportunity to become "a free citizen of this commonwealth and entitled to all and every the rights and privileges thereof." *Id*.

Other loyalty-oath statutes contain similar language. Maryland's revoked numerous privileges from those who refused, including barring them from juries. Churchill, *supra*, at 160. But in 1781, when raising

---

*Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 507–08 (2004)). That is not a loyalty-oath statute.

new battalions, it promised "nonjuror[s]" who enrolled "shall be restored to all the rights and privileges of a free citizen of this state." 18 Muster Rolls and Other Records of Service of Maryland Troops in the American Revolution, 1775-1783 373 (1900). Those who refused North Carolina's "no longer enjoy[ed] the Privileges of Freemen of the said State." 24 Colonial and State Records of North Carolina 88-89 (William Saunders, ed. 2007). And Massachusetts's revoked several rights, while letting courts "restore" such persons to "the privileges of a good and free member of this community." State Library of Massachusetts, Acts and Resolves 1692-1780, *available at* https://tinyurl.com/yc2jt9wy. Because the disloyal lacked the "rights" and "privileges" of "freemen" and "citizens," legislatures could disarm them.

Finally, Catholic-disarmament laws follow the same trend. Importantly, there was no American tradition of abridging Catholics' right to armed self-defense, as there were just two colonial Catholic-disarmament laws and one let them keep defensive arms. Churchill, *supra*, at 157.[2] But regardless, Catholic disarmament occurred only

---

[2] The Maryland "law" that the government cites was never enacted. Churchill, *supra*, 175 n.47.

19

when "Catholics . . . fell beyond the protection of the right to have arms." *Bruen*, 597 U.S. at 45 n.12. In seventeenth- and eighteenth-century England and America, the operative rights-protecting document was the English Bill of Rights, and it shielded only Protestants. *United States v. Harrison*, 654 F. Supp. 3d 1191, 1220 (W.D. Okla. 2023).

All these laws therefore support an obvious principle: If a person has no right to bear arms, governments can disarm them. That says nothing about how legislatures can regulate those with gun rights.

This discussion also illustrates a broader point. If a law does not implicate a right to bear arms, then it is unhelpful in defining the right's scope. On that reasoning, the Militia Act of 1662 is unenlightening, too. When Parliament passed the Militia Act, there was no right to bear arms. The English Bill of Rights would not exist for another quarter century. *Bruen*, 597 U.S. at 44. In the interim, the Crown's abusive disarmament practices "caused Englishmen to be jealous of their arms." *Id.* at 43 (simplified). The backlash spawned the arms right's codification. *Frein v. Pennsylvania State Police*, 47 F.4th 247, 255 (3d Cir. 2022). Thus, the English Bill of Rights did not enshrine pre-Glorious Revolution disarmament practices, but protected against them.

20

Even after its passage, however, it prohibited only the *Crown* from interfering with arms. *Bruen*, 597 U.S. at 44. Parliament still retained unbridled authority to pass acts—like the Militia Act—that took away guns. *See id.* Our Second Amendment, however, revoked that authority. AOB-32-33. Thus, even if Parliament had power to pass the Militia Act, that does not suggest that Congress could pass comparable laws.

The government's responses are meritless. The government argues that some historically disarmed groups, like Catholics, "may include citizens." AAB-34. What matters, however, is not citizenship per se, but whether these groups had rights to bear arms. None did.

The government also insists that all English history is illuminating. AAB-34. *Bruen* instructs otherwise: "English common-law practices and understandings at any given time in history cannot be indiscriminately attributed to the Framers of our own Constitution." 597 U.S. at 35. Where that history "was not incorporated into the Second Amendment's scope," it is irrelevant. *Id*. at 43 n.10. Here, the Founders indisputably jettisoned limits based on religion, social status, and branch of government. AOB-33-34. Laws predicated on those limits cannot justify disarmament today.

21

### b. Laws designed to win wars and avert rebellions do not confer unbounded authority to disarm the "dangerous" and "unlawful."

Even if the government's laws reflected "the people's" rights, it does not follow that the government can disarm anyone Congress deems dangerous or unlawful.

Initially, to resist the idea that *only* the dangerous could be disarmed, the government focuses on the historical groups' actual characteristics. It reasons that historical legislatures did not exclusively regulate the dangerous, because some members of the regulated groups—like pacifist Quakers disarmed via loyalty oath—were harmless. AAB-33. But that logic would invalidate all the government's adjectives. Not all enslaved people, Native Americans, or Catholics were "unlawful." Many were undoubtedly law-abiding. Likewise, not all who refused a loyalty oath were "disaffected." Quakers simply could not swear consistent with their principles. *See* Churchill, *supra*, 159.

What matters is not these groups' actual characteristics, but "how" and "why" legislatures regulated them. *Bruen*, 597 U.S. at 29. Here, the "how" varied, and it was typically far less burdensome than lifetime disarmament. In America, only the enslaved were categorically

22

barred from bearing arms. *See, e.g.*, 1 Laws of Ky., ch. 54, § 5, p. 106 (1799). Laws targeting Native Americans merely prohibited colonists from selling them guns or repairing their weapons. *See* Malcolm, *supra*, at 142 (quoting Massachusetts and Virginia laws). Of the two laws targeting Catholics, one permitted them to keep arms necessary for self-defense. Churchill, *supra*, at 157. And revolutionary loyalty-oath statutes mandated arms forfeitures, without outlawing future acquisitions. C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Policy 695, 724 (2009).

As for the "why," "the purpose of disarmament laws was usually to preclude armed insurrections." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 259 (2020). That's what "disaffected" means: "those disloyal to the current government, who might want to overthrow it." *Id*.

Unsurprisingly, the enslaved and Native Americans were disarmed "for fear that these groups would use guns to revolt" against their oppressors. *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting) (quoting Adam Winkler, Gunfight 115–16 (2011)).

23

The two laws targeting Catholics followed this trend. Pennsylvania's Catholic-disarmament law, passed during "actual war" with the Catholic French, opens by noting the necessity of "suppress[ing] any intestine commotions, rebellions or insurrections." 5 Statutes at Large of Pennsylvania 1682-1801 627 (WM Stanley Ray ed., 1898); *see* Greenlee, *supra*, 263 (explaining the war's Catholic/Protestant dynamics). Virginia's, enacted during the same conflict, begins, "Whereas it is dangerous at this time to permit Papists to be armed." 7 William Waller Hening, The Statutes at Large; A Collection of All the Laws of Virginia 35 (1820).

Revolutionary-era loyalty statutes had two purposes. First, as North Carolina's put it, legislatures hoped to "prevent[] the Dangers which may arise from Persons disaffected to the State." 24 Colonial and State Records of North Carolina 86 (William Saunders, ed. 2007). That law explained, "there are divers persons whose intentions are inimical to the State, who would in Case of Invasion by our Enemies, or the Expectation of immediate Support of them, carry such Intentions into Practice." *Id*. at 88; *see also, e.g.*, 203 Hanson's Laws of Maryland 1763-1784 187 (1787) (entitling oath statute "An Act for the better security of the government.").

24

Second, arms confiscations supplied the revolutionary army. The Continental Congress, for instance, enacted a detailed scheme for redistributing confiscated weapons. 4 Journals of the Continental Congress 1774-1789 205 (Worthington Chauncey Ford ed., 1906). Secretary of State Thomas Jefferson later justified such confiscations to the British ambassador: "Excluded from all commerce even with Neutral nations, without arms, money, or the means of getting them abroad, we were obliged to avail ourselves of such resources as we found at home." 3 Works of Thomas Jefferson 365, 369 (H.A. Washington, ed. 1884). Thus, whether to disarm the disloyal or arm the loyal, these laws responded to the revolution's exigencies.[3]

These observations point in the same direction. Legislatures mandated confiscation, sales bans, possession prohibitions, and other extreme measures to avert threats to the state, usually during wars or after rebellions. That is not comparable to disarming for life persons

---

[3] The Quaker example is not to the contrary. As noted, Pennsylvania's legislature did not intentionally target Quakers, and it soon passed a remedial law. Churchill, *supra*, at 159. And at least two states preempted the problem by drafting a Quaker-specific oath. State Library of Massachusetts, Acts and Resolves 1692-1780 483, *available at* https://tinyurl.com/yc2jt9wy; 24 Colonial and State Records of North Carolina 86 (William Saunders, ed. 2007).

who evade taxes, or steal mail, or transport marijuana. At any reasonable level of generality, these laws do not validate § 922(g)(1).

### 3. *Heller* renounced reliance on constitutional convention proposals, and the irreconcilable contradictions between them validate that choice.

Finally, the government relies on three constitutional convention proposals, two of which were rejected at their own conventions and none of which made it into the text. AOB-44-48. The government's reasons for relying on them do not withstand scrutiny.

**First**, *Heller* did not endorse them, *contra* AAB-38-39, but said the opposite: "It is dubious to rely on such history to interpret a text that was widely understood to codify a pre-existing right, rather than to fashion a new one." 554 U.S. at 603. It discussed them only "assuming" without deciding "that this legislative history is relevant" at all. *Id.*

**Second**, these proposals did not just "differ" "somewhat." AAB-37. They are incommensurable. New Hampshire's (adopted) proposal permitted disarmament *only* for "actual rebellion"; Samuel Adams's (rejected) Massachusetts proposal protected *anyone* "peaceable"; and Pennsylvania antifederalists' (rejected) proposal shielded *all* except those who "committed" "crimes" or posed a "real danger of public injury." *Kanter*, 919 F.3d at 454–55 (Barrett, J., dissenting) (simplified).

26

Thus, each proposal identified an exclusive carve-out, and none aligned with the others. Not all the law-breakers, dangerous, or unpeaceable have waged actual rebellion. Not every crime is unpeaceable, and not all the unpeaceable have committed crimes. The government's theory would therefore unacceptably imply that "different people of the founding period had vastly different conceptions of the right to keep and bear arms." *Heller*, 554 U.S. at 604–05.

The government offers no theory for how to parse these conflicts or even for what these proposals mean. Does "peaceable" mean "nonviolent"? If so, it would encompass someone who, like Mr. Rojo, transported marijuana. Does "crimes committed" mean all crimes, even misdemeanors? If so, it would confer greater power than the government has ever claimed.

**Third**, there is little evidence that the "peaceable citizens" qualification was implicitly adopted. *Contra* AAB-38. In a letter, a Massachusetts federalist stated that the draft Bill of Rights generally— not the Second Amendment specifically, *contra* AAB-38—"takes in the principal Amendments which our Minority had so much at heart." Letter from Rep. Frederick A. Muhlenberg to Benjamin Rush (Aug. 18, 1789). Samuel Adams in minority had proposed many, varying

27

amendments. *See* Stephen P. Halbrook, A Right to Bear Arms 45 (1989). Nothing suggests Muhlenberg was focused on the arms right or the "peaceable citizens" qualifier. And Muhlenberg could not have meant that every proposal was adopted in every particular, as a provision involving standing armies was outright rejected. *See id.*; *accord* AAB-38.

Likewise, in a letter to the editor, an aggrieved anti-federalist sought to shame Samuel Adams's "enemies" and do him "justice" by reprinting his proposed amendments, claiming that "every one" (save standing armies) was adopted. *United States v. Emerson*, 270 F.3d 203, 254 (5th Cir. 2001) (quoting Bos. Indep. Chronicle, Phila. Indep. Gazetteer 2 (Aug. 20, 1789)). But the author nowhere indicated that the Constitution incorporated the proposals' deleted details, as opposed to their general thrust. He certainly placed no emphasis on "peaceable citizens." And anyway, *Heller* warns against relying on "the recorded views of one Antifederalist," noting, "[t]he claim that the best or most representative reading of the language of the amendments would conform to the understanding and concerns of the Antifederalists is highly problematic." 554 U.S. at 590 n.12 (simplified). That applies

doubly to a letter designed not to interpret the Constitution, but to air partisan grievances.

## III. As-applied analyses are limited to a statute's "application," that is, what the statute actually authorizes or prohibits— not facts irrelevant to the conviction.

Because the government has not located § 922(g)(1) in a historical tradition, that law is unconstitutional—at least as applied to the 10-year-old marijuana felony supporting Mr. Rojo's conviction.

In urging this Court to uphold the conviction on an as-applied basis, the government cites facts having nothing to do with the charged offense. AAB-48–50. These include that Mr. Rojo possessed the gun while cash smuggling, that he previously used methamphetamine, and that he later failed to appear at a hearing.[4] These arguments misunderstand the concept of an as-applied challenge.

As-applied challenges take into account only legally relevant facts, i.e., facts relevant to the offense elements. That's what it means for a statute to "apply": "[A]pplications" concern "conduct" that the statute "actually authorizes or prohibits." *City of Los Angeles, Calif. v. Patel,*

---

[4] The government also asserts the cash was from "drug proceeds." AAB-49. Nothing in the cited sections of the PSR or record supports that accusation, which was never leveled below.

576 U.S. 409, 418 (2015). Thus, "the proper focus of the constitutional inquiry is [prosecutions] that the law actually authorizes, not those for which it is irrelevant." *Id.*; *accord Garcia v. City of Los Angeles*, 11 F.4th 1113, 1119 n.7 (9th Cir. 2021).[5]

This, then, is how § 922(g)(1) "applied" here, PSR-10: Mr. Rojo was convicted of possession with intent to distribute for transporting marijuana. That conviction was punishable by more than a year, though he himself served only six months. Ten years later, he possessed a gun. Those are the legally relevant facts supporting his conviction—the only facts that matter for an as-applied challenge. Prosecuting him for that reason does not accord with regulatory tradition. No similar or even analogous laws existed near the founding. And even if the government could disarm anyone dangerous or unlawful, that decade-old conviction does not place him in those categories.

The other circumstances do not change the analysis, because legally irrelevant facts cannot save an unconstitutional prosecution— even if those facts also amount to a different, properly criminalized offense. Take, for example, "sodomy" laws prohibiting same-sex

---

[5] These cases interpret what it means for a law to be unconstitutional in "every application." *Id*. It follows that the same rules apply to each individual application, too.

intercourse. Those laws are "unconstitutional when applied to any person." *MacDonald v. Moose*, 710 F.3d 154, 162 (4th Cir. 2013). True, legislatures can criminalize some acts that *coincidentally* involve same-sex intercourse, like same-sex child molestation. *Id.* at 165. But even child molesters cannot be prosecuted for sodomy. *Id.* at 164–65. That's because the "conduct" that a sodomy law "prohibits" (same-sex intercourse) is protected, and the properly criminalized conduct (child molestation) is "irrelevant" to whether the defendant committed sodomy. *Patel*, 576 U.S. at 418. Thus, the government may prosecute such individuals for abusing children, but not for having same-sex intercourse.

Or consider flag-desecration statutes. True, legislatures can criminalize acts coincidentally involving flag burning. But if a defendant is prosecuted "*only* for flag desecration—not for trespass, disorderly conduct, or arson"—the flag-desecration charge is unconstitutional as applied. *Texas v. Johnson*, 491 U.S. 397, 412 n.8 (1989). That is true even when the very same flag-burning conduct could be criminalized for some other reason. In *United States v. Eichman*, for instance, the Supreme Court accepted an as-applied

31

challenge to a desecration charge, while letting a property destruction charge proceed. 496 U.S. 310, 313 n.1 (1990).

Likewise here. From § 922(g)(1)'s perspective, it is irrelevant that Mr. Rojo was smuggling cash when possessing the gun. Of course, the government properly brought a cash smuggling charge for that conduct. And if Congress had criminalized possessing a gun while cash smuggling (it has not), the government could possibly charge that too. But none of that has anything to do with whether the government can prosecute him for bearing arms following a 10-year-old marijuana felony. The same logic applies with even greater force to pre-offense drug use and post-offense court appearances.[6]

Limiting as-applied challenges to actual "applications" is not just legally required. It's also sensible. The government would have courts conduct an apparently unbounded inquiry, sifting through all aspects of the defendant's life (even post-offense!) to see if they were sufficiently dangerous, unlawful, disaffected, etc. to be disarmed. It is hard to imagine consistent, manageable standards that could guide that

---

[6] Against all this, the government cites then-Judge Barrett's inquiry into whether a plaintiff's "history or characteristics make him likely to misuse firearms." *Kanter*, 919 F.3d at 465 (Barrett, J., dissenting). But that inquiry occurred during the "means-end review" part of her analysis, which *Bruen* overruled. *Id.*

32

inquiry. And any attempt would usurp Congress's authority to decide which circumstances warrant criminalizing gun possession (like past felonies) and which do not (like concurrent cash smuggling).

Accordingly, whether facially or as applied, the government has not met its burden to validate § 922(g)(1).

## IV. *Bruen*'s mode of analysis is clearly irreconcilable with *Vongxay*.

Finally, the government's reliance on *United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010), fails. *See* 9th Circuit Docket Number 16 (amicus arguing same).

***First***, *Vongxay* is irreconcilably inconsistent with *Bruen*. *Bruen* held that "only" text and history can validate a gun law. 597 U.S. at 17. Thus, any circuit case that upheld a gun regulation without text-and-history review is irreconcilable with *Bruen*, regardless of whether it employed means-ends scrutiny. *Contra* AAB-14.

*Vongxay* conducted no textual analysis. As for history, the government relies on *Vongxay*'s references to "historical gun restrictions" and scholars' views about the Second Amendment. AAB-14 (quoting *Vongxay*, 594 F.3d at 1116). But what are these "historical gun restrictions"? A review of *Vongxay* reveals none. The only law cited was

33

a "current prohibition on felons in [Washington, D.C.'s] militia," *id.* at 1118, which does not establish a historical tradition, *see Bruen*, 597 U.S. at 66.

That leaves some scholars' endorsement of "virtue" theory. But the government does not deny that *Vongxay*'s sources derived "virtue" theory from "classical republican political philosophy." Don B. Kates, Jr., *The Second Amendment: A Dialogue,* 49 Law & Contemp. Probs. 143, 146 (1986); Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment,* 62 Tenn. L.Rev. 461, 480 (1995). That is not even arguably competent evidence under *Bruen*. This likely explains why, when asked at oral argument whether the government was "pulling in the virtuous citizenry," the Solicitor General said no. Transcript of Oral Argument at 12, United States v. Rahimi, No. 22-915.

Because *Vongxay* did not engage constitutional text and cited no historical regulations, the two are not just in "tension." *Contra* AAB-19. They are incommensurable. *Vongxay* is therefore overruled.

***Second***, it is not dispositive that *Bruen* decided a different issue than the one here. *Contra* AAB-15-18. Supreme Court precedent about one issue can overrule circuit precedent about another, so long as their "theory or reasoning" is "clearly irreconcilable." *Miller v. Gammie*, 335

34

F.3d 889, 900 (9th Cir. 2003) (en banc). Thus, a case about the law-abiding (*Bruen*) can overrule a case about lawbreakers (*Vongxay*) if the same "mode of analysis" applies to both. *Id.* Post-*Bruen*, the same mode of Second Amendment analysis covers all gun regulations: "Only" text and history validates a gun law. 597 U.S. at 17. Likewise, though *Bruen* itself did not determine who could carry a gun, it identified the "only" analysis courts can use to figure that out. *Id.* And though *Bruen* did not explicitly discuss *Heller*'s presumptively lawful regulations, it analyzed one such regulation—a concealed-carry license—using the "only" permissible touchstones. *Id.*; AOB-66-67. These analytical holdings are as binding as the Court's other holdings and overrule *Vongxay*'s contrary approach.

Furthermore, the *Miller* test does not require proof that *Vongxay*'s bottom-line conclusion is indisputably wrong, *contra* AAB-19—only that its "mode of analysis" is. *Miller*, 335 F.3d at 900. That makes sense. Why would a conclusion based on a hopelessly faulty premise deserve deference? Instead, when this Court identifies a fatal flaw in its prior analysis, it answers the question anew. *See, e.g.*, *Solorio-Ruiz v. Sessions*, 881 F.3d 733, 736–38 (9th Cir. 2018) (reanalyzing a categorical-approach question after Supreme Court clarifications).

35

**Third,** it is irrelevant that *Bruen* deemed circuits' text-and-history analyses to be "broadly consistent" with its clarified test. 597 U.S. at 19. For starters, *Vongxay* performed no text-and-history analysis. It was the first of many circuit cases to uphold *Heller*'s presumptively lawful regulations "without further analysis," i.e., without consulting text or history. *Young v. Hawaii*, 992 F.3d 765, 783 (9th Cir. 2021), *judgment vacated*, 142 S. Ct. 2895 (2022); AOB-65-66. Anyway, *Bruen* qualified that circuits' approaches were only "broadly" consistent—a far cry from validating every circuit opinion.

**Fourth,** it does not matter that some of *Bruen*'s concurrences and dissents reiterated *Heller*'s presumptively lawful list. *Contra* AAB-16. *Bruen*'s majority opinion showed that *Heller*'s listed regulations are subject to text-and-history review. AOB-66-67. The dissents and concurrences did not say otherwise, and even if they had, they would not control. And none of this has anything to do with whether *Vongxay* used the right mode of analysis. If the government is suggesting that this Court count votes instead of applying governing law, this Court must decline. The Fourth Circuit said it well when faced with similar arguments. "[I]f we have to choose between the outcome dictated by text, history, and tradition and the outcome hinted at in dicta, it is no

36

contest: Text, history, and tradition wins every time." *Maryland Shall Issue, Inc. v. Moore*, ___ F.4th ___, 2023 WL 8043827, at *5 (4th Cir. Nov. 21, 2023).

## CONCLUSION

This Court should reverse.

Respectfully submitted,


DATED: December 8, 2023      *s/Katie M. Hurrelbrink*
Katie M. Hurrelbrink
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California 92101
619.234.8467
Katie_Hurrelbrink@fd.org

Attorneys for Mr. Rojo

## CERTIFICATE OF COMPLIANCE

This brief contains 7,000 words, excluding the items exempted by Fed. R. App. P. 32(f). This brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6). I certify that this brief complies with the word limit of 9th Cir. Rule 32-1.

Respectfully submitted,

DATED: December 8, 2023       *s/Katie M. Hurrelbrink*

Katie M. Hurrelbrink
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California 92101
619.234.8467
Katie_Hurrelbrink@fd.org

Attorneys for Mr. Rojo